SEALED

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

2012 NOV -6  AM 9: 54

DEPUTY CLERK _____

| | |
|---|---|
| UNITED STATES OF AMERICA EX REL. CHRISTOPHER SEAN CAPSHAW <br><br> Relator <br><br> vs. <br><br> BRYAN K. WHITE, M.D., INDIVIDUALLY; BE GENTLE HOME HEALTH, INC. d/b/a PHOENIX HOME HEALTH CARE; SURESH KUMAR, INDIVIDUALLY; HOSPICE PLUS, L.P.; SABARI KUMAR, INDIVIDUALLY; REMANI B. KUMAR, M.D. INDIVIDUALLY; NORTH TEXAS BEST HOME HEALTH; A&S HOME HEALTH CARE; GOODWIN HOME HEALTH SERVICES, INC.; D. YALE SAGE, INDIVIDUALLY; KIRK SHORT, INDIVIDUALLY; SHEILA HALCROW A.K.A. SHEILA WATLEY/SHEILA TAYLOR, INDIVIDUALLY <br><br> Defendants | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**3-12CV-4457N**

Civil Action No.: _____

## RELATOR'S COMPLAINT FOR DAMAGES UNDER THE FALSE CLAIMS ACT
### 31 USC § 3729 ET SEQ.

COMES NOW the United States of America ex rel. Christopher Sean Capshaw

Relator/Plaintiff, and, pursuant to 31 U.S.C. § 3729, et seq., and other applicable rules and law,

files the instant Complaint against Bryan K. White, M.D., individually; Suresh Kumar,

Individually; Be Gentle Home Health, Inc. d/b/a Phoenix Home Health Care; North Texas Best

Home Health; A&S Home Health Care; Goodwin Home Health Services, Inc.; Hospice Plus,

L.P.; Goodwin Hospice, Inc.; D. Yale Sage, individually; Kirk Short, individually, Sheila

Halcrow a.k.a. Sheila Watley/Sheila Taylor, individually, for cause of claim would show as follows:

## I.
## PARTIES

1.     **Relator, Christopher Sean Capshaw** is an adult resident of Dallas County, Texas, residing at 4602 Rockaway, Dallas, Texas, 75214, who brings this action by virtue of being an original source of the information on which the allegations are based, having direct and independent knowledge on which these allegations are based.

2.     Relator is an insider to the scheme between the Part A Medicare participant companies (the White/Kumar companies, Defendants) and Part B participants (the American Physician House Calls ("APH"), American Physician House Calls Health Services ("APHHS")).

3.     Formally, Relator's position in APH was as Finance Director answering to Senior Vice President of Compliance, Chris McAdam. A graphical description of Relator's position as within APH is shown in Appendix E, taken from the files of information collected by Relator.

4.     Relator has direct and independent knowledge of the allegations herein and is disclosing to the United States substantially all of the evidence and information gathered by Relator upon discovering the scheme among the Defendants and the true relationship between the Defendants and APH/APHHS. Each of these entities and Defendants are more fully described below.

5.     Relator is serving upon the Government, pursuant to 31 USC 3730(b)(2) a written disclosure of substantially all material evidence and information the Relator possesses together with this Complaint. This evidence together with the information known by Relator reveal the scheme developed by the Defendants.

6.     **Defendant Bryan K. White, M.D.** is a natural person in Dallas, Texas, who may be served with process at 221 West Colorado Blvd., Suite 640, Dallas, Texas 75208. White is a central player in the scheme. He is: (1) part owner of all Part A Medicare participant companies, Defendants, (2) a significant lender to Part B participant APH, and (3) was the Medical Director for APHHS.

7.     **Defendant Suresh Kumar** is a natural person domiciled in Dallas, Texas, who may be served with process at 5550 Harvest Hill Road, Suite 125, Dallas, Texas 75230. Kumar is a central player in the scheme. He is: (1) part owner or manager of all Part A Medicare participant companies, Defendants, (2) a significant investor in Part B Medicare participant APH, and (3) was the manager for all of the White/Kumar owned business (whether personally or through his relatives).

8.     **Defendant Be Gentle Home Health, Inc**. (hereinafter "Be Gentle") is a Texas corporation, which may be served with process at Suresh Kumar, Registered Agent, 5550 Harvest Hill Road, Suite 125, Dallas, Texas 75230. Be Gentle is a Part A Medicare participant company owned primarily by White and Kumar (with Defendants Kirk Short and Yale Sage having some ownership interest given as a kickback), and is managed by Kumar.

9.     **Defendant Phoenix Home Health Care** is a d/b/a of Be Gentle Home Health, Inc. (hereinafter "Phoenix") and it may be served at its original place of business, 5550 Harvest Hill Road, Suite 125, Dallas, Texas 75230.

10.     **Defendant North Texas Best Home Healthcare Inc.** (hereinafter "North Texas Best") is a domestic for-profit corporation that may be served with process at Sabari Kumar, 2629 Serenity Ct., Carrollton, Texas 75010. North Texas Best is a Part A Medicare participant company owned by White and managed by Kumar.

11.    **Defendant A&S Home Health Care** (hereinafter "A&S) is a Texas corporation, which may be served with process at 17826 Davenport Rd., Suite A, Dallas, Texas 75252. A & S is a Part A Medicare participant company owned by White and managed by Kumar.

12.    **Goodwin Home Health Services, Inc.** (hereinafter "Goodwin") is a corporation that may be served with process at Mayub Malik, 1909 Kensington Drive, Carrollton, Texas 75007. Goodwin Home Health is a Part A Medicare participant company owned by White and Kumar, and managed by Kumar.

13.    **Hospice Plus, L.P.** (hereinafter "Hospice Plus") is a domestic limited partnership (LP) which may be served with process at CT Corporation System, 350 North St. Paul Street, Suite 2900, Dallas, Texas 75201-4234. Hospice Plus is a Part A Medicare participant company owned by White and Kumar, and managed by Kumar.

14.    **Goodwin Hospice Inc.** (hereafter "Goodwin Hospice") is a corporation that may be served with process at 3100 McKinnon St. Suite 200, Dallas, Texas 75201. Goodwin Hospice is a Part A Medicare participant company owned by White and Kumar, and managed by Kumar.

15.    **Defendant Dan Yale Sage** (hereinafter "Sage") is a natural person domiciled in Dallas, Texas who may be served with process at 5727 W. Hanover Ave., Dallas, Texas 75209-3429. Sage was the primary owner and manager of Part B Medicare participant APH, and is also part owner of Part A Medicare participant, Be Gentle Home Health, Inc.

16.    **Defendant Kirk Short** (hereinafter "Short") is a natural person domiciled in Dallas, Texas who may be served with process at 6722 Blue Valley Lane, Dallas, Texas 75214-2716. Short managed Part B Medicare participant APH, and is a part owner of Part A Medicare participant, Be Gentle Home Health, Inc.

17.     **Defendant Sheila Halcrow,** a.k.a. Sheila Watley/Sheila Taylor (hereinafter "Halcrow") is a natural person domiciled in Dallas, Texas who may be served with process at 2835 Villa Creek Drive, Apt. 213, Dallas, Texas 75234-7447. Halcrow managed Part B Medicare participant APH, and controlled all APHHS doctors, mandating referrals be directed to one of the Defendant Part A Medicare participant companies.

18.     The web of parties is complicated by the corporate identities whose names do not reveal the common interests and ownership and interests of the Defendants White, Kumar, Sage, Short, and Halcrow. The flowchart of the scheme, attached as Appendix I, illustrates the connection.

## NON-PARTY CO-CONSPIRATORS

19.     **Sage Physician Partners, Inc. d/b/a American Physician Housecalls** ("APH") is a for-profit business formerly owned primarily by Dan Yale Sage (Defendant herein), Kirk Short (Defendant herein) Suresh Kumar (Defendant herein) and a number of other individual shareholders.

20.     Relator has tendered in his disclosure statement to the United States the stock and debt holders names and stakes in APH.  APH is now bankrupt and out of business.

21.     None of the scheme alleged herein was disclosed in the bankruptcy APH.

22.     APH was a for profit corporation with a singular purpose, to manage APHHS, whose only employees were physicians. Defendant Sheila Halcrow coordinated the physician referrals complained of herein by APHHS physicians.

23.     Halcrow was employed by APH and coordinated the physician referrals under the APHHS Medical Director, Defendant Bryan White, M.D.

24.     **American Physician Housecalls Health Services, Inc.** (herein referred to as "APHHS") is a corporation organized as a non-profit that functioned to employ doctors and care providers. These employees of APHHS provided certifications, re-certifications and orders necessary to effectuate the referrals of Part A eligible patients to populate the White/Kumar owned Defendant Part A Medicare participant companies in violation of Stark law and the Anti-Kickback statute.

25.     The type of patient referred by APHHS personnel to the White/Kumar Part A companies were patients that did not already have an existing relationship with another similar Part A Medicare provider.

26.     In addition to the scheme as outlined by Appendix I, the APHHS physicians submitted false claims related to Care Plan Oversights (CPO) for patients that were referred by APHHS to the White/Kumar Part A companies. The CPO funds were used, in addition to the kickback loans and investment from White and Kumar, to sustain the business of APH and APHHS, so that these failing Part B companies could continue to be a source of illegal referrals to the White/Kumar Part A Defendant companies.

27.     To be clear, APH and APHHS were not profitable and the business model they could have legitimately operated under was not sustainable. However, in order to keep the referral pipeline flowing, White and Kumar invested millions of dollars with no hope for any monetary return. A description of the debt instruments from APH's own files is attached here as Appendix F. Though titled "expired" debt instruments, the terms reveal that 13 of the 14 instruments were "extended indefinitely," which is evidence the loans were never intended to be paid in the ordinary course of business by APH.

28.     In essence, the profitable Part A Medicare providers threw good-money-after-bad to keep the fledgling Part B Medicare participant APH/APHHS provider afloat in order to continue the illegal referrals scheme.

29.     The party Defendants together with the non-parties described here acted in a conspiracy to violate the False Claims Act through express and implied false certification that Stark law and the Anti-Kickback statute were being complied with when in fact they were being violated habitually, and in the ordinary course of business under the scheme.

## II.
## TABLE OF RELATOR'S APPENDIX

A.  Medicare Enrollment Application (Form 8551) containing Certification Statement – *See* p. 25.

B.  Spreadsheet tracking 1.75 years of referrals to Non-Hospice Providers.  The scheme lasted approximately 6 years in total.  (None of the Hospice referrals are included in this document).

C.  Superbill excerpts, includes specific patients referred in violation of the Anti-Kickback Statute and Stark law and shows actual payments by Medicare for the services in violation of the False Claims Act.  The full text Superbill is over 4000 pages.

D.  Hospice Plus Monthly Billing Statement showing payments by Medicare of over $29.3 million during 3.25 years of the 6 year scheme.  Approximately $14.6 million of the payments in that period were paid through false claims generated by the scheme described below.  The balance of the 6 year scheme includes 5 additional Medicare Part A facilities.

E.  Organization Chart for APH showing Relator's connection to the entities involved.

F.  Debt Chart identifying some of the debt instruments used to keep APHHS and APH operating during the scheme and demonstrating the financial relationship between the Medicare Part A Defendants and the Medicare Part B entities.

G.  APH Family of Companies from the files of APH.

H.  Citymark Lease.

I.  Flowchart of the Scheme.

## II.
## NATURE OF THE CASE

30.     This case involves a conspiracy to commit violations of the Federal Anti-Kickback statute and Stark law, which resulted in violations of the False Claims Act by Defendants. This action is brought by Relator pursuant to the *qui tam* provision of 31 U.S.C. 3729 *et seq.,* the False Claims Act.

31.     Defendants, directly and through conspiracy, made material false statements to Medicare in order to receive payment on Medicare claims. The material false statements were (1) false express certifications made as a condition of *payment* that all claims and underlying transactions complied with the Federal Anti-Kickback statute, Stark law, and other such law; and, (2) implied false certification when *billing* Medicare that all claims and underlying transactions complied with the Federal Anti-kickback statute, Stark law, and other such law.

32.     These false certifications were made through a web of Part A and Part B Medicare participants involved in a scheme of referrals and kickbacks. The scheme is illustrated by the flowchart attached as Appendix I.

33.     In essence, Defendants Bryan White and Suresh Kumar, together with Defendants Yale Sage, Kirk Short, and Sheila Halcrow, knowingly set up a system of kickbacks and illegal referrals.  In this scheme a financially unviable Part B Medicare participant company primarily

8

owned by Sage, and managed by Sage, Short, and Halcrow (specifically, American Physician House Calls ("APH") and its non-profit arm, American Physician House Calls Health Services ("APHHS")) were used as tools to significantly increase referrals and, thereby Part A Medicare payments, to the White/Kumar owned Part A Medicare participant companies (specifically, Be Gentle Home Health, Inc. d/b/a Phoenix Home Health Care, North Texas Best Home Health, A&S Home Health Care, Goodwin Home Health Services, Inc., Hospice Plus, L.P., Goodwin Hospice, which are all Defendants in this case).

34.    The illegal kickbacks to Sage, Short, and Halcrow from White and Kumar in the scheme include: (1) equity interest for Sage and Short in at least one White/Kumar owned company (Be Gentle d/b/a Phoenix), (2) loans from White to APH (primarily owned by Sage) which were never intended to be repaid, and in fact were never repaid, (3) and leased spaced for APH for which rent was not paid on a monthly basis.

35.    The self-interested illegal referrals include (1) a steady stream of original referrals and re-certification referrals to the White/Kumar owned Part A companies from the Sage owned Part B companies (APH/APHHS) managed by Sage, Short, and Halcrow, and (2) referrals back to the Sage owned Part B companies (APH/APHHS) from the White/Kumar owned Part A companies for re-certification.

36.    The illegal purpose, which the evidence shows that White, Kumar, Sage, Short, and Halcrow all had the requite knowledge, was to maintain the cycle of self-interested referrals to the White/Kumar owned Part A Medicare participant companies in order to substantially bill and receive payment from Medicare.

37.    As a result of this scheme, the White/Kumar owned Part A companies were able to bill Medicare an astronomical amount of money through claims that were falsely certified.

Specifically, the White/Kumar Part A companies received Medicare payments in excess of $100,000,000.00 from 2006 to 2012, based on the personal knowledge of Relator and an analysis of internal documents provided in Appendix B, D, by Relator, the finance Director of APH.

38.     Under the False Claims Act the consequential civil penalties and damages for this scheme are substantial. Each individual false claim (of which there are tens of thousands) creates liability in civil penalties of between $5,500.00 and $11,500.00 per false claim (when adjusted for inflation), plus 3 times the amount of damages the Government sustained, which again, is well in excess of $100,000,000.00.

39.     This action is filed by Relator Christopher Sean Capshaw on behalf of the United States of America. Relator has personal knowledge of the scheme including documentation detailing the specific scheme of illegal referrals and the amounts paid by Medicare as a result of this scheme. Through the attached appendices and disclosure statement, Relator is providing over 30 gigabytes of detailed information and proof in support of these claims. This information provides the identity, subject, places, dates, and amount of money involved in the corpus of the scheme.

40.     Since the collapse of APH and APHHS, the individual Defendants have resurrected the scheme for the benefit of the Medicare Part A Defendants. Sheila Halcrow fills the same role in the new company as she did in APH.

### III.

### JURISDICTION

41.     Relator brings this action in the name of the United States of America. The federal district court has original jurisdiction in this proceeding pursuant to Section 31 U.S.C. Title 3729 and 3730, in this civil action arising under the Federal laws of the United States. Relator is not a present or former member of the government including Congress, the

Executive branch or the armed forces. No Defendant is a member of the government. No claim herein is the subject of any other federal criminal, civil or administrative hearing. No claim herein has been otherwise publicly disclosed. The Relator himself, a true innocent insider, is the original source of all information provided here and information provided in his disclosure statement to the United States. The requisite disclosure statement is being provided to the United States. All conditions precedent have been met. This complaint is filed under seal Pursuant to 31 U.S.C. 3730(b)(2)

## IV.
## VENUE

42.     The venue is proper in this District by virtue of Title 28 Section 1391(b) in that all of the Defendants maintain an office and principal place of business and are subject to personal jurisdiction in the District as a result of conducting substantial business in the District.

## V.
## LAW

43.     Under Federal law, a conspiracy to commit knowingly false certification of compliance (with the Anti-Kickback and Stark law) when seeking payment and/or billing a Federal Government Program (such as Medicare)--as a matter of law--is a conspiracy to commit legally false claims under the False Claims Act, when the certification is a prerequisite for payment.

44.     Therefore, as a matter of law, express certifications which are a condition of *payment* from Medicare that are false, as well all implied false certifications made when *billing* Medicare create liability under the False Claims Act.

**Materiality of the False Certifications**

45.     Furthermore, as a matter of law, when a false certification of compliance (with the Anti-Kickback and Stark law) is a "condition of payment," the false certification is "material" within the meaning of the False Claims Act. Federal Courts have recognized that if Medicare knew the certification of compliance was false, it would refuse to pay.

**The False Claims Act**

The False Claims Act (FCA) provides, in pertinent part that:

> (a)Liability for certain acts.--In general [] (1) Any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false for fraudulent claim; (C) conspires to commit a violation...; (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government,
>
> ***
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of that person ....
>
> (b) For purposes of this section--(1) the terms "knowing" and "knowingly"--(A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information, and (B) require no proof of the specific intent to defraud.

31 U.S.C. § 3729.

46.     In this case, the false certifications made to Medicare were that the Anti-Kickback Statue and Stark Law were complied with when in fact they were not.

**The Anti-Kickback Statute**

47.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that payoffs to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of the program from these difficult-to-detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No.1 00-93.

48.     The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally- funded medical services, including services provided under the Medicare and Medicaid programs with both civil and criminal penalties.

Under 42 U.S.C.A. § 1320a-7a Civil Monetary Penalties:

(a) Improperly filed claims

Any person (including an organization, agency, or other entity, but excluding a beneficiary, as defined in subsection (i)(5) of this section) that--

(8) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim for payment for items and services furnished under a Federal health care program;...

shall be subject, in addition to any other penalties that may be prescribed by law, to a civil money penalty of not more than $10,000 for each item or service...[or]$50,000 for

each such act, in cases under paragraph (8)....In addition, such a person shall be subject to an assessment of not more than 3 times the amount claimed for each such item or service in lieu of damages sustained by the United States or a State agency because of such claim

Under 42 U.S.C.A. § 1320a-7b Criminal Penalties for Acts Involving Federal Health Care Programs

(b) Illegal remuneration

(1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person --

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

49.    Violation of the statute can also subject the perpetrator to exclusion from

participation in federal health care programs and, effective August 6, 1997, civil monetary

penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. §

14

1320a- 7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

## Stark Law

50.    Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "Stark Statute") prohibits a hospital (or other entity providing healthcare items or services) from submitting Medicare claims for payment based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with the healthcare provider. The regulations implementing 42 U.S.C. § 1395nn expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

51.    The Stark Statute establishes the clear rule that the United States will not pay for items or services prescribed by physicians who have improper financial relationships with other providers. The statute was designed specifically to reduce the loss suffered by the Medicare program due to such increased questionable utilization of services.

52.    Congress enacted the Stark Statute in three parts, commonly known as Stark I, Stark II and most recently Stark III (Stark III is actually just a new phase of Stark II). Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

53.    In 1993, Congress extended the Stark Statute (Stark II) to referrals for ten additional designated health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

54.    As of January 1, 1995, Stark II applied to patient referrals by physicians with a prohibited financial relationship for the "designated health services" which included inpatient

and outpatient hospital services. *See* 42 U.S.C. § 1395nn(h)(6).

In pertinent part, the Stark Statute provides:

(a) Prohibition of certain referrals

(1) In general

Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then --

(A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payer, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn.17.

55.    The Stark Statute broadly defines prohibited financial relationships to include any "compensation" paid directly or indirectly to a referring physician. The statute's exceptions then identify specific transactions that will not trigger its referral and billing prohibitions. Those exceptions do not apply in this case.

56.    Violation of the statute may subject the physician and the billing entity to exclusion from participation in federal health care programs and various financial penalties, including (a) a civil money penalty of $15,000 for each service included in a claim for which the entity knew or should have known that payment should not be made under Section 1395nn(g); and (b) an assessment of three times the amount claimed for a service rendered pursuant to a referral the entity knew or should have known was prohibited. *See* 42 U.S.C. §§ 1395nn(g), 1320a-7a(a).

**The Medicare and Medicaid Programs**

57.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A.

58.     Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. See 42 U.S.C. §§ 1395c-1395i-4.

59.     Part B of the Medicare Program authorizes payment for medically necessary doctor's services, outpatient care, and most other services that Part A does not cover such as home health care services. See 42 U.S.C. §§ 1395c-1395i-4.

60.     HHS is responsible for the administration and supervision of the Medicare program. The Centers for Medicare and Medicaid Services (CMS) is an agency of HHS and is directly responsible for the administration of the Medicare program.

61.     Under the Medicare program, CMS makes payments retrospectively (after the services are rendered) to healthcare providers for inpatient and outpatient services. Medicare enters into provider agreements with the healthcare providers in order to establish the providers' eligibility to participate in the Medicare program. However, Medicare does not prospectively contract with hospitals to provide particular services for particular patients. Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

62.     As detailed below, Defendants submitted or caused to be submitted claims both for specific services provided to individual beneficiaries as a result of referrals in violation of the Stark law and Anti-Kickback Legislation whereupon the Defendants' bills to Medicare incurred in treating these Medicare beneficiaries were paid by Medicare.

## VI.
## FACTUAL PREDICATE AND BACKGROUND
### The Co-Conspirators' Scheme (Who, What, When, Where, How, and Scienter).

Paragraphs 1-62 are incorporated herein as if fully set forth.

**Co-Conspirators (Who):**

63.     In this case, Suresh Kumar, Bryan K. White, D. Yale Sage, Kirk Short and Sheila Halcrow are the principals in the fraudulent scheme alleged in this Complaint.

64.     The Part A Medicare participant companies, specifically, Be Gentle Home Health, Inc. d/b/a Phoenix Home Health Care, North Texas Best Home Health, A&S Home Health Care, Goodwin Home Health Services, Inc., Hospice Plus, L.P., Goodwin Hospice, which are all Defendants, were all involved in the scheme.

65.     The Part B Medicare participants companies, specifically, American Physician House Calls ("APH") and its non-profit arm, American Physician House Calls Health Services ("APHHS") were involve in the scheme, but are not defendants in this case only because they are now bankrupt entities.

66.     The ownership and management of the Part A and Part B companies reveal the following:

Bryan K. White

Bryan K. White owned in whole or in part the following Part A Medicare participant companies: Be Gentle Home Health, Inc. d/b/a Phoenix Home Health Care, North Texas Best Home Health, A&S Home Health Care, Goodwin Home Health Services, Inc., Hospice Plus, L.P., Goodwin Hospice. Bryan White also directed the physicians employed by Part B Medicare Participant APHHS in his position as Director of Medicine of APHHS.

Suresh Kumar

Suresh Kumar owned in whole or in part the following Part A Medicare participant companies: Be Gentle Home Health, Inc. d/b/a Phoenix Home Health Care, Goodwin Home Health Services, Inc., Hospice Plus, L.P. Suresh Kumar also was a substantial investor in Part B Medicare Participant APH. Kumar also managed (personally or through his family relations), Be Gentle Home Health, Inc. d/b/a Phoenix Home Health Care, North Texas Best Home Health, A&S Home Health Care, Goodwin Home Health Services, Inc., Hospice Plus, L.P., Goodwin Hospice.

Dan Yale Sage

Dan Yale Sage owned, in part, the following Part A Medicare participant company, Be Gentle Home Health, Inc. d/b/a Phoenix Home Health Care. Sage also was the primary owner of Part B Medicare Participant company, American Physician House Calls (APH). Sage was also a primary manager of APH, and therefore APHHS, which had a sole management agreement to manage APH.

Kirk Short

Kirk Short owned, in part, the following Part A Medicare participant company, Be Gentle Home Health, Inc. d/b/a Phoenix Home Health Care. Short also was a stakeholder of Part B Medicare Participant company, American Physician House Calls (APH). Short was also a primary manager of APH, and therefore APHHS, which had a sole management agreement to manage APH.

Sheila Halcrow

Sheila Halcrow also was a stakeholder of Part B Medicare Participant company, American Physician House Calls (APH). Halcrow was also a primary manager of APH, and therefore APHHS, which had a sole management agreement to manage APH.

**The Scheme (What & How):**

67.    This scheme, in essence, was a conspiracy to commit violations of the Federal Anti-Kickback statute and Stark law, which resulted in violations of the False Claims Act by Defendants.

68.    Defendants, directly and through conspiracy, made material false statements to Medicare in order to receive payment on Medicare claims. The material false statements were express certifications, which were made as a *condition of payment*, made by the doctors in their Medicare Enrollment Application and ongoing reapplication. The express certification, specifically states:

> "I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable condition of participation in Medicare."

69.    In addition, Defendants also made a implied false certifications when *billing* Medicare that all claims and underlying transactions complied with the Federal Anti-kickback statute, Stark law, and other such laws.

70.    In order to guarantee a steady stream of referrals to the White/Kumar Part A Medicare participant companies, illegal kickbacks were made to Sage, Short, and Halcrow from White and Kumar (in violation of the Anti-Kickback statute). Specifically, Kickbacks include (1) equity interest for Sage and Short in at least one White/Kumar owned company (Be Gentle d/b/a

Phoenix), (2) loans from White to APH (primarily owned by Sage) that were never intended to be repaid, which is evidenced by the Debt Instrument Chart, attached as Appendix F, and (3) leased spaced for APH for which monthly rent was never paid, which is evidenced by The City Mark Lease attached as Appendix H.

71. The self-interested illegal referrals made to and from Defendants include (1) a steady stream of original referrals and re-certification referrals to the White/Kumar owned Part A companies from the Sage owned Part B companies (APH/APHHS) managed by Sage, Short, and Halcrow, which is evidenced by the Referral Spreadsheet attached as Appendix B; and (2) referrals sent back to the Sage owned Part B companies (APH/APHHS) from the White/Kumar owned Part A companies for re-certification, which is evidenced by The SuperBill document showing billing to Medicare, excerpts of which are attached as Appendix C.

72. The illegal purpose was to maintain the cycle of self-interested referrals to the White/Kumar owned Part A Medicare participant companies in order to substantially bill and receive payment from Medicare.

73. As a result of this scheme, the White/Kumar owned Part A companies were able to bill Medicare an astronomical amount of money through claims that were falsely certified. Relator's analysis, as the Director of Finance for APH, is that the combined Medicare payments put the amount received as a direct result of the false certification upwards of $100,000,000.00. This analysis is further evidenced by The Summary of The Hospice Plus Monthly Billing Statements which is attached as Appendix D, as well as the personal knowledge of Relator.

74. The Flowchart below, which is also attached as Appendix I, has been inserted to clarify how the scheme worked. But for this scheme, the government would not have paid the billings by the Defendants.

21



**Medicare**

False Claims (on billing) due to implied false certification that claims are not the product of improper referrals in violation of Stark law and Anti-Kickback Statute

False Claims (on payment) due to express false certication (found on NPI) that claims are not the product of improper referrels that violate Stark law and Anti-Kickback Statute

*Medicare Part A*

*Medicare Part B*

Part A Businesses owned by **Bryan White & Shuresh Kumar**

PART B Business propped up By **White** loans & **Kumar** investment

Businesses which are all owned by **White** and/or **Kumar**, and are all managed by **Kumar** (or **Kumar's** relatives)

**AMERICAN PHYSICIANS HOUSECALLS (APH)**

Managed by **Yale Sage, Kirk Short**, & **Sheila Halcrow** Halcrow controlled APHHS physicians and mandated a certain class of referrals by APHHS physicians to **White/Kumar** owned companies.

**BE GENTLE D/B/A PHOENIX HOME HEALTH CARE** owned by White & Kumar (Sage & Short have ownership interest)

**NORTH TEXAS BEST HOME HEALTH** owned by White

**A + S HOME HEALTH CARE** owned by White

**GOODWIN HOME HEALTH SERVICES, INC.** owned by White & Kumar

**HOSPICE PLUS** owned by White & Kumar

**GOODWIN HOSPICE** owned by White & Kumar

**Referral Scheme in Violation of Stark law and Anti-Kickback Statute**

Sole member management contract

**AMERICAN PHYSICIANS HOUSECALLS HEALTH SERVICES (APHHS)**; (501(a) non-profit arm of APH)

APHHS doctors refer to White/Kumar owned home care companies (with Form HCFA-485 certification of necessity), and refer to White/Kumar owned hospice companies via doctor's order. Referrals include original and re-certification referrals

**White**, Director of Medicine APHHS. APHHS employed physicians, who were controlled by **White** and **Halcrow**. who mandated that all referrals, for patients without prior Part A facility relationship, be to **White/Kumar** owned companies.

Referrals back from **White/ Kumar** owned home care and hospice companies to APHHS doctors for re-certification, Form 485's and orders, every 60 days

22

75.    Importantly, Sheila Halcrow was employed by APH but handled the administrative duties related to patient record keeping and referrals for APHHS as well. Bryan White, as the Medical Director for APHHS, controlled the APHHS physicians through daily directions given by Sheila Halcrow.

76.    When a patient did not have a prior existing relationship with a Part A Medicare participant company, Sheila instructed the APHHS physicians to refer the patient to the appropriate White/Kumar owned Part A companies in a controlled manner so as not to arouse the suspicion any curious government employees or outsiders. The initial certification of necessity for services by the APHHS physicians (made via an HCFA form 485 for the home care companies, and Orders for the hospice companies) were made habitually, by mandate, so that the White/Kumar Part A companies could continue to make claims to Medicare and receive payment.

77.    For patients in need of Hospice services, only a doctor's or Medical Director's order is necessary (as opposed to the HCFA-485 form) for the referral to a Medicare Part A facility. In these instances, patients cared for by physicians were referred to Hospice Plus and Goodwin Hospice, which are also White/ Kumar owned companies.

78.    When the Medicare Part A patients needed recertification of necessity for services provided by the Part A Defendants companies, the patient was referred back to the physician for recertification. The recertification was signed by the actual physician directed by Halcrow who often had consent from some physicians to sign their names, in some instances.

79.    Furthermore, through this cycle, the Part A Defendant companies were able to continue to bill Medicare for this class of patients again and again.

80.     All *payments* made by Medicare in connection with these referrals from each of the Part A Medicare Defendant entities are express violations of the Certification Statement by each Defendant in each of their Medicare Enrollment Applications that state in pertinent part:

> "I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable condition of participation in Medicare."

This is evidenced by the Medical Enrollment Application attached as Appendix A. *See* p.25.

81.     All *billing* to Medicare in connection with these referrals are implied violations of the Certification Statement by each Defendant (including billing by or through the Defendant entities) in each of their Medicare Enrollment Applications that state in pertinent part:

> "I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 4A of this application."

*See id* at 25.

82.     Hospice Plus provides an example to measure the amount of damages involved in this False Claims scheme.  In only a 3.25 year period, at least 50 percent of Hospice Plus patients came from referrals by APPHS employees.  For that period alone, Hospice Plus (which is only one Part A provider Defendant) was paid over $29,300,000.00 from Medicare. This is evidenced The Summary of The Hospice Plus Monthly Billing Statements which is attached as Appendix D. Based on the analysis and the personal knowledge of the Relator, Hospice Plus was one of the smaller entities involved in this scheme.

83.     During the time where the scheme was in operation, APH and APHHS were not profitable and were steadily losing money. However, the Part A White/Kumar owned companies (like Hospice Plus) were profiting significantly from the referrals by APHHS employees.

84.     In order to sustain the stream of referrals and re-certifications by APHHS employees, White "propped up" APH and APHHS through a series of debt instruments and loans. By the time APH failed, White personally provided approximately $1,900,000 in loans to fund the APH/APHHS operation. There is no evidence that any of the loans were repaid or were ever intended to be repaid. One of the promissory notes through which White funneled money to APH was a backdated note executed just prior to the Bankruptcy filings of these entities. In addition to this back-dated note, APH documents reveal a schedule of the debt instruments; the terms of those instruments were extended "indefinitely". This is evidenced by The Debt Instrument Chart attached as Appendix F.

**Dates of the Overall Scheme and Individual Referral Transactions (When)**

85.     There are two levels of "when" the scheme occurred. In the most broad sense, the scheme began in on or about 2006 until on or about May of 2012. All referrals by APHHS physicians to all Medicare Part A Defendants, and all billing associated with each patient referred represents violations of the False Claims Act (and violations of the Anti-Kickback Statute and Stark law).

86.     On a more individualized level, meaning per patient, the referrals occurred in accordance with the referral transaction, which can be seen by way of example, in Appendix B.

**Location of the Scheme (Where)**

87.     In the most broad sense, the scheme transpired in the Northern District of Texas.

More specifically, scheme unfolded at location of the Defendants offices and the offices of APH

and APHHS, which are as follows:

3100 McKinnon, Suite 400, Dallas, Texas, in addition to each Medicare Part A

Defendants' address, described above and incorporated herein, under the heading "Parties."

**Evidence of Scienter ("Knowingly")**

88.     Bryan K. White, Suresh Kumar, Dan Yale Sage, Kirk Short and Sheila Halcrow

all played a role in causing false claims to be presented to Medicare. Specifically, they caused all

the physicians who worked for APHHS throughout the duration of the scheme, who are listed in

the extreme right column of the spreadsheet attached as Appendix B and incorporated herein (as

well as any other similarly situated APHHS physician not listed), to make certifications that were

false. Moreover, Bryan K. White, Suresh Kumar, Dan Yale Sage, Kirk Short and Sheila Halcrow

knowingly caused these false certification to be made in furtherance of the scheme. The included

evidence specifically shows that White, Kumar, Sage, Short, and Halcrow had actual knowledge,

or acted with deliberate ignorance, of the false certifications being made to Medicare (and the

underlying violations of the Anti-Kickback statute and Stark law) in order to effectuate the

scheme and obtain payment to the Part A Medicare Defendants.

**VII.**
**COUNTS**

**Count I--False Claims Act, 31 U.S.C. § 3729(a)(1)**

**Presenting Claims to Medicare and Medicaid for Services Rendered as a Result of
Kickbacks**

89.     Relator incorporates by reference paragraphs 1-89 of this complaint as if fully set

forth.

90.    Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States, including claims for payments and/or reimbursement for services rendered to patients unlawfully referred to by physicians and others to whom defendants provided kickbacks and/or illegal remuneration and/or with whom defendants entered into prohibited financial relationships in violation of the Anti- Kickback Statute and the Stark Statute.

91.    By virtue of the false or fraudulent claims defendants caused to be made, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,500 for each violation. Each bill for each patient paid by Medicare that followed the referrals is an individual violation.

## Count II--False Claims Act, 31 *V.S.C.* § 3729(a)(2)

### Use of False Statements

92.    Relator incorporates by reference paragraphs 1-91 of this complaint as if fully set forth.

93.    Defendants knowingly made, used, and caused to be made or used, false records or statements.

94.    By virtue of the false or fraudulent claims defendants knowingly caused to be made, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,500 for each violation. Each bill for each patient paid by Medicare that followed the referrals is an individual violation.

### Count III--False Claims Act, 31 *V.S.C.* § 3729(a)(3)

### Conspiracy to Submit False Claims

95.    Relator incorporates by reference paragraphs 1-94 of this complaint as if fully set forth.

96.    Defendants entered into agreements with certain physicians and conspired to defraud the United States by causing the submission of false or fraudulent claims for payment and/or reimbursement from the United States for monies to which they were not entitled, in violation of 31U.S.C.§3729(a)(3).

97.    As part of the schemes and agreements to obtain payment and/or reimbursement from the United States in violation of federal laws, defendants conspired to provide kickbacks and illegal remuneration to each other, to physicians, and others, and to engage in prohibited financial relationships with physicians and others in violation of the Stark Law and Anti-Kickback statute--*i.e.,* the false certifications and representations made and caused to be made by defendants when submitting the false claims for payments and the false certifications made and caused to be made by defendants in submitting the cost reports as well as false entries in medical records--to get false or fraudulent claims paid and approved by the United States.

98.    By virtue of the false or fraudulent claims made by the defendants, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,500 for each violation. Each bill for each patient paid by Medicare that followed the referrals is an individual violation.

### VII.
### PRAYER FOR RELIEF

WHEREFORE, Plaintiff/Relator demands judgment against the Defendants, requesting relief as follows:

1.  Find for the Plaintiff and award treble damages or any other applicable provision of law, including any alternate remedy provisions for each false or fraudulent charge, or overcharge, submitted for payment to the United States government;

2.  Awarding civil penalties against the Defendants each jointly and severally in an amount between Five Thousand, Five Hundred Dollars ($5,500.00) and Eleven Thousand Dollars ($11,500.00) for each violation of 31 U.S.C. §3729, et seq.; of 2 U.S.C.§1320a-7b(b), and other Anti-Kickback Statutes; of 45 C.F.R. 46, et seq.; of the Settlement Agreement with the Office of Inspector General Department of Health and Human Services; or such other maximum amount allowed by law.

3.  Award all actual damages.

4.  Award costs and reasonable attorneys fees.

5.  Award other such relief as may be just.

Respectfully submitted,

**TED B. LYON & ASSOCIATES, P.C.**

By: _____

**TED B. LYON**
State Bar No. 12741500
tblyon@tedlyon.com
**MARQUETTE WOLF**
State Bar No. 00797685
mwolf@tedlyon.com
18601 LBJ Freeway, Suite 525
Mesquite, Texas  75150
Phone (972) 279-6571
Fax     (972) 279-3021

CAPSHAW & ASSOCIATES

By: _____

    RICHARD A. CAPSHAW
    State Bar No. 03783800

    3031 Allen Street, Suite 201
    Dallas, Texas 75204
    (214) 761-6610
    (214) 761-6611 Facsimile
    richard@capslaw.com

    **ATTORNEYS FOR RELATOR**