SEALED



CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2014 MAY 20 PM 12: 22

DEPUTY CLERK_____

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| UNDER SEAL §<br>§<br>    Plaintiffs, §<br>§<br>vs. §<br>§<br>UNDER SEAL §<br>    Defendants. §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 3-12CV-4457N<br><br>(Consolidated with No. 3-13-cv-3392-B)<br><br>FILED UNDER SEAL<br>DO NOT PUT IN PACER<br><br>JOINT AMENDED COMPLAINT<br>PURSUANT TO 31 U.S.C §§ 3729-<br>3732, FEDERAL FALSE CLAIMS ACT<br>AND TEX. HUM. RES. CODE<br>§ 32.039(a)-(b) AND TEX. HUM.<br>RES. CODE § 36.002, TEXAS<br>MEDICAID FRAUD PREVENTION ACT<br><br><br>JURY TRIAL DEMANDED |

<u>**RELATORS' JOINT AMENDED COMPLAINT**</u>

## FILED UNDER SEAL

JOINT AMENDED COMPLAINT                                 i

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

UNITED STATES OF AMERICA
*Ex rel.* CHRISTOPHER SEAN
CAPSHAW, KEVIN BRYAN, AND
FRANKLIN BROCK WENDT

and

STATE OF TEXAS
*Ex rel.* CHRISTOPHER SEAN
CAPSHAW, KEVIN BRYAN, AND
FRANKLIN BROCK WENDT

 Plaintiffs,

vs.

BRYAN K. WHITE, M.D.; BE GENTLE
HOMEHEALTH, INC. also d/b/a PHOENIX
HOME HEALTHCARE; SURESH G.
KUMAR, R.N.; HOSPICE PLUS, LP.;
GOODWIN HOSPICE, LLC; SABARI
KUMAR; REMANI B. KUMAR, a/k/a
REMANI AMMA; NORTH TEXAS BEST
HOME HEALTH; VINAYAKA
ASSOCIATES, LLC, d/b/a A&S HOME
HEALTH CARE; GOODWIN HOME
HEALTHCARE SERVICES, INC.; D. YALE
SAGE; KIRK SHORT; SHEILA HALCROW
a/k/a SHEILA WATLEY/SHEILA
TAYLOR/SHEILA O'BRIEN;
INTERNATIONAL TUTORING SERVICES,
LLC, f/k/a INTERNATIONAL TUTORING
SERVICES, INC., and d/b/a HOSPICE
PLUS; and CURO HEALTH SERVICES,
LLC f/k/a CURO HEALTH SERVICES,
INC.,

 Defendants.

CIVIL ACTION NO.3-12CV-4457N

(Consolidated with No. 3-13-cv-3392-B)


FILED UNDER SEAL
DO NOT PUT IN PACER


JOINT AMENDED COMPLAINT
PURSUANT TO 31 U.S.C §§ 3729-
3732, FEDERAL FALSE CLAIMS ACT,
AND TEX. HUM. RES. CODE
§ 32.039(A)-(B) AND TEX. HUM.
RES. CODE § 36.002, TEXAS
MEDICAID FRAUD PREVENTION ACT


JURY TRIAL DEMANDED

## TABLE OF CONTENTS

I.      SUMMARY ............................................................................................1

      A.      Sham Loan, Equity, and Rent Scheme .....................................2

      B.      Payola Scheme .........................................................................3

      C.      Damages to the United States and the State of Texas ..............3

II.     PARTIES ..............................................................................................4

III.    JURISDICTION AND VENUE ..............................................................9

IV.     FALSE CLAIMS ACT ........................................................................10

V.      TEXAS MEDICAID FRAUD PREVENTION STATUTE ......................12

VI.     THE MEDICARE PROGRAM .............................................................15

      A.      The Medicare Payment Process .............................................18

      B.      Hospice and Medicare .............................................................21

      C.      Obligations of the Hospice Provider ........................................22

VII.    MEDICAID PROGRAM .......................................................................24

VIII.   THE ANTI-KICKBACK STATUTE .......................................................25

IX.     THE STARK ACT ...............................................................................27

X.      INDEPENDENT ANTI-KICKBACK AND STARK ANALYSIS...............30

XI.     THE SHAM LOAN, EQUITY, AND RENT SCHEME ...........................31

      A.      Sham Loan, Equity, and Rent Scheme: Who, What, When, Where, How, and Scienter (Why)? .................................................36

      B.      Co-Conspirators (Who) ............................................................36

      C.      The Scheme: What, How, When & Where: ..............................38

      D.      Why: Scienter ("Knowingly") ...................................................44

XII.    THE PAYOLA SCHEME ......................................................................45

     A.    Bryan ..............................................................................55

     B.    Wendt ...........................................................................79

XIII.   FALSE CLAIMS ...................................................................89

XIV.   ESTIMATED ACTUAL DAMAGES TO THE UNITED STATES ............95

XV    CAUSES OF ACTION ...........................................................97

     Count I     False Claims Act, 31 U.S.C. §§ 3729(a)(1)-(2)
                    Presentation of False or Fraudulent Claims; Making or Using
                    False or Fraudulent Statements or Records .................97

     Count II    False Claims Act, 31 *U.S.C.* § 3729(a)(3)
                    Conspiracy to Submit False Claims ...........................98

     Count III   42 U.S.C. § 1320a-7a, Anti-Kickback Statute
                    Per Se False Claims Act Violations ...........................99

     Count IV   Tex. Hum. Res. Code § 36.001 et seq., Texas Medicaid
                    Fraud Prevention Law ...........................................101

     Count V    False Claims Act, 31 U.S.C. § 3729(a)(1)(C)
                    SHAM LOAN, EQUITY, AND RENT SCHEME: Conspiracy
                    ................................................................102

     Count VI   False Claims Act, 31 U.S.C. § 3729(a)(1)(C)
                    PAYOLA SCHEME: Conspiracy ...............................103

     Count VII  Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §
                    36.001 et seq. SHAM LOAN, EQUITY, AND RENT SCHEME:
                    False Claims ......................................................105

     Count VIII Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §
                    36.001 et seq. PAYOLA SCHEME: False Claims ...........108

XVI.   PRAYER - STATE LAW VIOLATIONS ........................................111

XVII.  PRAYER - FEDERAL LAW VIOLATIONS ....................................112

Request for Jury Trial .................................................................113

CERTIFICATE OF SERVICE ........................................................115

APPENDIX

**JOINT AMENDED COMPLAINT OF RELATORS CHRISTOPHER SEAN CAPSHAW, KEVIN BRYAN, AND FRANKLIN BROCK WENDT PURSUANT TO FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729-3733, AND TEXAS MEDICAID FRAUD PREVENTION ACT, TEX. HUM. RES. CODE § 32.039(A)-(B) AND TEX. HUM. RES. CODE § 36.002,**

The United States of America and the State of Texas, by and through *qui tam* Relators Christopher Sean Capshaw ("Capshaw"), Kevin Bryan ("Bryan") and Franklin Brock Wendt ("Wendt") (collectively, "Relators"), bring this action under 31 U.S.C. §§ 3729-3733 ("False Claims Act"), the Anti-Kickback Statute of the Medicare and Medicaid Patient Protection Act of 1987, as amended, 42 U.S.C. § 1320a-7b ("Anti-Kickback Statute"), the Stark Act, 42 U.S.C. §§ 1395nn and 1396b(s) ("Stark Act"), and Tex. Hum. Res. Code § 32.039(A)-(B) and Tex. Hum. Res. Code § 36.002, Texas Medicaid Fraud Prevention Act ("Texas statutes"), to recover all damages, penalties and other remedies established by the False Claims Act and the Texas statutes. In support, Relators would show the following:

## I. SUMMARY

1. Defendants Bryan K. White, M.D. ("White") and Suresh G. Kumar, R.N., ("Kumar") are the owners, part owners, and/or operators of a web of health care entities. The various entities are corporations, limited liability companies, and limited partnerships, which own, in whole or in part, other entities. Various entities operate under assumed names, and various entities have names similar to each other's or do business under the names of other entities. These include but are not limited to hospices and home health agencies that are Part A Medicare provider participants, physicians who are Part B Medicare provider participants, and Medicaid provider participants. The entities include various types of hospice providers including in-patient

hospice and home health hospice providers, as well as other home health agencies, which are providers under Part A and Part B of Medicare as well as Medicaid providers.

2.    White and Kumar used these entities to defraud the United States and the State of Texas by presenting or causing to be presented false or fraudulent claims for payment under the Medicaid and Medicare programs, making or using or causing to be made or used false statements/certifications or records material to false or fraudulent claims for payment, and conspiring to do those things. White and Kumar, along with other individuals (some but not all of whom are named Defendants herein), and along with several entities (some but not all of which are named Defendants herein), presented or caused to be presented their false claims and made or used or caused to be made or used their false statements/certifications or records in the course of two fraudulent schemes, described herein as the "Sham Loan, Equity, and Rent Scheme" and the "Payola Scheme."

**A.    Sham Loan, Equity, and Rent Scheme**

3.    To implement the Sham Loan, Equity, and Rent Scheme, the scheme participants used two undercapitalized entities, American Physician House Calls ("APH") and its non-profit arm, American Physician House Calls Health Services ("APHHS"), as conduits for illegal referrals of Medicare/Medicaid patients to hospices and other healthcare entities/facilities owned by the scheme participants. The referrals were illegal because APH and APHHS and their owners received compensation for the referrals in violation of the Anti-Kickback Statute, the Stark Act, and the Texas Medicaid Fraud Prevention Act. The compensation to APH and APHHS was disguised as loans, which the parties never intended to be repaid and which were not repaid, the use of

rental property by APH/APHHS for which rents were not paid, and free equity interests in one or more of the Kumar/White-owned entities, all in exchange for illegal referrals. White and Kumar and their entities referred patients back to APH/APPHS for recertification for additional Medicare/Medicaid compensable hospice care; the entities volleyed Medicare patient referrals back and forth to maximize Medicare/Medicaid payments, with little or no regard to the patients' needs or best interests.

## B.  Payola Scheme

4.      White and Kumar's second scheme was to illegally bribe and compensate various health care facilities and professionals for patient referrals—the "Payola Scheme." In this scheme, White and Kumar and other individual and entity Defendants "bought" terminally ill Medicare and Medicaid patients from area nursing homes, assisted living facilities, doctors, and hospitals, with all types of gifts, including cash, gift cards, lunches, dinners, happy hours, tickets to Rangers and Cowboys games, elaborate Christmas gifts, cars, manicures and pedicures, free power lift chairs for disabled patients, and the services of skilled nursing staff offered and provided at no cost to "cooperative" area nursing homes and assisted living facilities.

## C.  Damages to the United States and the State of Texas

5.      White and Kumar, and other individual and entity Defendants have presented or caused to be presented to Medicare and Medicaid requests for payment of hundreds of millions of dollars (which have been paid) for hospice and home health services for patients whom they had illegally obtained for their companies by means of the Sham Loan, Equity, and Rent Scheme and the Payola Scheme. These requests for payments, however, constitute false claims under the False Claims Act and violations of

the Texas Medicaid Fraud Prevention Act. Defendants also made or used or caused to be made or used false statements/certifications or records in the course of the Sham Loan, Equity, and Rent Scheme and the Payola Scheme, also in violation of the False Claims Act and the Texas Medicaid Fraud Prevention Act, as explained in detail herein. Also in the course of the Sham Loan, Equity, and Rent Scheme and the Payola Scheme, Defendants conspired to present or cause to be presented false claims for payments, and conspired to make, use, or cause to be made or used, false statements/certifications or records material to false claims, as explained in detail herein. Total single damages (before trebling) to the United States Government resulting from these schemes are in excess of $400,000,000 (four-hundred million USD). In addition, statutory damages of $5,500-$11,000 are to be awarded to the United States *for each violation of the statute.*

## II. PARTIES

6.     Relator Christopher Sean Capshaw ("Capshaw") is an individual resident of Dallas County, Texas. Capshaw formerly held the position of Finance Director for American Physician House Calls ("APH"), a Part B Medicare participant, and has personal and direct knowledge of the fraudulent schemes and unlawful activities alleged herein. See Appendix E, Organizational Chart reflecting Capshaw's position in APH.

7.     Relator Kevin Bryan ("Bryan") is an individual resident of Rockwall, Rockwall County, Texas. Bryan was formerly employed as Director of Marketing for Defendant Hospice Plus, L.P., and was an eyewitness, and has personal and direct knowledge of the facts alleged herein.

8.      Relator Franklin Brock Wendt ("Wendt") is an individual resident of Leonard, Fannin County, Texas. Wendt was employed as a nurse marketer for Defendant Hospice Plus, L.P., from 2009 to 2013 and was an eyewitness and has personal and direct knowledge of the facts alleged herein.

9.      Prior to filing his original *Relator's Complaint for Damages Under the False Claims Act 31 U.S.C. § 3729 et seq.*, Capshaw served upon the Government pursuant to 31 U.S.C. § 3730(b)(2) a written disclosure of substantially all material evidence and information that he possessed. This included more than 30 gigabytes of detailed information, documents, and proof that supports the claims alleged herein.

10.      Prior to filing their original *Complaint Pursuant to 31 U.S.C. §§ 3729-3733, Federal False Claims Act* under seal in Cause No. 3-13CV3392-B, Relators Bryan and Wendt served upon the Government pursuant to 31 U.S.C. § 3730(b)(2) a written disclosure of substantially all material evidence and information they possessed with a copy of that complaint.

11.      Defendant Bryan K. White, M.D., ("White") is a natural person who may be served with process at his residence, 1307 Sylvan Ct., Arlington, Texas, 76012. White is a central player in the schemes alleged herein. He is: (1) part owner of all of the Defendant Part A Medicare participant companies, (2) a significant lender to APH, which is a Part B Medicare participant, and (3) was the Medical Director for American Physician House Calls Health Services ("APHHS").

12.      Defendant Suresh G. Kumar, R.N., ("Kumar") is a natural person who may be served with process at his residence, 2629 Serenity Ct., Carrollton, Texas 75010. Kumar is a central player in the schemes alleged herein. He is: (1) part owner or

manager of the Part A Participant Defendants, (2) a significant investor in APH, and (3) was the manager for all of the White/Kumar-owned businesses (whether personally or through his relatives as alter ego conduits).

13.     Defendant BE Gentle Home Health, Inc., also d/b/a Phoenix Home Healthcare ("BE Gentle" or "Phoenix") is a Texas corporation, which can be served with process by serving its registered agent, Suresh Kumar, 5550 Harvest Hill Road, Suite 125, Dallas, Texas 75230. BE Gentle is a Part A Medicare participant company owned primarily by White and Kumar (with Defendants Kirk Short and Yale Sage having some ownership interest given as a kickback under the Sham Loans, Equity, and Rent Scheme), and is managed by Kumar.

14.     Defendant North Texas Best Home Healthcare, Inc. ("North Texas Best") is a domestic for-profit corporation that can be served with process by serving its registered agent, Sabari Kumar, 2629 Serenity Ct., Carrollton, Texas 75010. North Texas Best is a Part A Medicare participant company owned by White and managed by Kumar.

15.     Defendant Vinayaka Associates, LLC, d/b/a A&S Home Health Care ("A&S") is a Texas limited liability company which can be served with process by serving its registered agent, Remani B. Kumar, 4230 LBJ Freeway, Ste. 129, Dallas, Texas 75244. A & S is a Part A Medicare participant company owned by White and managed by Kumar.

16.     Defendant Goodwin Home Healthcare Services, Inc. ("Goodwin") is a corporation that can be served with process by serving its registered agent, M. Ayub Malik, 1909 Kensington Drive, Carrollton, Texas 75007. Goodwin Home Healthcare

Services, Inc., is a Part A Medicare participant company owned by White and Kumar, and managed by Kumar.

17. Defendant Hospice Plus, L.P. ("Hospice Plus") is a Delaware limited partnership with its principal place of business at 3100 McKinnon, Suite 2100, Dallas, TX 75201, which can be served with process by serving its registered agent, Marie Hauer, CT Corporation System, 1999 Bryan Street, Ste. 900, Dallas, Texas 75201-3136. Hospice Plus is a Part A Medicare participant company owned by White and Kumar, and managed by Kumar.

18. Defendant Goodwin Hospice, LLC, (hereafter "Goodwin Hospice") is a Delaware limited liability company, with its principal place of business at 3100 McKinnon, Ste. 200, Dallas, Texas 75201, and may be served with process by serving its registered agent, CT Corporation System, 1999 Bryan Street, Ste. 900, Dallas, Texas 75201-3136. Goodwin Hospice is a Part A Medicare participant company owned by White and Kumar, and managed by Kumar.

19. Defendant D. Yale Sage ("Sage") is a natural person domiciled in Dallas, Dallas County, Texas who can be served with process at 5727 W. Hanover Ave., Dallas, Texas 75209-3429. Sage was the primary owner and manager of Part B Medicare participant (non-party) APH, and is part owner of Part A Medicare participant, Defendant BE Gentle HomeHealth, Inc.

20. Defendant Kirk Short ("Short") is a natural person domiciled in Dallas, Dallas County, Texas who can be served with process at 6722 Blue Valley Lane, Dallas, Texas 75214-2716. Short managed Part B Medicare participant (non-party)

APH, and is a part owner of Part A Medicare participant, Defendant Be Gentle HomeHealth, Inc.

21.     Defendant Sheila Halcrow, a.k.a. Sheila Watley/Sheila Taylor/Sheila O'Brien ("Halcrow") is a natural person domiciled in Dallas, Dallas County, Texas who can be served with process at 2835 Villa Creek Drive, Apt. 213, Dallas, Texas 75234-7447. Halcrow managed Part B Medicare participant (non-party) APH, and controlled all APHHS doctors, requiring that their referrals be directed to one of the Defendant Part A Medicare participant companies.

22.     Defendant Remani B. Kumar, a/k/a Remani Amma ("RKumar"), is a natural person resident of Carrollton, Denton County, Texas who may be served with process at her residence, 2629 Serenity Ct., Carrollton, Texas 75010.

23.     Defendant Sabari Kumar ("Sabari Kumar") is a natural person resident of Carrollton, Denton County, Texas who may be served with process at his residence, 2629 Serenity Ct., Carrollton, Texas 75010.

24.     Defendant International Tutoring Services, LLC, f/k/a International Tutoring Services, Inc., and d/b/a Hospice Plus ("International Tutoring"), is a Delaware limited liability company with its principal place of business at 3100 McKinnon, Suite 2100, Dallas, TX 75201. International Tutoring Services, LLC, can be served by serving its registered agent for service of process, CT Corporation System, 1999 Bryan Street, Ste. 900, Dallas, Texas 75201-3136.

25.     Defendant Curo Health Services, LLC f/k/a Curo Health Services, Inc. ("Curo"), is a Delaware limited liability company with its principal office address at 491 Williamson Road, Suite 204, Mooresville, NC 28117. Curo Health Services, LLC, can be

served by serving its registered agent for service of process, CT Corporation System, 150 Fayetteville Street, Box 1011, Raleigh, North Carolina, 27601.

### III. JURISDICTION AND VENUE

26.     Jurisdiction and venue are proper in this Court for the following reasons:

a.     Jurisdiction for this Court exists pursuant to 28 U.S.C. § 1331 (federal question) and the False Claims Act, 31 U.S.C. §§ 3730(b)(1) and 3732(a), because Relators' causes of action seek remedies on behalf of the United States for the Defendants' multiple violations of 31 U.S.C. § 3729, some or all of which occurred in the Northern District of Texas. The Court has both general and specific personal jurisdiction over Defendants because each of them transacts substantial business and/or resides within the Northern District of Texas, and because a substantial part of the transactions upon which this action is based occurred in the Northern District of Texas. This Court has supplemental jurisdiction over the Texas State FCA causes of action pursuant to 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367. Pursuant to 31 U.S.C. § 3730(e)(1-4): Relators are not present or former members of the armed forces. This action is not brought against a Member of Congress, a member of the judiciary, or a senior executive branch official. This action is not based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party. The allegations or transactions alleged in this action and the claims brought herein are not substantially the same allegations or transactions as any allegations or transactions that were publically disclosed, whether in a Federal criminal, civil, or administrative hearing in which the Government or its agents were a party; nor in a congressional, Government Accountability Office, or any other Federal

report, hearing, audit, or investigation, or from the news media, before Relators filed their original Complaints. In addition and alternatively, Relators are original sources of any such publicly disclosed information within the meaning of 31 U.S.C. § 3730(e)(4)(B).

b.     Venue exists in the United States District Court for the Northern District of Texas pursuant to 31 U.S.C. § 3730(b)(1), because the Defendants reside in, are qualified to do business in the State of Texas, and/or have transacted substantial business within the State of Texas and in Texas, and pursuant to 28 U.S.C. §§ 1391(b)(2), (b)(3), (c), and (d).

### IV. FALSE CLAIMS ACT

27.     This *qui tam*[1] action alleges violations of the Federal False Claims Act, 31 U.S.C. §§ 3729-3732, seeking damages and civil penalties on behalf of the United States and Relators as a result of Defendants' false claims, statements/certifications and records.

28.     The False Claims Act provides that any person who, among other things,

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), [or] (B) . . .

 is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]) [currently not less than $5,500 and not more than

---

[1] *"Qui tam"* is shorthand for the Latin phrase "*qui tam pro domino rege quam pro se ipso in hac parte sequitur*,' which means 'who pursues this action on our Lord the King's behalf as well as his own.'" *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 768 n.1, 146 L. Ed. 2d 836, 120 S. Ct. 1858 (2000).

$11,000], plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. §§ 3729(a)(1)(A)-(C).

29.    A defendant acted "knowingly" under the False Claims Act if, with respect to the information, the defendant (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. It is not necessary to prove that the defendant had the specific intent to defraud the United States. 31 U.S.C. § 3729(b)(1)(B).

30.    The False Claims Act allows any person—called a "relator"—having knowledge of a false or fraudulent claim against the Government to bring an action in Federal District Court for himself and for the United States Government and to share in any recovery. 31 U.S.C. § 3730. Relators herein are entitled to a portion of any recovery obtained by the United States as Relators are, on information and belief, the first to file and, in any event, original sources for the allegations in this Joint Amended Complaint.

31.    Based on these provisions, Relators, on behalf of the United States Government, seek through this action to recover damages and civil penalties arising from the Defendants' presentation, or causing the presentation, of false or fraudulent claims for payment or approval, and their making or using, or causing to be made or used, false records or express and implied or false statements/certifications material to false or fraudulent claims. The United States has suffered significant damages, in excess of $400,000,000.00 (USD), as a result of the Defendants' fraudulent schemes as alleged herein.

32.     As required under the False Claims Act, Relators have provided the offices of the Attorney General of the United States and the United States Attorney for the Northern District of Texas Disclosure Statements of evidence and information related to this Complaint, which includes substantially all material evidence and information the Relators possess pursuant to 31 U.S.C § 3730(b)(2).

## V. TEXAS MEDICAID FRAUD PREVENTION STATUTE

33.     Relators also bring this *qui tam* action on behalf of the State of Texas to recover double damages and civil penalties under Tex. Hum. Res. Code § 36.001 et seq.

34.     Tex. Hum. Res. Code § 36.002 provides that a person commits an unlawful act if the person:

> (1)     knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;
>
> (2)     knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;
>
> . . .
>
> (4)     knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:
>
> > . . .
>
> > (B)     information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

(5) except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

. . .

(9) conspires to commit a violation of Subdivision (1), (2), (3), (4), (5), (6), (7), (8), (10), (11), (12), or (13);

. . .

(12) knowingly makes, uses, or causes the making or use of a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to this state under the Medicaid program; or

**(13) knowingly engages in conduct that constitutes a violation under Section 32.039(b).**

Tex. Hum. Res. Code § 36.002 (emphasis added).

35. **Section 32.039. provides:**

(a) In this section:

(1) "Claim" means an application for payment of health care services under Title XIX of the federal Social Security Act that is submitted by a person who is under a contract or provider agreement with the department.

(1-a) "Inducement" includes a service, cash in any amount, entertainment, or any item of value.
. . .

(4) A person "should know" or "should have known" information to be false if the person acts in deliberate ignorance of the truth or falsity of the information or in reckless disregard of the truth or falsity of the information, and proof of the person's specific intent to defraud is not required.

(b) A person commits a violation if the person:

(1)     presents or causes to be presented to the department a claim that contains a statement or representation the person knows or should know to be false;

**(1-a)  engages in conduct that violates Section 102.001, Occupations Code;**

**(1-b)  solicits or receives, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind for referring an individual to a person for the furnishing of, or for arranging the furnishing of, any item or service for which payment may be made, in whole or in part, under the medical assistance program, provided that this subdivision does not prohibit the referral of a patient to another practitioner within a multispecialty group or university medical services research and development plan (practice plan) for medically necessary services;**

**(1-c)  solicits or receives, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind for purchasing, leasing, or ordering, or arranging for or recommending the purchasing, leasing, or ordering of, any good, facility, service, or item for which payment may be made, in whole or in part, under the medical assistance program;**

**(1-d)  offers or pays, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind to induce a person to refer an individual to another person for the furnishing of, or for arranging the furnishing of, any item or service for which payment may be made, in whole or in part, under the medical assistance program**, provided that this subdivision does not prohibit the referral of a patient to another practitioner within a multispecialty group or university medical services research and development plan (practice plan) for medically necessary services;

**(1-e)  offers or pays, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind to induce a person to purchase, lease, or order, or arrange for or recommend the purchase, lease, or order of, any good, facility,**

service, or item for which payment may be made, in whole or in part, under the medical assistance program;

(1-f)   provides, offers, or receives an inducement in a manner or for a purpose not otherwise prohibited by this section or Section 102.001, Occupations Code, to or from a person, including a recipient, provider, employee or agent of a provider, third-party vendor, or public servant, for the purpose of influencing or being influenced in a decision regarding:

   (A)   selection of a provider or receipt of a good or service under the medical assistance program;

   (B)   the use of goods or services provided under the medical assistance program; or

   (C)   the inclusion or exclusion of goods or services available under the medical assistance program;

. . .

Tex. Hum. Res. Code § 32.039.

36.   Section 102.001 of the Occupations Code provides:

§ 102.001. Soliciting Patients; Offense

(a)   A person commits an offense if the person knowingly offers to pay or agrees to accept, directly or indirectly, overtly or covertly any remuneration in cash or in kind to or from another for securing or soliciting a patient or patronage for or from a person licensed, certified, or registered by a state health care regulatory agency.

Tex. Occ. Code § 102.001(a).

## VI. THE MEDICARE PROGRAM

37.   The Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program ("Medicare"), established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq., is a federally-funded health insurance

program that pays for covered medical services provided to eligible aged and disabled individuals.

38.     The Medicare Program is comprised of four parts. Medicare Part A is a 100 percent federally-funded health insurance program for qualified individuals aged 65 and older, younger people with qualifying disabilities, and people with End Stage Renal Disease (permanent kidney failure requiring dialysis or transplant). The majority of Medicare Part A's costs are paid by United States citizens through their payroll taxes. The benefits covered by Medicare Part A include hospice care under 42 U.S.C. § 1395x(dd), as well as home health care, the primary businesses involved in the schemes alleged herein.

39.     The Medicare program is supervised by the Centers for Medicare and Medicaid Services, ("CMS") in the Department of Health and Human Services ("HHS"). CMS in turn contracts with private organizations referred to as "fiscal intermediaries" ("FIs")," to act as the HHS Secretary's agents in reviewing and paying claims submitted by health care providers. 42 U.S.C. § 1395h; 42 C.F.R. §§ 421.3, 421.100.

40.     Medicare requires entities that seek to participate in the program to first enroll and gain approval from their local Medicare carrier. A carrier is the claims-processing and regulating entity that contracts with CMS. The enrollment process begins with the submission of a completed Medicare Enrollment Application on form CMS-855A ("855A") for Institutional Providers or Form CMS-855B ("855B") for Clinics/Group Practices and Certain Other Suppliers. Alternatively, providers may file the Internet-based Provider Enrollment, Chain and Ownership System (PECOS) at www.cms.gov/MedicareProviderSupEnroll . *See* Appendix A, Medicare Enrollment

Application (Forms 855A and 855B) containing Certification Statement, at pp. 47-48 (855A), pp. 30-31 (855B). The **855A** form is for: Community Mental Health Centers • Hospitals • Comprehensive Outpatient Rehabilitation Facilities • Indian Health Services Facilities • Critical Access Hospitals • Organ Procurement Organizations • End-Stage Renal Disease Facilities • Outpatient Physical Therapy/Occupational • Federally Qualified Health Center Therapy /Speech Pathology Services • Histocompatibility Laboratories • Religious Non-Medical Health Care Institutions • **Home Health Agencies** • Rural Health Clinics • **Hospices** • Skilled Nursing Facilities. **Form 855B** is for Ambulance Service Suppliers • Mammography Centers • Ambulatory Surgical Centers • Mass Immunization (Roster Biller Only) • **Clinic/Group Practices** • Part B Drug Vendors • Independent Clinical Laboratories • Portable X-ray Suppliers • Independent Diagnostic Testing Facilities (IDTF) • Radiation Therapy Centers • Intensive Cardiac Rehabilitation Suppliers, i.e., physician services, supplies, and tests. *United States ex rel. Hobbs v. Medquest Assocs.*, 711 F.3d 707, 710 (6th Cir. 2013). Forms 855A and 855B require the provider to sign a Certification Statement ("Cert. Statement") that provides, in relevant part:

> 3. I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider ["provider" in form 855A, "supplier" in form 855B]. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. **I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying** with such laws, regulations, and program instructions *(including, but not limited to, the Federal anti-kickback statute and the Stark law),* and on the provider's compliance with all applicable conditions of participation in Medicare.
> . . .
> 6. I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

The form concludes with a statement that if the signor "become[s] aware that any information in this application is not true, correct or complete, [[s]he] agree[s] to notify the Medicare program contractor of this fact in accordance with the time frames established in 42 C.F.R. § 424.516[(e)[2]]." Both forms notify applicants of potential criminal and civil penalties for deliberately furnishing false information in the application to gain or maintain enrollment in the Medicare program, including civil penalties under the False Claims Act. CMS periodically requires applicants to revalidate their enrollments; upon notification by CMS's fee-for-service contractor, the enrollee must submit a revalidation application, resubmitting enrollment information, including these Cert. Statements.

A.     **The Medicare Payment Process**

41.     The Medicare provider either submits its bill directly for payment, or it contracts with an independent billing company to submit a bill to the Medicare claims processor, on the provider's behalf. Providers are reimbursed based upon their submission of a single electronic form (in limited circumstances, hard-copy may be submitted), either a CMS-1450 Uniform Institutional Provider Bill for institutional providers billing for Medicare inpatient, outpatient, and home health services, or a CMS-1500 Health Insurance Claim Form for use by physicians and other suppliers to request payment for medical services. *See* 42 C.F.R. § 432.32 (b). These forms reflect the treatment or services provided and identify the provider or supplier who provided them. Tests, supplies, and services are correlated to a series of unique numbers, called CPT codes, which quickly convey to the carrier what reimbursable expenses the provider has incurred. The forms require the provider to certify that the services above were

---

[2] Subsection in 855A, and not in 855B.

medically indicated and necessary to the health of the patient. *United States ex rel. Hobbs v. Medquest Assocs.*, 711 F.3d 707, 710-711 (6th Cir. 2013).

42. All Medicare providers must have in each of their patients' files the medical documentation to establish that the Medicare items or services for which they have sought Medicare reimbursement are reasonable and medically necessary.

43. The Medicare program relies upon the providers to comply with the Medicare requirements, and trusts the providers to submit truthful and accurate claims.

44. On the claim form, the provider certifies that the claim "is correct and complete," that "[p]hysician's certifications and re-certifications, if required by contract or Federal regulations, are on file," and that "[r]ecords adequately disclosing services will be maintained and necessary information will be furnished to government agencies as required by applicable law."

45. Once the health care provider, like Defendants, submits its CMS-1450 or CMS-1500 form to the Medicare claims processor, payments are typically made by Medicare directly to the provider rather than to the patient. The Medicare beneficiary usually assigns his or her right to Medicare payment to the provider. The United States reimburses Medicare providers with payments from the Medicare Trust Fund, through CMS, as supported by American taxpayers. CMS, in turn, contracts with Medicare Administrative Contractors ("Medicare claims processors," also known as "MACs"), to review, approve, and pay Medicare bills, called "claims," received from health care providers like Defendants. In this capacity, the Medicare claims processors act on behalf of CMS.

46.    In addition, at the end of each provider's fiscal year, the provider files with the fiscal intermediary a "cost report" stating the amount of reimbursement the provider believes it is due for the year. *See,* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20; 42 C.F.R. § 405.1801(b) (1). Freestanding hospices file their annual cost reports by submitting form CMS-1984; hospices that are part of a hospital submit form CMS-2552; hospices that are part of skilled nursing facilities submit form CMS-2540; home health agencies and hospices that are part of home health agencies submit form CMS-1728. Every Cost Report contains a "Certification," which must be signed by the chief administrator of the provider or a responsible designate of the administrator. Providers who file their Cost Reports electronically are required to submit a paper certification to the fiscal intermediary, which must be date-stamped and time-stamped. Each of these forms includes the following sentences:

> I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and-that **the services identified in this cost report were provided in compliance with such laws and regulations**.

> and

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. **<u>Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback</u>** or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

Every annual certification made or used or caused to be made or used by Defendants was false, because Defendants' services were provided or procured by the payment directly or indirectly of kickbacks. In addition, requests for additional payment contained

in the cost reports, if any, would constitute false claims within the meaning of the False Claims Act.

47.    All Medicare providers are expected to deal honestly with the Government and with patients. In addition, all Medicare healthcare providers are obligated to comply with applicable statutes, regulations, and guidelines in order to be reimbursed by Medicare. When participating in Medicare, a provider has a duty to be knowledgeable of the statutes, regulations, and guidelines for coverage of Medicare services. 42 U.S.C. §1395y(a)(1)(C). Federal law requires providers like Defendants that receive funds under the Medicare program, to report and return any overpayments within specified time periods. 42 U.S.C. § 1320a-7k(d). (Cost reports failing to disclose overpayments are "reverse false claims.").

**B.    Hospice and Medicare**

48.    In addition to paying for doctor visits, nursing home care, and hospital stays, Medicare offers a hospice benefit for eligible Medicare beneficiaries. Hospice care services include palliative care, or care to relieve pain, symptoms, and stress for Medicare beneficiaries who are "terminally ill." An individual is "terminally ill" if he or she has a medical prognosis of six months or less if the individual's illness runs its normal course. 42 C.F.R. § 418.3. Palliative hospice care services are intended to include a comprehensive set of medical, social, psychological, emotional, and spiritual services for eligible beneficiaries, *instead of curative care* (*i.e.,* care designed to cure an illness or condition). Medicare beneficiaries must elect hospice care (*i.e.,* it is voluntary) and in doing so agree to forego curative treatment of their terminal illnesses. Patients who receive the Medicare hospice benefit no longer receive care that seeks to cure their

illnesses. For this reason, electing the Medicare hospice benefit is a critical medical decision for a patient who has been informed that his or her death is imminent because he or she is *electing to cease further curative care* for his or her illness.

49.     In order to be eligible to elect hospice care under Medicare, an individual must be (a) entitled to Part A of Medicare; and (b) certified as terminally ill in accordance with 42 C.F.R. § 418.22. *See* 42 U.S.C. § 1395f(7)(A); 42 C.F.R. § 418.20. Hospice is available to terminally ill individuals for two initial 90-day periods, and then an unlimited number of 60-day periods, as long as certain conditions are met. Medicare Benefit Policy Manual, Chapter 9, §§ 10, 20.1. To be covered, hospice services must be reasonable and necessary for the palliation and management of a patient's terminal illness as well as related conditions. Medicare outlines the admission criteria for various illnesses.

50.     Hospices are paid a per diem rate based on the number of days and level of care provided to the patient. Medicare recognizes and provides reimbursement for four levels of hospice care: routine home care, continuous home care, inpatient respite care, and general inpatient care. The payment rates are based on which level of care the hospice provider furnishes to a patient on a particular day. 42 C.F.R. § 418.302; Medicare Benefit Policy Manual, Chapter 9, § 40.

**C.     Obligations of the Hospice Provider**

51.     To bill for hospice care, the hospice provider must ensure that a patient is terminally ill before the individual is faced with the decision to stop receiving medical care that could cure his or her illness. The hospice provider must have a written certification of terminal illness that, among other things, includes: (I) a statement that the

individual's medical prognosis is that his or her life expectancy is six months or less if the terminal illness runs its normal course; (2) specific clinical findings and other documentation that support a determination that the patient has a life expectancy of six months or less; and (3) the signature(s) of the physician(s) attesting to these medical conclusions. 42 C.F.R. § 418.22. These important requirements are contained not only in the Medicare regulations but also in the Medicare Benefit Policy Manual, Chapter 9, § 20.1, along with additional descriptions and guidance for hospice providers.

52. Recognizing the gravity of a patient's decision to forgo curative care for a terminal illness, Medicare instructs that "a hospice needs to be certain that the physicians' clinical judgment can be supported by clinical information and other documentation that provide a basis for the certification of a prognosis of six months or less if the illness runs its normal course. A signed certification, absent a medically sound basis that supports the clinical judgment, is not sufficient for application of the hospice benefit under Medicare." 170 Fed. Reg. 70534-35; *see* 42 CFR §418.22.

53. For the initial 90-day period, the hospice provider must obtain a certification of terminal illness for the patient from both (a) the medical director of the hospice or a physician member of the hospice interdisciplinary group, and (b) the individual's attending physician, if the individual has an attending physician. For subsequent periods, the hospice provider must obtain the certification of terminal illness from either the medical director of the hospice or a physician who is a member of the hospice's interdisciplinary group for the patient. 42 U.S.C. § 1395f(7)(A); 42 C.F.R. S 418.22. Additionally, it is the hospice provider and not the patient's primary care or

treating physician, who is required to submit to Medicare the underlying documentation that supports the eligibility determination and the claim.

54.     When billing, on the CMS-1450 form, the hospice provider must state, among other things, the identity of the patient, the hospice's provider number, the patient's principal diagnosis, the date of the patient's certification or re-certification as "terminally ill," the location where hospice services were provided, and the level of hospice care provided (i.e., routine home care, crisis care, respite care, or general inpatient care).

## VII. MEDICAID PROGRAM

55.     Medicaid is a state-administered federal health care program designed to provide health care services to qualifying low-income individuals not subject to any other coverage. The federal government contributes varying costs, depending on the state. *See Ark. Dep't of Health & Human Servs. v. Ahlborn*, 547 U.S. 268, 275, 126 S. Ct. 1752, 164 L. Ed. 2d 459 (2006); 42 U.S.C. § 1396, *et seq*. The program is regulated by the Secretary of the United States Department of Health and Human Services, who acts through CMS. *Ahlborn*, 547 U.S. at 275; *United States ex rel. Black v. Health & Hosp. Corp.*, 494 Fed. Appx. 285, 288 (4th Cir. 2012). Though jointly financed and regulated by the federal and state governments, each state bears responsibility for administration of services. *Scherfel v. Genesis Health Ventures, Inc. (In re Genesis Health Ventures, Inc.)*, 112 Fed. Appx. 140, 141 (3d Cir. 2004). Similar to the manner in which Medicare claims are processed, a state agency enters into agreements with participating health care providers, which submit claim forms to receive compensation. *Scherfel*, 112 Fed. Appx. at 141. Medicaid regulations require parties seeking

reimbursement to maintain supporting documentation. A party seeking reimbursement must maintain financial data to support the cost claim. 42 C.F.R. § 413.20(a). That financial data must be based on audit-quality records. 42 C.F.R. § 413.24(a). Moreover, the party seeking reimbursement must certify compliance with these requirements. 42 C.F.R. § 412.24(f)(iv); *see also United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 447 (6th Cir. 2005) (holding that reimbursement "regulations require that providers maintain sufficient financial records and statistical data for proper determination of costs payable under the program. Moreover, the cost reports submitted to the intermediaries must provide adequate cost data capable of verification by qualified auditors. *United States ex rel. Davis v. District of Columbia*, 591 F. Supp. 2d 30, 39 (D.D.C. 2008).

## VIII. THE ANTI-KICKBACK STATUTE

56.     The purpose of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, is to eliminate the practice of any person or entity knowingly and willfully offering, paying, soliciting, making or accepting payment to induce or reward any person or entity for referring, recommending or arranging any good or items for which payment may be made in whole or in part by a federal health care program, which includes any State health program or health program funded in part by the federal government—*i.e.*, at a minimum, Medicare and Medicaid. 42 U.S.C. §§ 1320a-7b(b) and 1320a-7b(f).

57.     A "kickback" means any money, fee, commission, credit, gift, item of value or compensation of any kind, which is provided directly or indirectly, for the purpose of obtaining favorable treatment with a contract. Under the Anti-Kickback Statute it is illegal to: (1) knowingly and willfully (2) offer or pay any remuneration (3) to induce such

person to refer an individual to a person for the furnishing or arranging . . . of any item or service for which payment may be made in whole or in part under a Federal health care program. *See* 42 U.S.C. § 1320a-7b(b)(2). In pertinent part, the Anti-Kickback Statute provides:

(b) Illegal remuneration

(1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind –

    (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

    (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person --

    (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

    (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

58. In addition to criminal penalties, a violation of the Anti-Kickback Statute can also subject the perpetrator to exclusion from participation in federal health care programs (42 U.S.C. §1320a-7(a)), civil monetary penalties of up to $50,000 per violation (42 U.S.C. §1320a-7a(a)(7)), and three times the amount of remuneration paid, offered, solicited, or received, **regardless of whether any part of the remuneration is for a lawful purpose** (42 U.S.C. §1320a-7a(a)).

59. In addition to the penalties provided for in this section or section 1128A [42 U.S.C. § 1320a-7a], **a claim that includes items or services resulting from a violation of these sections constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31, United States Code [the False Claims Act, 31 U.S.C. §§ 3729 et seq.]—i.e., a violation of the Anti-Kickback Statute is a per se violation of the False Claims Act.** With respect to violations of section 42 U.S.C. § 1320a-7b(b), a person need not have actual knowledge of this section or specific intent to commit a violation. 42 U.S.C. § 1320a-7b.

## IX. THE STARK ACT

60. Similarly, the Stark Act generally prohibits a *physician* from referring Medicare and Medicaid patients for designated health services to an entity in which the physician has a nonexempt financial interest. 42 U.S.C. §§ 1395nn(a)(1) and 1396b(s). The goal of Stark is "to curb overutilization of services by physicians who could profit by referring patients to facilities in which they have a financial interest." *See* Jo-Ellyn Sakowitz Klein, *The Stark Laws: Conquering Physician Conflicts of Interest*, 87 GEO. L.J. 499, 511 (1998). Stark has three *prima facie* elements: (1) a "financial relationship" between a physician and a medical entity; (2) a referral from such physician to the

medical entity for designated health services; and (3) a claim presented or caused to be presented by such medical entity to an individual, third party payor, or other entity for designated health services furnished pursuant to a referral under subparagraph (A). *See* 42 U.S.C. §1395nn(a)(1).

61.     The Stark Act, enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn et seq., prohibits a *hospital* (or other entity providing healthcare items or services) from submitting Medicare claims for payment based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with the healthcare provider. The regulations implementing 42 U.S.C. §§ 1395nn and 1396b(s) expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

62.     The Stark Act establishes the clear rule that the United States will not pay for items or services prescribed by physicians who have improper financial relationships with other providers. The statute was designed specifically to reduce the loss suffered by the Medicare program due to such increased questionable utilization of services.

63.     Congress enacted the Stark Act in three parts, commonly known as Stark I, Stark II and most recently Stark III (Stark III is actually just a new phase of Stark II). Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

64.    In 1993, Congress extended the Stark Statute (Stark II) to referrals for ten additional designated health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

65.    Effective January 1, 1995, Stark II applied to patient referrals by physicians with a prohibited financial relationship for the "designated health services" which included inpatient and outpatient hospital services. *See* 42 U.S.C. § 1395nn(h)(6).

66.    In pertinent part, the Stark Statute provides:

(a) Prohibition of certain referrals

(1) In general

Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then –

(A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

67.    The Stark Act broadly defines prohibited financial relationships to include any "compensation" paid directly or indirectly to a referring physician. The statute's exceptions then identify specific transactions that will not trigger its referral and billing prohibitions. Those exceptions do not apply in this case.

68.    Stark is a strict liability statute and intent is not an element. Violation of the statute may subject the physician and the billing entity to exclusion from participation in

federal health care programs and various financial penalties, including (a) a civil money penalty of $15,000 for each service included in a claim for which the entity knew or should have known that payment should not be made under Section 1395nn(g); and (b) an assessment of three times the amount claimed for a service rendered pursuant to a referral the entity knew or should have known was prohibited. *See* 42 U.S.C. §§ 1395nn(g), 1320a-7a(a). "Falsely certifying compliance with the Stark or Anti-Kickback Acts in connection with a claim submitted to a federally funded insurance program is actionable under the FCA." *United States ex rel. Wilkins v. United Health Group, Inc.,* 659 F.3d 295, 313 (3d Cir. 2011).

## X. INDEPENDENT ANTI-KICKBACK AND STARK ANALYSIS

69.     The analysis of the Anti-Kickback Statute and Stark Law must be done independently when determining if violations occurred. *See* OIG Supplemental Compliance Program Guidance for Hospitals, 70 FR 4858-01 at 4863(January 31, 2005). This is because "compliance with a Stark law exception does not immunize an arrangement under the Anti-Kickback statute. Rather, the Stark law sets a minimum for arrangements between physicians and hospitals. Even if a hospital-physician relationship qualifies for a Stark law exception, it should still be reviewed for compliance with the anti-kickback statute." *Id; see also Feldstein v. Nash Cmty. Health Services, Inc.,* 51 F. Supp. 2d 673, 686 (E.D.N.C. 1999) ("[T]he fact that a particular [agreement] falls with [an] exception to the Stark Act does not mean it is a legal [agreement] pursuant to 42 U.S.C. § 1320a-7b(b). . . . '[T]he anti-kickback statute is different in scope and application than Stark[ ] and must be distinguished.' 60 FR 41914 at

41927."). Consequently, both sets of laws provide alternate routes for claims to be violations of the FCA.

## XI. THE SHAM LOAN, EQUITY, AND RENT SCHEME

70.    Defendants White, Kumar, Sage, Short, and Halcrow together with the Defendant Participant companies, specifically including BE Gentle HomeHealth, Inc. d/b/a Phoenix Home Healthcare; Defendant North Texas Best Home Healthcare, Inc.; Defendant Vinayaka Associates LLC d/b/a A & S Home Health Care; Defendant Goodwin Home Healthcare Services, Inc.; Defendant Hospice Plus, L.P.; Defendant Goodwin Hospice, LLC; ("Sham Loan, Equity, and Rent Defendants"), and non-party co-conspirators American Physician House Calls ("APH") and its non-profit arm, American Physician House Calls Health Services ("APHHS") are all participants and co-conspirators in the Sham Loan, Equity, and Rent Scheme.

71.    The Sham Loan, Equity, and Rent Scheme was a conspiracy to commit violations of the Anti-Kickback Statute and Stark Act, which also resulted in violations of the False Claims Act. The Sham Loan, Equity, and Rent Defendants knowingly, and in agreement with each other, set up a system of kickbacks and illegal referrals whereby a financially unviable Part B Medicare participant company primarily owned by Sage, and managed by Sage, Short, and Halcrow (specifically, American Physician House Calls ("APH") & its non-profit arm, American Physician House Calls Health Services ("APHHS")), were used as tools to significantly increase patient referrals, and thus Part A Medicare as well as Medicaid payments, to the White/Kumar owned Part A Medicare participant companies—specifically, Defendants BE Gentle HomeHealth, Inc., also d/b/a Phoenix Home Healthcare, North Texas Best Home Healthcare, Inc., Vinayaka

Associates, LLC, d/b/a A&S Home Health Care, Goodwin Home Healthcare Services, Inc., Hospice Plus, L.P., and Goodwin Hospice, LLC.[3]

72.    The illegal kickbacks to Sage, Short, and Halcrow from White and Kumar in the Sham Loan, Equity, and Rent Scheme include: (1) free equity interest for Sage and Short in at least one White/Kumar owned company (BE Gentle d/b/a Phoenix), (2) sham loans in the amount of approximately $1,900,000.00 from White to APH (primarily owned by Sage) which were never intended to be repaid, and in fact were never repaid,

---

[3] **NON-PARTY CO-CONSPIRATORS**
        **Sage Physician Partners, Inc. d/b/a American Physician Housecalls ("APH")** is a for-profit business formerly owned primarily by **Defendants D. Yale Sage, Kirk Short** and **Suresh Kumar**, and a number of other individual shareholders. It filed for protection under Chapter 11 of the U.S. Bankruptcy Code on May 14, 2012, *In re Sage Physician Partners, Inc.*, No. 12-41314, *In the United States Bankruptcy Court, Eastern District of Texas*, filed May 14, 2012. A Chapter 11 Plan was confirmed August 7, 2013 appointing a liquidating trustee, which recently filed (February 21, 2014) an unopposed motion to temporarily and administratively close the case, as the estate has been fully administered. APH was a for-profit corporation with a singular purpose—to manage **American Physician Housecalls Health Services, Inc. ("APHHS")**, whose only employees were physicians. Defendant Sheila Halcrow, an employee of APH, coordinated physician referrals by APHHS physicians under the APHHS Medical Director, Defendant Bryan White, M.D.
        APHHS is a non-profit corporation that employs doctors and care providers. These employees of APHHS provided certifications, re-certifications and orders necessary to effectuate illicit referrals of Part A eligible patients that did not already have an existing relationship with another similar Part A Medicare provider to populate the White/Kumar-owned Defendant Part A Medicare participant companies in violation of the Stark Act and the Anti-Kickback Statute. The APHHS physicians also presented or caused to be presented false claims related to Care Plan Oversights ("CPO") for patients that were referred by APHHS to the White/Kumar Part A companies. The CPO funds were used to help sustain the business of APH and APHHS, so that these failing Part B companies could continue to be a source of illegal referrals to the White/Kumar Part A Defendant companies.
        APH and APHHS were not profitable and the business model under which they could have legitimately operated was not sustainable. However, in order to use them to keep the hospice and home health referral pipeline flowing to their Part A participant entities, White and Kumar invested millions of dollars with no expectation of repayment. A description of the debt instruments from APH's own files is attached as Appendix F. Though titled "expired" debt instruments, the terms reveal that 13 of the 14 instruments were "extended indefinitely," which is evidence the loans/kickbacks were never intended to be repaid in the ordinary course of business by APH.
        In essence, the profitable Part A Medicare provider Defendants threw good-money-after-bad to keep the fledgling Part B Medicare participants APH/APHHS afloat in order to continue the illegal referrals scheme.
        The Sham Loan, Equity, and Rent Defendants, together with the non-parties described above acted in a conspiracy to violate the False Claims Act through express and implied false statements/certifications that they were in compliance with the Stark Act and the Anti-Kickback Statute when in fact the laws were being violated consistently and continually and in the ordinary course of business under the Sham Loan, Equity, and Rent Scheme.

and (3) free leased space for APH for which rent was not paid on a monthly basis, and was never intended to be paid at fair market value.

73.    The self-interested and kickback-induced illegal patient referrals include: (1) a steady stream of original patient referrals and re-certification referrals to the White/Kumar owned Part A Defendant companies from the Sage owned Part B companies (APH/APHHS) managed by Sage, Short, and Halcrow, and (2) referrals back to the Sage owned Part B companies (APH/APHHS) from the White/Kumar owned Part A companies for re-certification.

74.    The illegal purpose, for which the evidence shows that all the Sham Loan, Equity, and Rent Defendants, including their principals, had the requisite knowledge of and agreed to, was to maintain the cycle of self-interested and kickback-induced patient referrals to the White/Kumar owned Part A Medicare participant companies in order to bill and receive substantial Medicare and Medicaid payments from the Government.

75.    As a result of this Sham Loan, Equity, and Rent Scheme, the White/Kumar-owned Part A companies billed Medicare and Medicaid an astronomical amount of money, presenting or causing to be presented false claims for payment and making or using or causing to be made or used false statements/certifications or records (including false physician certifications regarding the patients being "terminally ill") material to false claims for payment. Specifically, the White/Kumar Part A companies received Medicare payments in excess of $100,000,000.00 from 2006 to 2012. *See* Appendices B and D.

76.    Under the False Claims Act the civil penalties and damages for the Sham Loan, Equity, and Rent Scheme are substantial. Each individual false claim (of which

there are tens of thousands) creates liability for civil penalties of between $5,500.00 and $11,000.00 per false claim, plus 3 times the amount of damages the Government sustained.

77.     Relator Capshaw has personal knowledge of the Sham Loan, Equity, and Rent Scheme. Additionally, the appendices attached to this Joint Amended Complaint reflect the identity, subject, places, dates, and amount of money involved in the corpus of the Sham Loan, Equity, and Rent Scheme.

78.     Since the financial collapse of APH and APHHS, in mid-2012[4] the individual Sham Loan, Equity, and Rent Defendants have resurrected the scheme for the benefit of the Medicare Part A Defendants. Sheila Halcrow fills the same role in the new company as she did previously in APH.

79.     The web of parties involved in the Sham Loan, Equity, and Rent Scheme alleged herein is complex, and the ownership interests and activities of Defendants White, Kumar, Sage, Short, and Halcrow/Watley/Taylor/O'Brien are concealed behind corporate names and relationships. The following flowchart illustrating the Sham Loan, Equity, and Rent Scheme participants, relationships and structure is attached as Appendix I.

---

[4] *See supra,* n.4.



**Medicare**

False Claims (on billing) due to implied false certification that claims are not the product of improper referrals in violation of Stark law and Anti-Kickback Statute

False Claims (on payment) due to express false certification (found on 855A enrollment forms and Cost Reports) that claims are not the product of improper referrals that violate Stark law and Anti-Kickback Statute

Part A Businesses owned by Bryan White & Shuresh Kumar

PART B Business propped up By White loans & Kumar investment

Businesses which are all owned by White and/or Kumar, and are all managed by Kumar (or Kumar's relatives)

Kickbacks including sham loans, equity in Be Gentle, and rent, in exchange for referrals

**AMERICAN PHYSICIANS HOUSECALLS (APH)**

Managed by Yale Sage, Kirk Short, & Sheila Halcrow Halcrow controlled APHHS physicians and mandated a certain class of referrals by APHHS physicians to White/Kumar owned companies.

**BE GENTLE D/B/A PHOENIX HOME HEALTH CARE** owned by White & Kumar (Sage & Short have ownership interest)

**NORTH TEXAS BEST HOME HEALTHCARE, INC.** owned by White

**A + S HOME HEALTH CARE** owned by White

**GOODWIN HOME HEALTH SERVICES, INC.** owned by White & Kumar

**HOSPICE PLUS** owned by White & Kumar

**GOODWIN HOSPICE LLC** owned by White & Kumar

Sole member management contract

**Referral Scheme in Violation of Stark law and Anti-Kickback Statute**

APHHS doctors refer to White/Kumar owned home care companies (with Form HCFA-485 certification of necessity), and refer to White/Kumar owned hospice companies via doctor's order. Referrals include original and re-certification referrals

Referrals back from White/Kumar owned home care and hospice companies to APHHS doctors for re-certification, Form 485's and orders, every 60 days

**AMERICAN PHYSICIANS HOUSECALLS HEALTH SERVICES (APHHS);** (501(a) non-profit arm of APH)

White, Director of Medicine APHHS. APHHS employed physicians, who were controlled by White and Halcrow, who mandated that all referrals, for patients without prior Part A facility relationship, be to White/Kumar owned companies.

80.     The Sham Loan, Equity, and Rent Scheme Defendants made or used or caused to be made or used material false statements/certifications to Medicare and Medicaid in order to receive payment on Medicare and Medicaid claims, including (1) false express statements/certifications made as a condition of *payment* that all claims and underlying transactions complied with the Anti-Kickback Statute, Stark Act, and other such laws on the Form 855A's, the applicable Cost reports (*see supra at* p.20 of this Joint Complaint); and, (2) implied false statements/certifications when billing Medicare that all claims and underlying transactions complied with the Federal Anti-Kickback Statute, Stark Act, and other such laws.

**A.      Sham Loan, Equity, and Rent Scheme: Who, What, When, Where, How, and Scienter (Why)?**

81.     Paragraphs 1-80 are incorporated herein as if fully set forth.

**B.      Co-Conspirators (Who)**

82.     Defendants Suresh Kumar, Bryan K. White, D. Yale Sage, Kirk Short and Sheila Halcrow are the principals in the Sham Loan, Equity, and Rent Scheme.

83.     The Part A Medicare participant Defendants, specifically, BE Gentle HomeHealth, Inc., also d/b/a Phoenix Home HealthCare, North Texas Best Home Healthcare, Vinayaka Associates, LLC, d/b/a A&S Home Health Care, Goodwin Home Healthcare Services, Inc., Hospice Plus, L.P., Goodwin Hospice, LLC, were all involved in the Sham Loan, Equity, and Rent Scheme.

84.     The Part B Medicare participants companies, specifically, American Physician House Calls ("APH") and its non-profit arm, American Physician House Calls Health Services ("APHHS") were involved in the Sham Loan, Equity, and Rent Scheme, but are not defendants in this case only because they are bankrupt entities.

85.     The ownership and management of the Part A and Part B companies reveal the following:

a.      Defendant Bryan K. White, M.D., owned in whole or in part the following Part A Medicare participant companies: BE Gentle HomeHealth, Inc., also d/b/a Phoenix Home HealthCare, North Texas Best Home Healthcare, Vinayaka Associates, LLC, d/b/a A&S Home Health Care, Goodwin Home Healthcare Services, Inc., Hospice Plus, L.P., and Goodwin Hospice, LLC. Bryan K. White, M.D., also directed the physicians employed by Part B Medicare Participant APHHS in his position as Director of Medicine of APHHS. *See* Appendix G.

b.      Defendant Suresh G. Kumar, R.N., owned in whole or in part the following Part A Medicare participant companies: BE Gentle HomeHealth, Inc., also d/b/a Phoenix Home HealthCare, Goodwin Home Healthcare Services, Inc., and Hospice Plus, L.P. Suresh G. Kumar, R.N., also was a substantial investor in Part B Medicare Participant APH. Kumar also managed (personally or through his family relations), BE Gentle HomeHealth, Inc. d/b/a Phoenix Home HealthCare, North Texas Best Home Healthcare, Vinayaka Associates, LLC, d/b/a A&S Home Health Care, Goodwin Home Healthcare Services, Inc., Hospice Plus, L.P., and Goodwin Hospice, LLC.

c.      Defendant D. Yale Sage owned, in part, the following Part A Medicare participant company: BE Gentle HomeHealth, Inc., also d/b/a Phoenix Home HealthCare. Sage also was the primary owner of Part B Medicare Participant company, American Physician House Calls (APH). Sage was also a primary manager of APH, and therefore APHHS, which had a sole management agreement to manage APH.

d.      Defendant Kirk Short owned, in part, the following Part A Medicare participant company: BE Gentle HomeHealth, Inc., also d/b/a d/b/a Phoenix Home HealthCare. Short also was a stakeholder of Part B Medicare Participant company, American Physician House Calls (APH). Sage was also a primary manager of APH, and therefore APHHS, which had a sole management agreement to manage APH.

e.      Defendant Sheila Halcrow also was a stakeholder of Part B Medicare Participant company, American Physician House Calls (APH). Halcrow was also a primary manager of APH, and therefore APHHS, which had a sole management agreement to manage APH.

## C.    The Scheme: What, How, When & Where:

86.    The Sham Loan, Equity, and Rent Scheme was a conspiracy to commit violations of the Federal Anti-Kickback Statute and Stark Act, which resulted in numerous per se violations of the False Claims Act. The schemers also conspired to violate the Texas Medicaid Fraud Prevention Act.

87.    In order to guarantee a steady stream of patient referrals to the White/Kumar Part A Medicare participant companies, White and Kumar made illegal kickbacks to Sage, Short, and Halcrow (in violation of the Anti-Kickback Statute, the Stark Act and the Texas Medicaid Fraud Prevention Act.). Specifically, said kickbacks included: (1) free equity interest for Sage and Short in at least one White/Kumar owned company (BE Gentle), (2) sham loans in the amount of approximately $1,900,000.00 from White to APH (primarily owned by Sage) that were never intended to be repaid, which is evidenced by the Debt Instrument Chart, attached as Appendix F and (3) free

leased spaced for APH for which rent was never paid, which is evidenced by The City Mark Lease attached as Appendix H.

88.     The self-interested and kickback-induced illegal referrals made to and from Defendants include (1) a steady stream of original patient referrals and re-certification patient referrals to the White/Kumar owned Part A Defendant companies from the Sage owned Part B companies (APH/APHHS) managed by Sage, Short, and Halcrow, which is evidenced by the Referral Spreadsheet attached as Appendix B; and (2) referrals sent back to the Sage owned Part B companies (APH/APHHS) from the White/Kumar owned Part A companies for re-certification, which is evidenced by The SuperBill document showing billing to Medicare, excerpts of which are attached as Appendix C.

89.     The illegal purpose, for which the evidence shows all the Sham Loan, Equity, and Rent Defendants, including their principals, had the requisite knowledge of and agreed to, was to maintain the cycle of self-interested and kickback-induced patient referrals to the White/Kumar owned Part A Medicare participant companies in order to bill and receive substantial Medicare and Medicaid payments from the Government

90.     Importantly, Sheila Halcrow was employed by APH but handled the administrative duties related to patient record keeping and referrals for APHHS as well. Defendant White, as the Medical Director for APHHS, controlled the APHHS physicians through daily directions given by Sheila Halcrow.

91.     When a patient seen by an APHHS physician did not have a prior existing relationship with a Part A Medicare participant company, Shelia instructed the APHHS physicians to refer the patient to the appropriate White/Kumar owned Part A companies

in a controlled manner so as not to arouse the suspicion of any curious government employees or outsiders. The initial certification of necessity for services by the APHHS physicians was made via an HCFA form 485 for the home care companies. For patients in need of hospice services, only a doctor's or Medical Director's order is necessary (as opposed to the HCFA-485 form) for the referral to a Medicare Part A facility. In these instances, patients cared for by physicians were referred to Hospice Plus and Goodwin Hospice, both of which are White/ Kumar owned companies.

92.    When the Medicare Part A patients needed to be recertified for continued care, either hospice or home health, an employee of their White/Kumar Part A entity would contact Halcrow, who in turn would direct the patient's APHHS physician to recertify the patient. Often, Halcrow had consent of some of the APHHS physicians to sign their names for re-certifications for them.

93.    Furthermore, through this cycle, the Part A Sham Loan, Equity, and Rent Defendant companies were able to continue to bill Medicare and Medicaid for this class of patients again and again.

94.    The Sham Loan, Equity, and Rent Part A Participant Defendants made or used or caused to be made or used false statements/certifications when billing Medicare that the claims were "correct and complete." The claims were not correct because they unlawfully included claims for reimbursement for services provided as a result of violations of the Stark Act and the Anti-Kickback Act.

95.    All claims for payment from Medicare in connection with these referrals from each of the Part A Medicare Sham Loan, Equity, and Rent Defendant entities are false claims because they violated these laws. Moreover, compliance with those laws is

a condition of payment and the violations were "knowing" as demonstrated in the Defendants' Certification Statement in its Medicare Enrollment Application, Form 855A:

> 3. I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. **I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying** with such laws, regulations, and program instructions **(including, but not limited to, the Federal anti-kickback statute and the Stark law),** and on the provider's compliance with all applicable conditions of participation in Medicare.
> . . .
> 6. I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

For this reason, by submission of each claim, Defendants impliedly certified compliance with all such laws, regulations, and program instructions, including but not limited to, the Federal anti-kickback statute and the Stark Law, consistent with this Certification Statement. *See* Medicare Enrollment Application attached as Appendix A.

96.     The Sham Loan, Equity, and Rent Defendants fraudulently induced the Government to allow them to participate in the Medicare Program by knowingly falsely promising in their Medicare Enrollment Applications that:

> "I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 4A of this application."

*Id.* Defendants knew when making these agreements of their plans to violate these laws by means of the Sham Loan, Equity, and Rent Scheme.

97.     Because each Sham Loan, Equity, and Rent Defendant fraudulently induced the United States to contract with it and make payments to it, all monies paid under their agreements are damages. Hospice Plus provides an example of the measure of damages arising from this Sham Loan, Equity, and Rent Scheme. In only a

3.25 year period, at least 50 percent of Hospice Plus patients came from referrals by APPHS employees. For that period alone, Hospice Plus (which is only one Part A provider Sham Loan, Equity, and Rent Defendant) was paid over $29,300,000.00 from Medicare. This is evidenced by The Summary of The Hospice Plus Monthly Billing Statements which is attached as Appendix D. Based Capshaw's personal knowledge, Hospice Plus was one of the smaller entities involved in this scheme. The Government's damages clearly are substantial and in the hundreds of millions of dollars before trebling.

98. In addition, the Sham Loan, Equity, and Rent Defendants also made express false certifications that each claim they made in the preceding year was for services made in compliance with relevant laws and regulations when they signed and filed their annual Cost Reports. Each cost report includes the following statement:

> I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and-that **the services identified in this cost report were provided in compliance with such laws and regulations**.

> and

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. **Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback** or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

Every annual certification made or used or caused to be made or used by the Sham Loan, Equity and Rent Scheme Defendants was false, because Defendants' services were provided or procured by the payment directly or indirectly of kickbacks.

99.     During the time the Sham Loan, Equity, and Rent Scheme was in operation, APH and APHHS were not profitable and were steadily losing money. However, the Part A White/Kumar owned companies (like Hospice Plus) were profiting significantly from the referrals by APHHS employees. In order to sustain the stream of referrals and re-certifications by APHHS employees, White "propped up" APH and APHHS through a series of debt instruments and loans. By the time APH failed, White had personally provided approximately $1,900,000.00 in sham loans to fund the APH/APHHS operation. None of the loans were repaid or were ever intended to be repaid. For instance, one of the promissory notes through which White funneled money to APH was a backdated note executed just prior to the Bankruptcy filings of these entities. In addition to this back-dated note, APH documents reveal a schedule of the debt instruments; the terms of those instruments were extended "indefinitely." This is evidenced by The Debt Instrument Chart attached as Appendix F.

100.    The Sham Loan, Equity, and Rent Scheme began in on or about 2006 until about May of 2012. All referrals by APHHS physicians to all Medicare Part A Sham Loan, Equity, and Rent Defendants, and all billing associated with each patient referred represent violations of the False Claims Act (and violations of the Anti-Kickback Statute and Stark Act). Appendix B, attached hereto reflects individual, per patient referral transactions, including the relevant dates.

101.    As a result of this Sham Loan, Equity, and Rent Scheme, the White/Kumar-owned Part A companies were able to bill the Government for Medicare and Medicaid payment an astronomical amount of money through claims that were falsely certified. Relator Capshaw's analysis, as the Director of Finance for APH, is that

the combined Medicare payments put the amount received as a direct result of the false statements/certifications upwards of $100,000,000.00. See also The Summary of The Hospice Plus Monthly Billing Statements which is attached as Appendix D. The primary locations where the Sham Loan, Equity, and Rent Scheme unfolded were at the Defendants' offices described above under the heading "Parties," and the offices of APH and APHHS, at 3100 McKinnon, Suite 400, Dallas, Texas.

**D.    Why: Scienter ("Knowingly")**

102.    In addition to their certifications in their cost reports, the Sham Loan, Equity, and Rent Part A Participant Defendants acknowledged in their Medicare Enrollment Application and periodic revalidation applications that payment was conditioned on compliance with the Stark and Anti-Kickback Statutes.

> "**I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with** such laws, regulations, and program instructions (**including, but not limited to, the Federal anti-kickback statute and the Stark law**), and on the supplier's compliance with all applicable condition of participation in Medicare."

103. Bryan K. White, Suresh Kumar, Dan Yale Sage, Kirk Short and Sheila Halcrow, individually, and as principals of the Sham Loan, Equity, and Rent Scheme Defendant corporations, all played roles in causing false claims to be presented to Medicare under the Sham Loan, Equity, and Rent Scheme. Specifically, they caused all the physicians who worked for APHHS throughout the duration of the scheme, who are listed in the extreme right column of the spreadsheet attached as Appendix B and incorporated herein (as well as any other similarly situated APHHS physician not listed), to make statements/certifications that were false. Moreover, Bryan K. White, Suresh Kumar, Dan Yale Sage, Kirk Short and Sheila Halcrow, individually, and as principals of

the Sham Loan, Equity, and Rent Scheme Defendant corporations, knowingly made or used or caused these false statements/certifications to be made or used in furtherance of the Sham Loan, Equity, and Rent Scheme. The evidence specifically shows that all of the Sham Loan, Equity, and Rent Scheme Defendants had actual knowledge, or acted with deliberate ignorance, of the false statements/certifications being made to Medicare (and the underlying violations of the Anti-Kickback Statute and Stark Act) in order to effectuate the Sham Loan, Equity, and Rent Scheme and obtain payment to the Part A Medicare Defendants.

## XII. THE PAYOLA SCHEME

104.    The Payola Scheme is, as of the spring of 2014, at least a nine-year-long practice by two north Texas businessmen, White and Kumar, their hospice and home health companies, and the subsequent owner of those businesses, of "buying" terminally ill Medicare and Medicaid patients from area nursing homes, assisted living facilities, doctors, and hospitals. Defendants bought the patient referrals with all types of gifts, including cash, gift cards, lunches, dinners, happy hours, tickets to Rangers and Cowboys games, elaborate Christmas gifts, cars, manicures and pedicures, free power lift chairs for disabled patients, and the services of skilled nursing staff offered and provided at no cost to "cooperative" area nursing homes and assisted living facilities. This scheme, which is ongoing, has been perpetrated by Defendants White, Kumar, Hospice Plus, L.P., International Tutoring Services, LLC f/k/a International Tutoring Services, Inc. and d/b/a Hospice Plus, and Curo Health Services, LLC f/k/a Curo Health Services, Inc., (the "Payola Defendants"), as well as by the various home health and hospice companies established and/or acquired by White and Kumar in the North Texas

area since 2005, including Hospice Plus North East, Phoenix Hospice, Phoenix Hospice Care, Goodwin Hospice, Choice Hospice, Choice Plus Hospice, Home Health Plus, Phoenix Home Healthcare, Goodwin Home Health, Excel Plus Home Health, North Texas Best Home Healthcare, A&S Home Health Care, One Point Home Health, and One Point Health Services.

105.    Relator Kevin Bryan ("Bryan"), who worked for Defendant Hospice Plus, LP, ("Hospice Plus") from early 2006 to November of 2012, and for a home health company owned in whole or in part by one of Hospice Plus's owners from May of 2013 to July, 2013, was Hospice Plus's Director of Marketing. Relator Franklin Brock Wendt ("Wendt") worked as a nurse marketer for Hospice Plus from 2009 to July 2013. Bryan and Wendt were each involved in carrying out Hospice Plus's pay-for-patients scheme, and were both eye witnesses to the same efforts by fellow employees and by Hospice Plus's two principals, which were continuous and are, on information and belief, still ongoing. Hospice Plus's two principals, Defendants White and Kumar, directed and committed these illegal kickbacks in order to increase Hospice Plus's patient census (its number of patients at any given time). Bryan and Wendt have personal knowledge that more than 75 percent, conservatively, of all patients referred to Hospice Plus since 2006 were from sources that Hospice Plus was bribing and rewarding on an ongoing basis pursuant to the Payola Scheme. Bryan and Wendt witnessed that more than 90 percent of these patients were Medicare or Medicaid patients, and approximately 90 percent of those were Medicare. Hospice Plus submitted claims for payment electronically to CMS every month for these patients. All of these claims were false claims under the False Claims Act and the Texas Medicaid Fraud Prevention Act because they were for

patients who had been obtained with kickbacks and/or rewards to the referring organization, its managers and/or employees, or the patient.

106. Because of the number of patients involved (on average, approximately 600 Medicare patients per year, though Bryan and Wendt say the actual number is probably higher) and Medicare's reimbursement schedule for hospice patients (on average $200 per patient, per day, 365 days per year), the amount of money the Defendants have obtained from the Government by their fraud is, to date, in excess of $400,000,000.00.

107. Hospice Plus's principals, White and Kumar, have, since the early 2000s, created and operated many hospice and home health companies in north Texas, including Hospice Plus North East, Phoenix Hospice, Phoenix Hospice Care, Goodwin Hospice, Choice Hospice, Choice Plus Hospice, Home Health Plus, Phoenix Home Healthcare, Goodwin Home Health, Excel Plus Home Health, North Texas Best Home Healthcare, A&S Home Health Care, One Point Home Health, and One Point Health Services. All of these companies, some of which were housed together for years, have been procuring patient referrals using gifts, bribes, and rewards. Some of Defendant Suresh Kumar's family members and his accountant have been principals in some of these companies. These persons include: Kumar's wife, Defendant Remani B. Kumar a/k/a Remani Amma; his son, Defendant Sabari Kumar; his cousin (or nephew) Sathyajith Nair; and his accountant, Hari Pillai. Defendant White's sister, Kelli White, has been Director of Sales and Vice President of Finance and Risk Management of Hospice Plus. Defendants Kumar and White methodically grew Hospice Plus's census using bribes, kickbacks and rewards, and then sold Hospice Plus, and its various

affiliates, to Curo Health Services, LLC, ("Curo") of North Carolina, in 2011 or 2012. Curo Health Services' principals were actively involved in the evaluation of Hospice Plus and have actively overseen its operations in Texas along with Kumar and White since its acquisition.

108. Defendants' violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, resulting from the fraudulent conduct of Hospice Plus, Kumar, White, and Curo, via the Payola Scheme have been ongoing continuously since at least 2005.

109. The unlawful activities in the Payola Scheme that violate, in part, the FCA, included the proactive, purposeful actions of the Payola Defendants. The Payola Defendants' violations were not minor or inadvertent but systematic conduct arising out of said Defendants' greed and disregard for legal consequence or harm to others. The Payola Defendants made or used or caused to be made or used material false statements/certifications to the Government in order to receive payment on Medicare claims, including (1) false express statements/certifications made as a condition of *payment* that all claims and underlying transactions complied with the Anti-Kickback Statute, Stark Act, and other such laws; and, (2) implied false statement/certification when *billing* Medicare that all claims and underlying transactions complied with the Anti-kickback Statute, Stark Act, and other such laws.

110. False claims against the United States arise, *inter alia*, when a false or fraudulent record or statement (which may be a "certification," as a certification is a statement or record,), express or implied, which is material to a false or fraudulent claim for payment, is made or used by a person or entity. The Payola Defendants knowingly

presented or caused to be presented tens of thousands of false and fraudulent claims, and made or used or caused to be made or used statements/certifications and records to Medicare or its agents, and thousands of false and fraudulent claims to Medicaid, seeking payment for their illegally referred hospice.

111. Defendant Suresh Kumar formed International Tutoring Services, Inc., in 2003. International Tutoring Services, Inc., assumed the name "Hospice Plus" in June of 2004. Defendant Hospice Plus, L.P., was formed in July of 2005 by Defendant White. International Tutoring Services, LLC, was formed in September of 2010, and International Tutoring Services, Inc., was converted to International Tutoring Services, LLC, in September of 2010. Defendant International Tutoring Services, LLC, f/k/a International Tutoring Services, Inc., and d/b/a Hospice Plus, is sometimes referred to herein as Defendant "International Tutoring." Defendant Curo Health Services, LLC, sometimes referred to herein as Defendant "Curo", acquired International Tutoring Services, LLC, Hospice Plus, L.P., and many of their affiliated entities, which were owned and/or operated by Defendants White and Kumar in or about 2010 to 2012.

112. At all relevant times, Defendant Hospice Plus was the Alter Ego, as that term is defined by law, of Defendant International Tutoring. In particular, at all times material hereto, Defendant International Tutoring dominated Defendant Hospice Plus to the extent that Defendant Hospice Plus was a mere tool or business conduit of Defendant International Tutoring, such that the ostensible separate legal existence of said Defendants was a fiction. Further, Defendant Hospice Plus was, at all times relevant hereto, and continues to be, undercapitalized relative to the risks it took in the Texas health care market, such that the corporate veil of Defendant Hospice Plus

should be pierced and Defendant International Tutoring should be held liable for the tortious conduct of Defendant Hospice Plus.

113.    Pursuant to said doctrine, Defendant International Tutoring is responsible for the acts and/or omissions of the vice principals, employees, servants, agents, ostensible agents, and/or representatives of Defendant Hospice Plus.

114.    As detailed below, in order to obtain illegal patient referrals for their Medicare provider entities, White and Kumar (and thus International Tutoring and Hospice Plus) agreed to employ extensive efforts to bribe and reward potential sources of patient referrals, to employ marketers to carry out those efforts, and to hire physicians as ostensible medical directors whose primary role would be to make patient referrals to White and Kumar's Medicare provider entities. These agreements were the product of numerous and ongoing discussions between White and Kumar from 2006 to at least June of 2013. These discussions and agreements, as detailed below, are evidenced, in part, by: (1) the instructions they gave, both individually and together, to the marketing staff of their Medicare provider entities, on how to carry out the Payola Scheme; (2) the instructions Dr. White gave his sister, Kelli White, who was Hospice Plus's Accounts Payable Manager, and also Hospice Plus's Director of Sales and Vice President of Finance and Risk Management, to cut reimbursement checks to marketers for the lunches and other gifts the marketers were giving to potential referral sources; (3) Dr. White's ongoing reviews of American Physician Housecalls' patients' charts to find patients he could have Sheila Halcrow refer to his and Kumar's Medicare provider entities; (4) discussions Bryan was a party to at Monday morning marketing meetings with Kumar, and White and Kumar's subsequent instructions to carry out new Payola

efforts proposed in those meetings; (5) the September 2008 "sample" expense report Kelli White emailed to Bryan showing him what she was looking for, which included numerous examples of bribes and rewards for patient referrals; (6) White and Kumar both instructing Bryan and other marketers to provide Certified Nurse Assistants to potential patient referral sources; (7) White and Kumar both making it clear to Bryan and the other marketers that physicians being hired ostensibly as "medical directors" were actually being hired and paid in order to refer patients to Hospice Plus and White and Kumar's other Medicare provider entities; (8) White and Kumar both agreeing to pay Wendt $250 for each patient he referred to Hospice Plus or any of White and Kumar's other Medicare provider entities; (9) White and Kumar, during the time when Curo Health Services was in the process of buying Hospice Plus and other White/Kumar Medicare provider entities, both instructing all of the marketers to come to them personally to get money for lunches and other gifts for potential patient referral sources; (10) White explaining to Wendt that if a medical director would refer just two to three patients per month, he would more than cover the $3,000 per month that Hospice Plus was paying them; (11) White and Kumar having Sheila Halcrow transfer patients from one of their Medicare provider entities to another, with a new CMS 485, as the patients reached their end of plan care (on a prior CMS 485), so that they could continue the cycle of billing Medicare for those patients; (12) Kumar and Slade Brown, in Wendt's presence, agreeing that Kumar would pay him $2,000 cash on the spot for handing over intake sheets on ten patients, for One Point Home Health, and that Brown would deliver the other ten patients to Kumar when he was hired by One Point Home Health; (13) the meetings attended by Anthony Flores, R.N., Kumar, and Dr. Dennis Birenbaum, where

Birenbaum and Kumar reached an agreement whereby Kumar would help Birenbaum open up a new cancer center, provide him with a car, and a house to live in, and in turn Birenbaum would refer all of his hospice and home health patients to Hospice Plus and/or One Point Home Health; (14) Kumar and Jackie Pollard, LVN, in Wendt's presence, agreeing that Pollard would refer patients to Hospice Plus and/or One Point Home Health, and in exchange Kumar would pay her cash; and (15) 20 to 30 other such meetings between Kumar, Wendt and a potential referral source, whereby Kumar reached the same type of agreement with the referral source as with Pollard. As these facts show, White and Kumar had agreed to perpetuate the Payola Scheme to acquire Medicare patients in order for their numerous Medicare provider entities to present bills to Medicare for payment, for the care rendered to these fraudulently obtained patients.

115.   As also detailed below, in order to obtain the largest number of patients, and bill Medicare for their care of those patients, White and Kumar agreed to create multiple hospice and home health entities so that they could cycle patients back and forth among those entities in order to "game" Medicare's annual cap on payments for hospice patients, while still billing Medicare for home health services to those patients while they were "on deck" for further hospice care. These agreements are evidenced, in part, by the numerous Medicare provider entities created and/or acquired by White and Kumar, to which they then had their illegally obtained patients referred. As these facts show, White and Kumar had agreed to create and/or acquire these home health and hospice entities in order to present bills to Medicare for payment, for the care rendered to their fraudulently obtained patients.

116.     As also detailed below, Kumar, White, (and thus International Tutoring and Hospice Plus), and Curo Health Services, all agreed to continue the Payola Scheme, and the cycle of patient referrals among the White/Kumar entities (which later became Curo-owned entities), after Curo acquired the White/Kumar entities. These agreements are evidenced, in part, by: (1) Alice Ann Schwartz, Chief Operating Officer of Curo Health Services, approving a pretext explanation by Bryan, in White's presence, for Hospice Plus's marketers' expenses of $100,000 to $200,000 annually for numerous gifts, including gift cards, to potential referral sources, as being for "educational purposes, new employees, and supporting other marketers;" (2) Rich Dalcero, Curo Health Services' Vice President of Business Development, offering 18 of Hospice Plus's marketers ("Health Care Coordinators") $500 if, over the next nine days, they together obtained 130 patient referrals, and $600 if they obtained 140 patient referrals (i.e., $69 per patient for the first 130 patients, and $180 per patient for an additional ten patients), in addition to the 28 patients they had already obtained during the first six days of that month; (3) Hospice Plus's marketers, including Wendt, paying weekly for manicures / pedicures, and for happy hours at restaurants, for potential referral sources using Curo Health Services' Visa cards; (4) the fact that Wendt's compensation as an employee of Hospice Plus was paid from an account owned by International Tutoring, which Curo Health Services had acquired, all the while using Curo Health Services' Visa card to continue the Payola Scheme; (5) Kumar instructing Wendt to put on a lunch for the staff at The Forum at Park Lane, which he did using his Curo Health Services Visa card, and also instructed Wendt to have a full time Hospice Plus CNA scheduled for that facility, which Wendt did; and (6) Wendt being paid $150 per patient referral after Curo Health

Services acquired Hospice Plus. As these facts show, Kumar, White, (and thus International Tutoring and Hospice Plus), and Curo Health Services, all agreed to perpetuate the Payola Scheme, including using home health and hospice entities, in order to present bills to Medicare for payment, for the care rendered to their fraudulently obtained patients.

117.    Further, at all times relevant hereto prior to Defendant Curo's acquisition of Defendants International Tutoring and Hospice Plus, Defendants International Tutoring and Hospice Plus were each the Alter Ego, as that term is defined by law, of Defendants Kumar and White. On information and belief, Defendants White and Kumar controlled International Tutoring and Hospice Plus completely, commingled corporate funds of Defendants International Tutoring and Hospice Plus with their own funds, and hired and utilized employees for Defendants International Tutoring and Hospice Plus interchangeably. Moreover, Defendants Kumar and White undercapitalized Defendants International Tutoring and Hospice Plus relative to the risks those entities took in the Texas health care market, such that the corporate veil of Defendants International Tutoring and Hospice Plus should be pierced and Defendants Kumar and White should be held liable for the tortious conduct of Defendants International Tutoring and Hospice Plus.

118.    Pursuant to said doctrine, Defendants Kumar and White are responsible for the acts and/or omissions of the vice principals, employees, servants, agents, ostensible agents, and/or representatives of Defendants International Tutoring and Hospice Plus.

## A.    Bryan

119.    Relator Kevin Bryan ("Bryan") witnessed violations from 2005 to November of 2012 and from May to July of 2013. Bryan was a marketer, an assistant marketing director, and then a marketing director for Defendant Hospice Plus from 2006 to 2012. Relator is a Texas native, who received his degree in Fire Science in 1996 from Kilgore College Fire Academy and subsequently became a certified firefighter/emergency medical technician ("EMT"). After working as an EMT and operating his own emergency medical response business for several years, in about 2002 Bryan went to work for American Hospice as a Community Liaison. American Hospice, which was based in DeSoto, Texas and Fort Worth, Texas, provided hospice care to terminally ill patients who had been given a diagnosis with a life expectancy of six months or less if the illness were to run its normal course.

120.    In the course of his employment with American Hospice, Bryan met Defendant Bryan K. White, M.D., who at the time was the Medical Director at Lennwood Nursing Home. Dr. White was employed at the time by Vitas Innovative Hospice Care, and later became a "team physician" for American Hospice. In the course of his employment at American Hospice, Bryan would find nursing homes in need of a doctor and would suggest Dr. White, so that American Hospice would have a relationship with those facilities, which could help with hospice patient referrals. Bryan then met Dr. White's partner, Dr. Gene Bigham, who also became a team physician at American Hospice. Dr. Bigham was also Medical Director with Dr. White at some facilities.

121.    In the fall of 2004, approximately seven months before Dr. White resigned from American Hospice, Bryan had lunch with Kirk Short, who was opening American

Physician Housecalls, or "APH." APH provided medical and nursing services at patients' homes, primarily to the chronic and terminally ill. Short was looking for a physician that worked in a large number of nursing homes, so Bryan told Short about Dr. White. This was in the fall of 2004, while Dr. White was still with American Hospice. Bryan introduced the two at a lunch. During the lunch Short, White, and Bryan discussed Dr. White's plans for a new hospice company, which he was in the process of forming as Hospice Plus, and also discussed the potential for a large number of homebound patients, as that is a primary source of revenue in the hospice market.

122.     A few months after that lunch, but while Dr. White was still with American Hospice, Bryan and Dr. White met again with Short, and also Yale Sage, another owner of APH, to introduce them to Dr. White's business concept of the hospice business, and the potential he saw for large profits in that business. In the spring of 2005, Dr. White resigned from American Hospice and opened Hospice Plus. Bryan stayed at American Hospice for another year, and left there in about January or February of 2006.

123.     In 2005, during his final year working for American Hospice, Bryan was at Park Manor, a skilled nursing and rehabilitation facility, when Angela Chatham, the Marketing Manager for Hospice Plus at the time, and Dr. White were hosting a luncheon for all of the department heads (roughly 30-40) of Park Manor, including the Administrator, the Director of Nursing ("DON"), and the Charge Nurses.

124.     In about February of 2006, after losing a majority of patients to Hospice Plus, Bryan left American Hospice and joined Hospice Plus. Bryan was employed with Hospice Plus from 2006 to 2012. Bryan first met Suresh Kumar ("Kumar") in 2006 for his job interview. Kumar was Dr. White's business partner. When Bryan first started at

Hospice Plus, he would go to nursing homes where he marketed for Hospice Plus. Bryan would introduce himself as the new marketing representative for Hospice Plus, and as time went on, Bryan would give staff members a Dillard's or Macy's gift card, or do a lunch for the staff. Bryan turned in these expenses to Kelli White, Dr. White's sister, who was the accounts payable manager at Hospice Plus. The purpose of these efforts was to induce the facilities or responsible personnel to refer patients to Hospice Plus. Bryan also worked closely with Hospice Plus's marketing manager, Angela Chatham.

125. In the hospice and nursing home industry, March is Social Work Month. Social Work Month is set aside to honor social workers throughout the country for their hard work. At the beginning of March, 2006, Dr. White, Angela Chatham, and Bryan purchased gifts, and Visa gift cards, to distribute throughout the month to personnel at various facilities. They gave gift cards to Mark Knoll, Administrator at Laurenwood Nursing and Rehabilitation, Ann Mann, Director of Nursing at Laurenwood, Gary Bagwell, a social worker at Mesquite Tree Nursing Center, and various doctors at Treemont Nursing Home, to name a few who received such gifts. The three started by distributing gifts to these facilities, where Dr. White was medical director, since those facilities would be a good source of patient referrals to Hospice Plus. At the time, Bryan was a marketing representative with Hospice Plus. At Dr. White's instruction, Hospice Plus's marketing employees also did this during National Nursing Home Administrator's Week (March), Nurse's Week (May), and Certified Nurse's Aide Week (June) of 2006. These gift cards were in amounts ranging from $10 up to $100. Dr. White had the marketers deliver the more expensive cards to the various administrators and directors of nursing, and less expensive cards to the charge nurses and nursing staff of these

facilities. The purpose of giving all of these cards and gifts was to induce the recipients and the facilities for which they worked to refer patients, including Medicare and Medicaid patients, to Hospice Plus.

126.    In the summer of 2006, Bryan began assisting the marketing manager, Angela Chatham, with hosted lunches at nursing facilities where Dr. White was the medical director. The first lunch Bryan helped host was for the entire staff at Doctor's Nursing Home in Dallas. At the time, Chatham and Bryan didn't have company issued credit cards, so Dr. White would have Kelli White, his sister, who was the accounts payable manager at Hospice Plus, cut a check and give it to Chatham and/or Bryan to cover the meeting or function expenses, or Dr. White would attend with the marketing employees and pay for it himself. The intent of hosting these lunches for the staffs of the nursing facilities was to induce them to refer patients, including Medicare and Medicaid patients, to Hospice Plus. This was well known at Hospice Plus.

127.    Dr. White also had the Hospice Plus marketing employees host free "happy hours" and sponsor parties for referral sources. In the spring and summer of 2007, Dr. White had the marketers host several parties, including a Cinco de Mayo party at Benavides Mexican Restaurant, for the administrators, directors of nursing, and social workers of the nursing homes from whom Hospice Plus was getting patient referrals, including Beth, Director of Nursing at Park Manor, Roy, the Administrator from Red Oak Nursing Home, and Kelly, the Activities Director at Avanté Rehabilitation Center in Irving, to name a few. On another occasion, in about March of 2006, Hospice Plus marketers hosted a big dinner at a Dallas steakhouse for Michael Tobias, who at the time owned several Lexington Independent Living facilities. None of the guests paid

anything for their food or drink, since Hospice Plus had paid for it all. Mr. Tobias and Dr. White subsequently produced a marketing commercial about the quality of care and facilities at the Lexington Independent Living homes. Also, a woman named Susie at Treemont Nursing Home told Bryan that Dr. White took her and some co-workers to Ocean Prime. The purpose of hosting these dinners was to induce the guests to refer patients, including Medicare and Medicaid patients, to Hospice Plus.

128.    Bryan kept gift cards in his pockets whenever he went to any nursing home, assisted living facility, or any other location where he might get patient referrals, and handed them out to staff members as a way of inducing them to give Hospice Plus more patients. The purpose of all of these gift cards, gifts, lunches and parties was to induce the facilities to refer patients to Hospice Plus.

129.    These efforts worked well, as the facilities to whom Hospice Plus gave these gifts, and for whom it purchased the lunches and provided dinners, increased the number of patients they referred to Hospice Plus. As is true of hospice patients in general, more than 95 percent of these patients were insured by Medicare or Medicaid, with the rest being private pay or uninsured patients. Of the 95 percent who were insured by Medicare or Medicaid, the vast majority of them, probably 90 percent, were Medicare patients.

130.    In September or October of 2006, Angela Chatham resigned from Hospice Plus, and Bryan was promoted to Director of Marketing. As Director of Marketing at Hospice Plus, Bryan's job was to increase the number of patients referred to Hospice Plus, find new employees, to continue giving gifts to referral sources as a method of getting new patients, and to find new ways of getting new patient referrals. Bryan

reported directly to Dr. White, who oversaw marketing efforts, including marketing expenses.

131. Every year from 2006 to 2009, Dr. White hosted a Hospice Plus Christmas party, which was usually held in the ballroom at the Renaissance Hotel in Dallas, and the guests included Hospice Plus referral sources. These included Dr. Sam George Thoyakulathu in Bonham, Sheila Halcrow from American Physician Housecalls "(APH"), and other doctors. Before Hospice Plus's November, 2006 Christmas party, at Dr. White's instructions, Bryan went to a "big-box" retail store (a Target, Wal-Mart or Sam's Club) in Mesquite, Texas, to purchase a flat-screen television, and delivered it to Lexington Independent Living on Spankybranch Drive in Dallas for Michael Tobias, its owner. Dr. White instructed Bryan to do this so that Lexington would have the television for its own company Christmas party. Bryan delivered the television, introduced himself, and thanked Tobias's staff for the patients they had been sending Hospice Plus. The purpose of this gift was to reward Dr. Tobias and the staff at Lexington Independent Living for the patients, including Medicare and Medicaid patients, they had been referring to Hospice Plus, and to induce them to refer additional patients, including Medicare and Medicaid patients, to Hospice Plus.

132. American Physicians Housecalls ("APH"), which provided medical and nursing services at patients' homes, had a large presence in the Dallas area, and in 2007 it was an important source of patient referrals for Hospice Plus. Although APH was not a "home health" company or a "hospice" company, it did provide care to home health patients of other companies. APH's doctors and nurses simply made house calls to homebound patients and were therefore an important potential source of patient

referrals for Hospice Plus. Sheila Halcrow was Vice President of Operations for APH. Halcrow and Bryan worked together on patient referrals. Because Bryan had many contacts in the health care industry, he helped Halcrow place home health patients who were dissatisfied with their current home health provider, but who were not qualified for hospice, with other home health companies. In return, Halcrow referred patients who qualified for hospice to Hospice Plus. Additionally, Kirk Short, Chief Operating Officer, and Yale Sage, Chief Executive Officer of APH, would allow Dr. White to review the charts of APH patients to find diagnoses that would qualify them for hospice. Halcrow would then contact the patient's family and explain the benefits of hospice, and would send them to either Hospice Plus or Phoenix Hospice, as instructed by Dr. White. In return for those referrals, Bryan was instructed to give Halcrow gifts such as gift cards, lunches, or whatever item of monetary benefit she requested. On information and belief, Kumar paid for Halcrow to have plastic surgery as a "gift."

133. When Bryan started at Hospice Plus, on information and belief Kumar had already opened a company called Home Health Plus; while Dr. Gene Bigham and Dr. White were operating another company, which on information and belief was Phoenix Hospice. Starting in 2007 and 2008, Halcrow sent patients to both these companies, as she also did to Hospice Plus, which she did either directly or through Bryan, so that all three companies could grow their census. The same marketing schemes of bribes, kickbacks and rewards were used to get patient referrals for all three of these companies.

134. In or about January 2007, Kumar took over the management of the marketing team, and Hospice Plus issued the marketing staff, including Bryan,

individual corporate American Express cards in January or February. On Kumar's instructions, given over time, the marketing staff used their company cards to purchase gift cards, alcohol, expensive dinners for doctors, and other gifts to be given to referral sources in exchange for patient referrals to Hospice Plus.

135.    Shortly after February 2007, Dr. White hired Scott Burkett from American Hospice to join the Hospice Plus marketing department. Over time, Dr. White hired more marketing employees to support these efforts to obtain more patient referrals. The total actual monthly expenses the Hospice Plus marketing team spent on gifts for patient referrals were commonly thousands of dollars. Upon information and belief, from 2007 to 2009, Burkett's company American Express card charges would range from $8,000 - $12,000, much of which was for the purchase of gifts for his solicitation of patient referrals to Hospice Plus. On information and belief, the marketing team collectively would spend in total anywhere from $100,000 to $200,000 a year, thousands of dollars of which were for gifts for patient referrals. In 2009 the Christmas "gifts" alone that Hospice Plus gave to its referral sources and potential referral sources cost more than $30,000. Additionally, in 2010 the Christmas "gifts" were more than $18,000. All of the marketing team members were charging at least $1,000 to $2,000 monthly in "gifts" for patient referrals on their company American Express cards. In early 2007, soon after he was hired, Burkett became Assistant Director of Marketing for the Southern Dallas-Fort Worth Region, while Bryan was responsible for the Northern Dallas - Arlington area. Burkett and Bryan each reported directly to Kumar, and also pitched new marketing concepts to Dr. White. Among other "marketing" strategies, Kumar gave the Bradfield House, an assisted living facility in Mesquite, Texas, an

electric wheelchair for one of its patients. On information and belief, Kumar used his own personal funds for this purchase. Bryan sponsored lunches and open houses at Bradfield, and gave Ann, their Administrator, gift cards, all using his Hospice Plus company American Express card. Ann was married to a Hospice Plus chaplain.

136.    As part of their jobs, every Monday at 10:00 a.m. from 2007 until Bryan left the Dallas office to work outlying areas early in 2010, Burkett and Bryan pitched ideas to Kumar about how to get more patient referrals. Kumar expected Burkett and Bryan to assist with ideas to get patients referred to Hospice Plus.

137.    In October of 2007, while Bryan continued as Director of Marketing for Hospice Plus, Kumar had Bryan form KBryan Consulting, Inc., because Bryan had been spending a large amount of time getting patients for Kumar's new home health companies, including Home Health Plus. KBryan Consulting was paid $100 for each patient Bryan got for Home Health Plus. Bryan obtained these patients mostly from Halcrow at APH. On Kumar's instructions, Bryan created false KBryan consulting time invoices to submit to Home Health Plus so that it would not appear that Home Health Plus was paying Bryan for referrals. These invoices would therefore reflect that Bryan had provided consulting to facilities and doctors including Seven Oaks Nursing Home, St. Paul Hospital, Dr. Abubaker, Dr. Sam George Thoyakulathu, and Dr. Shaw at Red River Regional, Dr. Garrett Price at Medical Center of Plano, Bradfield Assisted Living, UT Southwestern Oncology, Treemont Assisted Living, Dr. Ololade Ries, and many others.

138.    On September 11, 2008, Kelli White emailed Bryan an expense report form and a "sample filled out expense report," which she included "to give Bryan an idea

of what she was looking for." The sample items of expenses that she, Hospice Plus's billing manager, was "looking for" included $200 for a business lunch with doctors, $340 for a "cookout function" at Park Manor Nursing Home, $600 for pizzas at Cedar Hill Nursing Home, $500 for tickets to Cowboys games for the Administrator of Avanté Rehabilitation Center, and $3,000 for a karaoke party for the southern region nursing homes. The purpose of these types of gifts, which Hospice Plus was "looking for" its marketers to give, was to induce the recipients to refer patients, including Medicare and Medicaid patients, to Hospice Plus.

139.    Another of Hospice Plus's schemes to induce patient referrals, which was expressly approved by Kumar or Dr. White, involved offering to provide the services of nurses and/or Certified Nurse's Aides (CNAs) to nursing homes or assisted living facilities. Medicare pays nursing homes (assisted living facilities) a per diem for patients at the nursing home facility who are on hospice. The facility's per diem is for specific services to the patient, which includes a certain amount of nursing care and a certain amount of CNA care, such as emptying bedpans, and helping patients with dressing and feeding. When a patient living in a nursing home is on hospice care, the patient's hospice company, which is a Medicare/Medicaid certified company separate from the nursing home company, is also paid a per diem by Medicare for providing certain items of care, including having a CNA at the facility on three days of the week. On each of those three days, the hospice CNA will typically spend one to two hours to provide the specified care to a given patient. Hospice Plus marketers, including Bryan, would approach a nursing home or an assisted living facility where Hospice Plus had two to four hospice patients, and propose that, as soon as the facility had referred to Hospice

Plus a total of six patients housed at the facility, Hospice Plus would place one of its own nurses or CNAs, or both, at that facility full time (eight hours a day, five days a week, and sometimes seven days a week), as long as that facility would get Hospice Plus more than eight patients at that facility quickly. In other words, Hospice Plus would offer to provide a facility the services of additional staff to help with the facility's work, including providing care to non-Hospice Plus patients, in order to induce patient referrals. Hospice Plus needed a total of eight patients at a facility to justify the cost of placing one full-time CNA there, because the CNAs were contracted with Medicare to provide at least one hour of care for each patient per day. Eight patients would justify one full-time CNA (i.e., 8 patients x 3 days/week/patient X 1-2 hrs. /day = 24 - 48 hours per week = 3 to 6 full days). Hospice Plus, however, offered to put a full time CNA at a facility when it reached only six patients, and sometimes as few as only four patients, as an inducement to receive the majority of referrals from that facility. Hospice Plus made it a condition that the facility get Hospice Plus to at least eight patients at that facility or Hospice Plus would have to pull its CNAs out of that facility. Suddenly pulling a full-time caregiver, and leaving only a part-time person could leave the facility short-staffed, as it takes time to find and hire qualified caregivers. This could potentially put patients' wellbeing at risk. Hospice Plus marketers, including Burkett and Bryan did this from about 2008 to 2010 in all their territories. Hospice Plus did this at Doctors' Nursing Home, Balch Springs Nursing Home, Plaza at Edgemere (now just "Edgemere"), and Mesquite Tree Nursing Home, among others. The purpose of this offer by Hospice Plus of "free" skilled nursing labor was to induce these facilities to refer patients, including

Medicare and Medicaid patients, to Hospice Plus. This scheme resulted in additional patient referrals to Hospice Plus.

140.    From 2008 to 2010, Burkett and Bryan continued to expand territories, with each of them responsible for finding nurses, physicians, and new marketers to continue using these same techniques for soliciting patient referrals. Hospice Plus gave Visa gift cards to, among others, Gary Bagwell, a social worker, and Dee Dee, the Director of Nursing, at Mesquite Tree Nursing Home, Kelly, the Activities Director at Avanté Rehabilitation Center in Irving, and Trackea Scott, a social worker at Balch Springs Nursing Home. Bryan also gave a bottle of vodka about once a month as a gift to Dee Dee at Mesquite Tree Nursing Home, and once gave a bottle of vodka as a gift to the Director of Nursing at Rowlett Nursing Home and Rehabilitation Center. The purpose of these gifts was to induce the recipients and the facilities for which they worked to refer patients, including Medicare patients, to Hospice Plus.

141.    Hospice Plus was most successful in marketing to nursing homes, but it needed help in getting patient referrals from hospitals. So in about 2008, Dr. White had Bryan meet with Traci Tigert, R.N., who, like Burkett, was better at getting referrals from physicians and hospitals. Kumar also sent Bryan to meet with his contacts, who were mostly Indian doctors and others he had worked with in the past, to provide a lunch, deliver paperwork for them, put on a party, or do some other favor for them. Traci would bring her contacts to Kumar, including Dr. Vaqar Dar and Dr. Michael Blackmon, a pulmonologist, who were given positions as "team doctors" with Hospice Plus. Once these doctors had become Hospice Plus team doctors, they would come to Hospice Plus's office to provide Interdisciplinary Team meetings ("IDT's"). Dr. Mark Fleschler, Dr.

Luis Trigo, and Dr. Jeffrey Phillips from Presbyterian Hospital of Dallas were also recruited as team doctors. Although these doctors may have provided care to Hospice Plus patients, Dr. White and Kumar made it clear that they were recruiting these specific doctors so that they would then refer more hospice patients to Hospice Plus. This all occurred from about 2008 to 2010. These Hospice Plus "team doctors" were, on information and belief, paid $3,000 per month. The purpose of these payments, in addition to compensation for whatever medical services the doctors provided, was to induce them to refer patients, including Medicare patients, to Hospice Plus.

142.     Jorge Decena was hired by Dr. White in about 2008 to take over Bryan's Dallas area Hospice Plus accounts, and also as its Spanish speaking representative. Bryan trained Decena, who was a witness to demands for gifts that the facilities would place on Hospice Plus in order for Hospice Plus to continue getting patient referrals. On one occasion, Jorge Decena and Bryan attended a lunch at APH with an APH physician, Dr. Silva. Dr. Silva expressed his anger that Dr. White was reviewing all of APH's patients' charts, and said that he believed that it was wrong, and ended the lunch abruptly. Bryan told Dr. White about the incident and White told Bryan not to go to APH anymore. This was in the late summer, or early fall of 2008.

143.     In August of 2008, in an effort to meet its census goal for that month, Hospice Plus offered its employees a raffle ticket for each patient referral they brought to the company, with a grand prize for the raffle being a trip to Cancun. This offer was announced, in part, with a poster that was put up in Hospice Plus's offices. That poster read:

---

# WANTED

## Community Referrals

### Bring in a referral and receive a ticket for our

### raffle drawing!!!

**Help us achieve our company census goal for the month of August.**

# REWARD*

## Grand Prize: Cancun Trip

### Ask a department head for details

#### * Marketers not included

---

That raffle drawing was later held at a Hospice Company party, which Kelli White, Hospice Plus's Director of Sales and Vice President of Finance and Risk Management, attended.

144.   In late 2008, Hospice Plus began marketing in the Bonham area. There Bryan met Dr. Sam George Thoyakulathu and Dr. Shaw, and gave gifts and lunches to facilities in the area, such as Clyde Cosper Nursing Home. The purpose of these gifts and lunches was to induce the recipients and the facilities for which they worked to refer patients, including Medicare patients, to Hospice Plus.

145.   Hospice Plus also began to focus its marketing and solicitation efforts on the Sherman/Denton area, and the area in between, for sources of patient referrals

whom Bryan would introduce to Kumar. Kumar in turn would have them interview with Dr. White, who would offer them some type of position with Hospice Plus, as, for instance a nurse, or a nurse marketer, to help get patients referred from the facilities where they worked.

146.    In 2009, Hospice Plus, Home Health Plus, and Phoenix Hospice, whose offices had all been housed at Treemont Nursing Home since their establishment, moved into separate offices. The Hospice Plus office moved to Uptown Dallas, as did APH's offices: Hospice Plus moved to the second floor and APH moved to the fourth floor of the same building. There were also other companies that worked with Hospice Plus and APH on the third floor. At this time Kumar sent Bryan back to APH to talk with Sheila Halcrow about getting patients for Kumar's additional new healthcare companies. As had been the longstanding practice, Bryan would go to Halcrow, she would find patients and assist with having APH refer them to Hospice Plus, then Bryan would deliver cash payments to her, which were as much as $2,000 at a time, as well as concert tickets, and other gifts. Frequently, getting these patient referrals from Halcrow and APH, or from another source, was as simple as Bryan going to Kumar, and telling him what the person or facility wanted in return. Kumar would either get it for Bryan to give to that person or facility or, with Kumar's approval, Bryan would purchase it with his Hospice Plus company American Express card. On one or more occasions, on Kumar's instructions, Bryan gave cash to one of these individuals in return for them referring patients to Hospice Plus.

147.    On another occasion, in 2009, Dr. White had Bryan go to Costco and buy Christmas gifts to give to nursing home clients. Bryan bought multiple pallets of

Christmas gift items, such as chocolate, cookie tins, gingerbread houses, wine baskets, cheese and sausage baskets, snowmen figures filled with cookies or other goodies, ticket packages to Stars games, and other items. Bryan had to rent two U-Haul trucks to transport all of these items, and keep them in a storage unit until Hospice Plus personnel could deliver them. Bryan, Burkett, Silas Shelton, Traci Tigert, and others delivered these gifts to nursing homes, assisted living facilities, hospitals and doctors' offices. These included Treemont, Park Manor, Doctors' Nursing Home, Charleton Methodist Hospital, Dr. Fleschler, Dr. Phillips, Dr. Trigo, Villa at Mountain View Nursing Home, Mesquite Tree Nursing Home, Balch Springs Nursing Home, and many others. Hospice Plus gave these gifts to reward the facilities and personnel for the patients, including Medicare and Medicaid patients, they had referred to Hospice Plus, and also to induce them to keep referring such patients to Hospice Plus. These gifts, which were charged to Bryan's company American Express card, totaled approximately $30,000.

148.   In the summer of 2009, Bryan met co-Relator, Franklin Brock Wendt ("Wendt") on a fishing trip with a mutual friend. Wendt and Bryan talked about their jobs and discovered that Wendt had many contacts in areas in which Bryan was being pushed by Hospice Plus to develop new business, including Arlington and Sherman, Texas. Bryan asked Wendt if he would be interested in doing some marketing for Hospice Plus, and told Wendt that he would discuss an opportunity for him with Dr. White and Kumar. About a week later, Hospice Plus hired Wendt on a part time basis as a marketer. Dr. White and Kumar had agreed to pay Wendt a fee of $250 for each patient that he was responsible getting referred to Hospice Plus.

149. Later in 2009, Wendt took Bryan to meet with Khuong Phan, D.O., in Mansfield to discuss Dr. Phan becoming a medical director with Hospice Plus. The three had a couple of lunches at Dr. Phan's office and later Bryan met with Dr. Phan privately and offered him $4,000 a month to become one of Hospice Plus's team doctors, but Dr. Phan declined.

150. Another scheme to get patient referrals from nursing facilities, which was created by Dr. White, involved offering to pay nursing homes in advance for Medicare Part B services. Hospice patients require certain services and supplies, such as room and board and adult diapers. Each month, Medicare pays the hospice provider (such as Hospice Plus) for these supplies and items of service. The hospice provider then reimburses the nursing facility where the patient is housed, which provided these Medicare Part B supplies and services in the first instance. When a patient elects hospice care, (s)he waives the right to Medicare Part B payments. The industry standard is for the hospice provider to pay these monies to the nursing facility after Medicare pays the hospice provider's monthly bill. Those reimbursements are thus, as an industry practice, typically made anywhere from 60 to 90 days after the nursing facility provides the item or service. But Dr. White instructed Hospice Plus marketers to tell the administrators and billing managers of the nursing facilities that Hospice Plus would, within fourteen days of any patient being referred to Hospice Plus and first coming onto Hospice Plus's service, get the nursing facility an advance check for the Part B supplies and services that Hospice Plus estimated the facility would later be owed (when Hospice Plus billed Medicare), and that, Hospice Plus would adjust the facility's next month's Part B reimbursement for any difference between the estimate

and what was actually owed. Dr. White had marketing employees deliver these reimbursement checks to the nursing homes at least once or even twice a month. This inducement worked very well, and brought in more patient referrals, including Medicare and Medicaid patients. Hospice Plus offered to do this for Park Manor Nursing Home, Plaza at Edgemere and Red Oak Nursing Home, among others. This went on from about mid-2007 to 2009.

151. After engaging in these practices for a number of years, Hospice Plus marketers, including Relators, started seeing companies such as Heart to Heart Hospice have their hospice nurses start working nights and weekends at nursing homes as second jobs, so that they could get those nursing homes' patients for their hospice. One of Heart to Heart's nurses, named Kay, worked at Signature Pointe on the Lake, and at Treemont Healthcare and Rehabilitation Center. Bryan was given the task of meeting and recruiting Kay from Heart to Heart so that she would help get new hospice patients referred to Hospice Plus instead. Other hospices were also hosting lunches and engaging in "gifting" practices similar to those of Hospice Plus. Eventually, the nursing homes would actually call Hospice Plus <u>demanding</u> lunches, gift cards, tickets to ballgames, and other gifts or favors for referrals. These included Diane Wheeler, the Administrator of The Plaza Health Services at Edgemere, Lennwood Nursing Home in DeSoto, Park Manor in DeSoto, and others, who would demand that Hospice Plus provide them a pizza lunch once a week. Jorge Decena provided Mexican food lunches on Mondays for Balch Springs Nursing Home, which was charged on Bryan's Hospice Plus company American Express card. If Hospice Plus did not meet these demands, the facilities would send their patient referrals to other hospice companies. For example,

Dawn Kauser, the Administrator at Mesquite Tree Nursing home at the time, called Bryan demanding tickets to the Ranger game that same night. Bryan was at the airport, on his way to a vacation when he got that call. When Bryan told Kauser that he was about to catch a plane, she said "If I don't have these tickets, you don't have any more patients." Bryan made the necessary calls, got her tickets, and had them waiting in her name for pickup at will call.

152. If Bryan had a productive month, with a high number of patient referrals to Hospice Plus, Kumar would let Bryan keep some of the gift cards for himself. On one occasion, Kumar expressed frustration that Sheila Halcrow, at APH, hadn't referred enough patients that month, and asked Bryan to go upstairs and ask her what it would take to get more patients, which Bryan did. Halcrow said she was going on a honeymoon to Mexico, and it would be nice to have some extra cash, which Bryan related to Kumar. Kumar then handed Bryan $2,000 cash and told Bryan to go give it to her, which Bryan did.

153. The fraudulent conduct continued. Hospice Plus hired marketing nurses, who then primarily worked to get patients from their previous employers. These nurses were at Kumar's disposal to do errands and favors for him, such as going to see a particular patient, or going to get orders signed by the doctors who wrote the referrals. Kumar loaned cars to several of these nurses, including Traci Tigert. Kumar owned these cars, but he allowed them to use these cars for any purpose, be it personal or work. Halcrow told Bryan that Kumar had bought her a sporty Cadillac for all the patient referrals she had gotten him, which included patients, including Medicare and Medicaid

patients, for Hospice Plus. These nurses also worked with Remani Kumar ("RKumar"), Kumar's wife, to open new home health and hospice companies.

154. In the fall of 2010, Hospice Plus planned its annual Christmas gifts for its "A," "B," and "C" facilities — which were Hospice Plus's rankings based on the number of patients a source had referred to Hospice Plus. Hospice Plus purchased those gifts, totaling more than $18,000, from Tony Lombardo, a marketing representative from Knockout Specialties in Plano.

155. Over a period of approximately four years, from the time Bryan began his employment with Hospice Plus through the time he began to assist with expanding the business in market areas outside Dallas, Texas, more than 75 percent of the patients referred to Hospice Plus, conservatively, were from sources who received gifts and other items of monetary value either as inducements or rewards for patient referrals.

156. Late in 2010, it was announced that Hospice Plus was for sale, and that Curo, a North Carolina company was considering buying it. A few months later, in early 2011, employees were called into a meeting, and it was announced that Curo was doing a joint venture with Hospice Plus. The marketing department, including Burkett, Julie Summey, Lawrence Eddington, LeAnn Jackson, Jorge Decena, and Bryan, was informed that Curo was very concerned about Hospice Plus's spending habits, especially regarding gift cards, alcohol, massages, and other giveaways. During this meeting, Dr. White and Kumar told everyone that if Hospice Plus needed to sponsor an event, the employees should come directly to White or Kumar, personally, so they could pay the cost, individually, and it wouldn't show up on the company records. The marketing team was told not to continue giving gift cards, alcohol, parties, happy hours,

or other gifts. Dr. White coached Bryan as to what to say in response if questioned about gift card purchases.

157. In early 2011, Burkett and Bryan were called into a meeting with Alice Ann Schwartz, of Curo, and Dr. White regarding Curo's concern about the volume of marketing expenditures by Hospice Plus. Bryan and Burkett were asked what all the gift cards were for, and Bryan said educational purposes, new employees, and supporting other marketers, to which Ms. Schwartz responded, "that works for me."

158. In early to mid-2010, Bryan was given a business development position in Arlington. Bryan focused on developing business in outlying markets, including Keller, Fort Worth, Weatherford, and Cleburne. While Curo was transitioning into Hospice Plus, all of the marketers were required to take a class on what was appropriate and what was not appropriate in healthcare marketing. Bryan failed the test, as Hospice Plus had never provided any training regarding marketing rules to its employees. Dr. White had Bryan retake the test with Jason Brazina, R.N., sitting beside him to make sure that Bryan got the answers correct.

159. Bryan started working the Cleburne area in early 2011. Bryan was worried because the hospices in Cleburne, particularly Mission Hospice, were using similar fraudulent schemes that Hospice Plus had been previously using in Dallas to get referrals. However, Bryan had not used these methods since Curo came on board. Getting referrals was virtually impossible in Cleburne because, if he got a patient, on information and belief, Mission Hospice's physicians would call that patient and threaten to resign as the patient's primary care physician if the patient did not use Mission Hospice.

160.    On March 6, 2012, Richard DalCero, Curo Health Services Vice President for Business Development, sent an email to Bryan, Wendt, Scott Burkett, Jorge Decena, Natalie Spencer, Anthony Flores, and 12 other Hospice Plus employees with a subject of "HCC Fast Start Bonus," a reference to "Health Care Coordinators." In that email, DalCero said:

Texas Team, I spoke with a few of you live line regarding this.

There is an additional March incentive for HCCs (in addition to Delivering Gift incentive). Achieve 130 admits for all of Hospice Plus by March 15 and each HCC will earn an additional $500. Achieve 140 admits by March 15th and the bonus is $600.

As of today in the system we are at 28. 11 admits per day will get us there. I know that is possible.

Good Luck!!

Rich

Richard DalCero
VP Business Development
Curo Health Services
Salt Lake City, Utah
rdalcero@curohs.com

161.    This email communicated Curo Health Services' offer of a cash reward of $500 each, or $600 each, to the entire Hospice Plus Marketing team if they obtained 130 or 140 patient referrals, respectively, by the end of March 2012.

162.    In May of 2012, Bryan received a phone call from Burkett who told Bryan that Kumar wanted Burkett to move to Tyler to open a new office. Bryan immediately called Kumar and Dr. White to ask if he could open the Tyler office instead of Burkett. They agreed, and moved Bryan and his family to Whitehouse, Texas, near Tyler, in June of 2012. Nonetheless, since Bryan was not buying referrals, his position was precarious. The first six months in Tyler, there were no employees, no nurses to take

care of any referrals, no marketing materials, and no access to Hospice Plus email. Bryan was left with no support, and Dr. White and Kumar apparently had quit talking to Bryan, until October 2012. That October, Krista Goodness became Hospice Plus's area manager for Tyler and hired a nurse named Lana to handle Tyler area patients. Bryan worked with Lana for four weeks, during which time Bryan brought two patient referrals, and also a registered nurse and a licensed vocational nurse, who were well respected in the community. Bryan heard from Bob Barker, Administrator of Hospice Plus, that the company might not open a Tyler office. Bryan complained to Curo, but was told that he was being "hostile." On November 12, 2012, Bryan was asked to resign with six months' severance, which he accepted given the alternative of termination and the reality of six months of lease obligations remaining on his residential lease in Whitehouse.

163.     In May of 2013, Kumar and Bryan met in Dallas to discuss the terms of a new job for Bryan with one of Kumar's companies, One Point Home Health (now named One Point Health Services, LLC) ("One Point"). Bryan was told that he was able to come back to work for Kumar because he didn't "spill his guts" about all of their wrongdoings or file a lawsuit against them. He offered Bryan $80,000 per year to work for One Point, which Bryan accepted. A month into this new job, Bryan realized the fraudulent conduct had not stopped since he had started working the outlying areas in late 2010, as Rebecca Wiltes, the director of marketing, told Bryan she was working on getting a Medicare license for One Point. That was a shock to Bryan because Kumar had Bryan handing out marketing brochures that said One Point was a Medicare provider, and the facility was certified by the Joint Commission on Accreditation of Hospital Organizations ("JCAHO"). Bryan expressed concern at a marketing meeting,

blurting out that it was fraud. Kumar was not at that meeting, but Wiltes was, as were Farheen Faisal and an employee named Lonnie. Bryan received a phone call a few days later from Kumar yelling at him for announcing this in a meeting, and for not coming to his office to discuss it with him in private. In mid-July, 2013, Remani Kumar and Brannon Wiltes called Bryan into the office, and said they could no longer afford his salary because he was not bringing in patients, and Bryan was terminated.

164. One Point manages A&S Home Health, Excel Home Health, North Texas Best Home Healthcare, Phoenix Hospice Care, Phoenix Hospice, and Goodwin Hospice. Upon information and belief, Kumar was also obtaining patient referrals for all of these companies, which are owned in full or in part and/or operated by Kumar, in the same manner as described herein for Hospice Plus.

165. On information and belief, in July of 2013, Dr. White asked Sheila Halcrow to transfer patients from Phoenix Home Health to One Point because he was going to transfer Phoenix's Medicare license to One Point. On information and belief, Halcrow refused, and was then fired. On information and belief, the kickback fraud was continuing in July of 2013. On information and belief, Kumar paid Halcrow with checks drawn on his personal bank account for patient referrals to other home health companies owned by Dr. White and Kumar. On information and belief, Dr. White and Kumar have begun to fraudulently extend patient income streams from Medicare. This is accomplished, when a patient is nearing the end of a plan of care, as stated on a CMS-485 form, by having Halcrow transfer the patient to another one of their own companies, with a new CMS-485, showing yet another plan of care, so that they can keep billing Medicare for that patient. On information and belief, Kumar bought Ms.

Halcrow a high priced Cadillac in his name, for all of the patients she had sent him. On information and belief, Beena Kurup, the billing manager for One Point worked weekends during June-July 2013 to fix a big "billing screw up." Kurup asked Halcrow for a computer passcode to get into Phoenix's patient records in order to "fix" nursing entries on the patients' charts, to submit bills to Medicare based on "fixed" patient charts. Virtually all of these home health patients are Medicare or Medicaid patients. Halcrow refused to give Kurup the passcode, but Kurup did get into those patients' charts. On information and belief, Dr. White and Kumar used Halcrow's name as an Administrator of a new home health agency without her permission, and one of Kumar's employed social workers named Stephanie signed Sheila Obrien's (formerly Halcrow) name without Ms. Halcrow's permission or knowledge.

166.    Bryan's paychecks for his work at Hospice Plus were all from a company named "International Tutoring Services."

167.    Defendants Kumar, White, International Tutoring, Curo and Hospice Plus knowingly made or used or caused to be made or used false statements/certifications or records material to a false or fraudulent claim for payment. Further, the evidence proves, objectively, that Defendants (i) had actual knowledge that the claims were false or fraudulent, (ii) acted in deliberate ignorance of the truth or falsity of the claim, (iii) or reckless disregard as to the truth or falsity of the claim.

**B.    Wendt**

168.    Franklin Brock Wendt ("Wendt"), who goes by "Brock", is a Licensed Vocational Nurse ("LVN") and a Registered Nurse ("R.N.") who has worked in intensive care units ("ICU"), emergency rooms ("ER"), operating rooms ("OR"), rehabilitation

nursing for joint replacement and post-surgical patients, as a house supervisor at Medical Center Arlington providing oversight for multiple hospital departments, and also has extensive experience with peripherally inserted central catheter, inserted into peripheral vein near heart ("PICC line insertion"), and in home health, and hospice marketing.

169. After Wendt met Bryan in the summer of 2009 on a fishing trip with a mutual friend, Hospice Plus hired Wendt on an "as needed" ("PRN") basis as a marketer, and agreed to pay him $250 for each patient that he was responsible for referring to Hospice Plus. There were several other marketers at the time, including Corrie, Julie Summey, LeAnn Jackson, Scott Burkett, and Natalie Spencer. Some were paid a salary, plus bonuses for referrals. There were also some, like Wendt, working for "bonus" only. This made their respective marketing jobs very competitive. It was very important to these marketers to keep up with their referrals, and how they were obtained, as other marketers would "steal" them, by taking credit for another marketer's patient referral.

170. Shortly after Wendt began with Hospice Plus, he was advised by Bryan that Dr. White had changed his mind about the terms of Wendt's employment with Hospice Plus, and wanted to put Wendt on a "small salary" plus the $250 bonus per patient. Dr. White wanted to give Wendt more incentive to send referrals in and told Wendt that as long as Wendt was on a little salary it would be *"legal."* So Wendt became a part-time employee of Hospice Plus at $30,000 a year plus $250 bonus for each patient referral he brought in.

171.   On about four or five occasions from 2009 to 2012, Wendt got patient referrals to Hospice Plus by offering a power-lift chair, free of charge, to a debilitated patient, such as a stroke patient, in exchange for that patient agreeing to come with Hospice Plus rather than another hospice agency. When the patient agreed, Wendt would call Kumar, who would arrange for the chair to be delivered to the patient. This also induced facilities to refer to Hospice Plus other patients who had the same need. These facilities included Texoma Health Care in Sherman and Sherman Health Care. The power-lift chairs typically cost from several hundred to a thousand dollars. These were all Medicare patients. Hospice Plus also provided power scooters to at least two patients of whom Wendt was aware, free of charge, in exchange for the patient agreeing to use Hospice Plus for hospice care.

172.   Also, on an ongoing basis, Wendt would visit nursing homes, assisted living facilities, hospitals, group homes, and doctors' offices to provide administrators, nurses, doctors, and other staff with meals and "giveaways" from Bath and Bodyworks or other gifts. Wendt would also regularly invite many of these patient referral sources to manicure-pedicure events, which they could attend free of charge. Those manicures and pedicures cost Hospice Plus from $40 to $100 for each person; in addition, Hospice Plus provided all of its guests/referral sources at these events with unlimited food and drinks. Hospice Plus also put on happy hours for its referral sources at Macaroni Grill, On the Border, and many other restaurants and bars. The invitees and attendees to these manicure-pedicure events, and happy hours, included the Case Managers at: Centennial Medical Center in Frisco, Presbyterian Hospital of Plano, Texoma Medical Center, Presbyterian Hospital of Dallas, Baylor University Medical Center in Dallas, the

Forum at Park Lane Independent and Assisted Living Facility, Plaza at Edgemere (now just Edgemere), Prestonwood Rehabilitation, and many others. Hospice Plus put on these happy hours every week that Wendt was working for the company. These were all paid for with Hospice Plus or Curo Health Services company credit cards. The purpose of these manicure-pedicure events, and happy hours, was to induce the recipients and the facilities for which they worked to refer patients, including Medicare patients, to Hospice Plus.

173.    After joining Hospice Plus in 2009 on a part-time basis, Wendt brought Bryan to meet with Khuong Phan, D.O., in Mansfield to discuss the possibility of Dr. Phan becoming a medical director with Hospice Plus. A nurse Wendt knew, Kristin Eddy, had told Wendt Dr. Phan was a good doctor to target for potential referrals of hospice patients. Wendt had told Bryan about Dr. Phan, and Bryan told Dr. White, who told Bryan that he and Wendt should meet with Dr. Phan about becoming a medical director. Bryan told Wendt that the medical director they had from that area, Dr. Raymond Westbrook, was not sending enough referrals, and they were looking to replace him. Dr. White had explained to Wendt that if a medical director sent just two to three patients each month, then that medical director would be more than paying for their $3,000 monthly salary from Hospice Plus, even if they performed no medical services. Not all of these "medical directors" were recruited and hired solely to perform chart reviews, interdisciplinary team meetings, or to provide patient care. Many of them were hired primarily as a source of patient referrals. Bryan and Wendt met with Dr. Phan twice over lunch at his office, and Bryan met with him again, but Dr. Phan declined the offers to become a Hospice Plus medical director.

174.    In early 2012, Wendt introduced Slade Brown to Kumar. Brown then went to work as a marketer for One Point Home Health (one of Kumar's companies). Brown had been working for Girling Health Care, and had been bringing them about 20 Medicare home health patients each month. Brown had a prior relationship with a group of physicians in Plano that made house calls to homebound patients. Brown suggested that he could introduce Wendt and Kumar to these doctors to solicit hospice patient referrals. Wendt and Kumar met with Brown and these doctors at the doctors' offices in Plano.

175.    After this meeting, Kumar, Brown, and Wendt went to Tupinamba Restaurant in Dallas for lunch. There Kumar offered to hire Brown into One Point Home Health as a marketer at a salary of $90,000 per year, plus bonuses. Brown had with him some intake paperwork on about 20 Medicare home health patients whom he was in the process of bringing into Girling Health Care, his current employer. Kumar offered him $2,000 cash on the spot for those patients. Brown took the cash and gave Kumar paperwork for half of those patients, with the understanding that he would bring Kumar the rest of them when he started at One Point Home Health.

176.    After about a month with One Point Home Health, Brown told Wendt that Kumar was going to have him meet with Rich Dalcero, Vice President of Sales for Curo, because Kumar wanted to hire Brown into Hospice Plus, since Brown had gotten so many patients for One Point. Hospice Plus hired Brown, on information and belief, and paid him on a per-patient-referral basis, or on or salary plus per-patient-referral basis. Later, Brown told Wendt that he had been getting some of his patient referrals for Hospice Plus from Dee Ann, a social worker at Presbyterian Hospital of Denton.

177. Brown also told Wendt that he was getting many of his patients for Hospice Plus from Dr. Warner Massey in Irving. Dr. Massey was part of a group of physicians who made house calls. Brown told Wendt that some of the patients for whom Dr. Massey wrote orders to be admitted to hospice had been previously denied a hospice diagnosis by their own physicians. These were patients in group homes or assisted living facilities whom Brown had gone to see to suggest to them that they become a hospice patient. He would then call those patients' physicians to obtain an order to evaluate the patient for hospice, and if those physicians declined to do so, Brown would have Dr. Massey go to the patient's bedside, evaluate that patient for hospice himself, and write orders for that patient to be admitted to hospice and/or home health. In the case of hospice, Brown would have the patient admitted to Hospice Plus, and for home health, Brown would have them admitted to One Point. On information and belief, One Point Home Health was, at the time, a Medicare-approved provider. On information and belief, all of these patients that Brown was getting for Hospice Plus and One Point Home Health were Medicare or Medicaid patients.

178. In October or November of 2012, Angela Grover, a social worker friend of Wendt's who worked at The Forum at Park Lane, an assisted living and skilled nursing facility, had gotten upset because a Hospice Plus nurse had failed to show up on time to care for a declining patient. Wendt called Kumar to tell him about this, as The Forum was a new account, and a potentially big account. Kumar instructed Wendt to put on a lunch for the facility and to call Juana Beltran, a secretary at Hospice Plus who scheduled its Certified Nurse's Aides ("CNAs") to provide a full time CNA for The Forum. At the time, Hospice Plus had only four patients at The Forum, and so had one

of its CNA's there only three days a week. The goal of putting a CNA at a facility like The Forum full time is to reduce the facility's workload and payroll, as an inducement to get them to refer more patients. Wendt made the arrangements, and provided lunch to the Forum's entire staff, purchasing the lunch with his Curo Health Services company credit card.

179. The next day, Hospice Plus sent a full-time CNA to The Forum, who worked there eight hours a day, Monday through Friday, for several weeks. After a couple of weeks, Kumar and Beltran instructed Wendt to tell The Forum that Hospice Plus had to have a total of eight patients there in order to keep the CNA there full time, and that if they would get Hospice Plus to fourteen patients there, it would provide two full time CNA's. Wendt told Angela Grover this. Although The Forum did continue to refer to Hospice Plus some patients, who were all Medicare patients, it failed to reach eight patients. For this reason, after several weeks, Kumar pulled the full time CNA out of The Forum.

180. In 2012, Anthony Flores, R.N., told Wendt: That he had held several meetings with himself, Kumar, and Dr. Dennis Birenbaum, an oncologist/hematologist who works mainly at Baylor Hospital in Carrollton; that as a result of those meetings, Dr. Birenbaum started living in one of Kumar's houses, Kumar bought Dr. Birenbaum an Audi, and Kumar helped Dr. Birenbaum open up a new cancer center; and that in return, Dr. Birenbaum began referring all of his hospice and home health patients to Hospice Plus and/or One Point Home Health. The majority of these referrals are Medicare or Medicaid patients.

181. In 2010, Wendt persuaded Carla Mercer, R.N., the owner of two group homes, Sanger House and Krum Cottage, to use Hospice Plus as their hospice provider of choice. Hospice Plus had the majority of hospice patients in these group homes from that time forward. These were all Medicare patients.

182. In March of 2013, one of Hospice Plus's CNAs, told Wendt that Traci Houston, R.N., the Director of Operations for Hospice Plus's Lewisville office, had asked her to document in one of Mercer's patient's record visits from this CNA on days this CNA had not visited the patient. This CNA then left Hospice Plus, and went to work for Novus Health, another hospice company. When this CNA left, three of her patients had their care transferred to Novus, as they wanted her to continue as their caregiver. Kumar decided that Hospice Plus had to have this CNA come back to work as its caregiver for Mercer's Sanger House and Krum Cottage facilities, because if she didn't, Hospice Plus could lose all of the patients in those facilities. Kumar instructed Wendt to call this CNA and offer her a $1,000 cash bonus and a $2/hour raise if she would come back to Hospice Plus and bring all her patients with her, all of whom were Medicare patients. This CNA declined. At this time, Kumar was in the process of buying another home health company. So Kumar told Wendt and Anthony Flores, R.N., a Hospice Plus nurse, that he was going to give each of them one-third of this new company, and instructed Wendt to call and tell Carla Mercer, R.N., that he was going to give her the other one-third of the company in exchange for her keeping the patients housed at her facilities with Hospice Plus, and transferring back to Hospice Plus the patients housed at her facilities who had transferred to Novus. Wendt did this, as instructed.

183.    On May 23, 2013 Wendt brought Kumar to a Bone Daddy's restaurant in Arlington to meet with Wendt's friend Jackie Pollard, LVN, about getting more patients for Hospice Plus and One Point Home Health. Pollard works for Enterprise Health Staffing, a nursing staffing agency. In her position as a Care Manager with Enterprise, Pollard is authorized to make patient referrals to home health and hospice agencies. After Pollard explained to Kumar what she does as a Care Manager, Kumar offered her $300 cash for each Medicare patient that she referred to Hospice Plus or One Point Home Health. He also offered her $100 cash for each non-Medicare patient that she referred to either of those entities. As he was telling her this, Kumar pulled out a roll of cash to show her. After Kumar offered Pollard cash for future referrals, Pollard mentioned that she had already sent four patients to Hospice Plus in April and May of 2013. Kumar then handed Pollard $800 cash and thanked her for those referrals. Kumar also told her that he was working on another new hospice company, and that he could therefore potentially pay her more for referrals in the future. Kumar told Pollard to call him before making any referral so that he could instruct her which company to send the patient to. Kumar also told her that, in order to receive her cash payments for referrals, she could call and meet with him, or he would have Wendt deliver the money to her. All of the patients that Pollard had referred to Hospice Plus in April and May of 2013 were hospice patients with Medicare, and virtually all of any future referrals that Pollard would send would also be Medicare patients, which Kumar knew to be the case.

184.    Meetings between Wendt, a potential referral source, and Kumar, where Kumar offered the potential referral source financial incentives including cash for patient referrals, which were virtually all Medicare patients, were held about 20 to 30 times

while Wendt worked for Hospice Plus. These potential referral sources included Amy Dorn, R.N., with 1st Choice Home Health in Denton, Randa Smith, R.N. with 1st Choice Home Health in Denton, Chad Meeks, LVN, Anthony Flores, R.N., and many others.

185. Pursuant to his agreement with Hospice Plus, Hospice Plus paid Wendt bonus pay each month that he was responsible for bringing in more than fourteen patients. Up until August of 2011, when Curo bought Hospice Plus, Hospice Plus paid Wendt $250 for each such patient referral. After August of 2011, Hospice Plus paid Wendt $150 for each such patient referral. Because Wendt hit his target of at least fourteen patient referrals every month, Hospice Plus always paid him some bonus pay. Wendt obtained these patient referrals, more than 90 percent of whom were Medicare patients, and about 10 percent of whom were Medicaid patients, in the manner described above, using bribes and rewards.

186. In his work for Hospice Plus, Wendt regularly assisted its billing staff in making sure claims to CMS for payment were correct. For example, the Director of Operations would have Wendt drop off and pick up signed physicians' orders in order to complete the documentation to support a claim for payment. Sometimes the Director of Operations would tell Wendt that claim information was incorrect or incomplete for a given patient, and would have Wendt get the documentation needed in order to submit the claim.

187. From 2006 to the present, all of Hospice Plus's claims to CMS were submitted electronically. During Wendt's tenure at Hospice Plus, at least 75 percent of the patients, conservatively, referred to it were from sources whom Hospice Plus had offered and/or given gifts or other things of value.

188. All of Wendt's paychecks for his work at Hospice Plus were from a company named "International Tutoring Services," even after Curo bought Hospice Plus.

189. Defendants Kumar, White, International Tutoring, Curo and Hospice Plus knowingly made or used or caused to be made or used false statements/certifications material to a false or fraudulent claim for payment. Further, the evidence proves, objectively, that Defendants (i) had actual knowledge that the claims were false or fraudulent, (ii) acted in deliberate ignorance of the truth or falsity of the claim, (iii) or reckless disregard as to the truth or falsity of the claim.

## XIII. FALSE CLAIMS

190. From 2006 to the present, all of Hospice Plus's claims to CMS were submitted electronically. All of these claims were submitted to CMS by either Hospice Plus, LP, under its own National Provider Identifier ("NPI") number, or under International Tutoring Services, LLC's NPI number. To become approved for electronic claims submissions, Hospice Plus and/or International Tutoring completed, signed and submitted to CMS an Electronic Data Interchange ("EDI") Enrollment Form, which became effective when it was signed by Hospice Plus's and/or International Tutoring's authorized person. The EDI Enrollment form(s) contained a certification that Hospice Plus and/or International Tutoring would acknowledge that all claims later submitted electronically met all of CMS's requirements. Hospice Plus's monthly electronic batch claims were made using an electronic form CMS-1450, which contains an acknowledgement of the consequences of falsifying or misrepresenting essential information for federal payments, as well as a certification for Medicaid that all the

information in the claim is true, and acknowledging the consequences for submitting false claims, statements, documents, or concealing material facts. Virtually all of the periodic submissions for payment to the government by Hospice Plus, whether in its own name or through International Tutoring Services, were false under the False Claims Act, because the requests for payment included patients who had been referred to Hospice Plus in return for the payment of kickbacks, whether bribes or rewards, to the referring organization's management or employees, or the patient.

191. According to the CMS, a hospice is a public agency or private organization, or a subdivision of either, that is primarily engaged in providing care to terminally ill individuals, meets the conditions of participation for hospices, and has a valid Medicare provider agreement. (DHHS Final Rule, Medicare and Medicaid Programs, Conditions of Participation, adopting and amending provisions of 42 CFR § 418 of May 27, 2005, Fed. Reg. Vol. 73, No. 109, June 5, 2008, at 32162). Although some hospices are part of a hospital, nursing home, or home health agency, hospices must separately meet specific Federal requirements and be separately certified and approved for Medicare participation. CMS requires an entity that wishes to participate in the Medicare program to submit a completed 855A claim form "Medicare Federal Health Care Provider/Supplier Applications that will Bill Medicare Fiscal Intermediaries," or Form CMS-855B "Medicare Federal Health Care Provider/Supplier Applications that will Bill Medicare Carriers" to request payment for specific medical services. 42 CFR § 424.32(b). Form 855-A requires the provider to sign a certification that states in relevant part:

I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations,

and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions *(including, but not limited to, the Federal anti-kickback statute and the Stark law),* and on the provider's compliance with all applicable conditions of participation in Medicare.

192. If a provider submits false, inaccurate, or incomplete information on its CMS-855B or CMS-855A Enrollment Application, or if a provider submits a claim to CMS when it knew or should have known that it was not entitled to receive Medicare payment, it has presented of caused to be presented a false claim or made or used or caused to be made or used a false statement/certification or record as defined by the False Claims Act. **Any claim for payment that includes a request for payment for items or services resulting from a violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, constitutes a *per se* false or fraudulent claim for purposes of the False Claims Act. 42 U.S.C. § 1320a-7b(g).** Intent is not an element of an Anti-Kickback Statute violation. 42 U.S.C. § 1320a-7b(h). In addition, in submitting a claim for Medicare reimbursement, the provider certifies that the submitted claim is eligible for Medicare reimbursement and that the provider is in compliance with all Medicare requirements. Due to illegal kickbacks, virtually all claims were ineligible.

193. The Social Security Act at §1862 (a)(22) requires that all claims for Medicare payment must be submitted in an electronic form specified by the Secretary of Health and Human Services, unless an exception described at §1862 (h) applies. In order to submit claims to CMS, or to its Fiscal Intermediary ("FI") contractors, a provider, which includes hospices, must complete an Electronic Data Interchange ("EDI") Enrollment Form and submit it to its designated Medicare Contractor. *Medicare Claims Submission Guidelines*, DHHS Medicare Learning Network Fact Sheet, at 10. The EDI

Enrollment Form contains the following agreement, which must be signed by an

Authorized Individual of the provider:

> The provider agrees to the following provisions for submitting Medicare claims electronically to CMS or to CMS's FI's, Carriers, RHHI's, A/B MAC's, or CEDI:

> **The Provider Agrees:**

> * * *

> 12. That it will acknowledge that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, *and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this Agreement may, upon conviction, may be subject to a fine and/or imprisonment under applicable Federal law*.

EDI Enrollment Form, at 2 (emphasis added). The EDI Enrollment Form further contains

the following admonishment:

> **NOTE:** . . . This document shall become effective when signed by the provider. *The responsibilities and obligations contained in this document will remain in effect as long as Medicare claims are submitted to the FI, Carrier, RHHI, A/B MAC, or CEDI, or other contractor if designated by CMS.*

EDI Enrollment Form, at 3 (emphasis added). The EDI Enrollment Form further contains

the following:

> **ATTESTATION:** Any provider who submits Medicare claims electronically to CMS or its contractors remains responsible for those claims as those responsibilities are outlined on the EDI Enrollment.

*Id.* The EDI Enrollment Form further contains the following signature provision:

> **SIGNATURE:** I certify that I have been appointed an authorized individual to whom the provider has granted the legal authority to enroll it in the Medicare Program, to make changes and/or updates to the provider's status in the Medicare Program (e.g., new practice locations, change of address, etc.), and to commit the provider to abide by the laws, regulations, and the program instructions of Medicare.

*Id*. When a hospice, such as Hospice Plus, enrolls as a Medicare provider via a Form 855A, it affirmatively binds itself to the provisions of the Anti-Kickback Statute and the False Claims Act. When a provider, such as Hospice Plus, enrolls in electronic data interchange, so that it can submit electronic claims for payment to Medicare, it again affirmatively binds itself to the provisions of the Anti-Kickback Statute and the False Claims Act for every such electronic submission of a claim for payment.

194. Based on the acts described above, Defendants Suresh Kumar, Bryan White, M.D., Hospice Plus, LP, and International Tutoring Services, LLC f/k/a International Tutoring Services, Inc., and Curo Health Services, LLC, f/k/a Curo Health Services, Inc., the Payola Defendants:

d. knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval;

b. knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

c. knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government; and

d. conspired to

i. knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval;

ii. knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim; and

iii. knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceal or knowingly and improperly avoid or decrease an

obligation to pay or transmit money or property to the Government.

195. Defendants BE Gentle HomeHealth Inc., also d/b/a Phoenix Home HealthCare, Vinayaka Associates, LLC, d/b/a A&S Home Health Care, Goodwin Home Health Care Services, Inc., Hospice Plus, L.P., Goodwin Hospice, LLC, International Tutoring Services, LLC f/k/a International Tutoring Services, Inc., and d/b/a Hospice Plus, are provider participants ("Medicare Provider Defendants") in the Medicare program, established by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq., which is administered by the Centers for Medicare and Medicaid Services ("CMS") in the Department of Health and Human Services ("DHHS"), agent for the United States. At all times relevant to this Complaint, CMS was an operating division of HHS that administered and supervised the Medicare Program. The Medicare Provider Defendants violated the False Claims Act by making or using or causing to be made or used false statements/certifications in their initial certifications to the Government, and in each required revalidation thereafter.

196. Each of the Defendants knowingly presented, or caused to be presented, false claims for payment to CMS each month, for patients who had been obtained with kickbacks and/or rewards to the referring organization, its managers and/or employees or patients in violation of the Anti-Kickback Statute (42 U.S.C. § 1320a-7b) and/or Stark Act (42 U.S.C. §§ 1395nn(a)(1) and 1396b(s)). Defendants Suresh G. Kumar, R.N. and Bryan K White, M.D., directed the fraudulent schemes described herein and were the principals of Defendant Hospice Plus, LP. Defendants D. Yale Sage, Kirk Short, and Sheila Halcrow a/k/a Sheila Watley/Sheila Taylor/Sheila O'Brien were actively involved and participated in the fraudulent schemes as alleged herein.

197. The Defendants knowingly and deliberately made or used, or caused to be made or used, false or fraudulent records or statements/certifications material to a false or fraudulent claim for payment to the United States in violation of the False Claims Act. 31 U.S.C. § 3729(a)(1)(B). Additionally, Defendants presented or caused to be presented false or fraudulent claims to the State of Texas in violation of Texas laws, as described herein, including the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code § 32.039(a)-(b) and TEX. Hum. Res. Code § 36.002. Defendants' fraudulent schemes and making or use or causing the making or use of false statements/certifications and records resulted in unlawful benefits to Defendants and injury to the United States and the State of Texas.

## XIV. ESTIMATED ACTUAL DAMAGES TO THE UNITED STATES

198. The United States Government, unaware of the falsity of the claims Defendants presented or caused to be presented, or the falsity of the records, and/or statements/certifications Defendants made or used or caused to be made or used, and in reliance on the accuracy thereof, paid such false or fraudulent claims.

199. Medicare's basic reimbursement rates for hospice patients are based on where the patient is housed. There are four categories of reimbursement, with corresponding rates of reimbursement:

Hospice care in home, which is currently $153.45 per patient, per day;

Continuous home full rate (24 hrs.), which is currently $895.56 per patient, per day;

Inpatient Respite Care, which is currently $158.72 ($85.92 of which is subject to a geographic wage adjustment), per patient, per day; and

General Inpatient Care, which is currently $682.59 ($436.93 of which is subject to a geographic wage adjustment), per patient, per day.

42 CFR § 424.302. These basic reimbursement rates, which are paid per patient, per day, are increased by care modifiers. So the reimbursements can go up, depending on the patient's status.

200.   While Relator Bryan was bringing in patient referrals to Hospice Plus, pursuant to which he actually reviewed each incoming patient's face sheet, Hospice Plus's patient population (called a "census") was approximately 90 percent home-based patients and nursing home-based patients, broken out as approximately 60 percent and 40 percent, respectively. Overall, Hospice Plus's Medicare census was about 54% home-based patients, 36% nursing home-based patients, and the remaining 10% were hospital inpatient, and inpatient respite care. Home and nursing home patients have the same baseline reimbursement. On information and belief, with modifiers, the average Medicare reimbursement paid to Hospice Plus from 2006 to 2013 was about $200 per patient, per day, 365 days per year.

201.   When Bryan started at Hospice Plus in January or February of 2006, its patient census was 132. When Bryan left the Dallas metroplex to market to the outlying territories in 2010, its census was about 900. When Wendt started at Hospice Plus in 2009, its patient census was more than 400, and when he left in July of 2013, it was more than 2,000. Hospice Plus's current census is more than 2500, according to the Texas Department of Aging and Disability Services. About 90 percent of all hospice patients, including Hospice Plus's patients, are Medicare or Medicaid, with about 10 percent of those being Medicaid. Assuming the following census growth: 2007: 130; 2008: 350; 2009: 500; 2010: 700; 2011: 900; 2012: 1100; 2013: 1500, the average patient population was 740 patients per year). An estimated 90 percent of those were

Medicare or Medicaid, with 90 percent of those being Medicare. So, on average, there were 600 Medicare and 67 Medicaid patients per year for whom Hospice Plus alone was billing the government. Using the spring of 2005 as a starting point, these figures yield the following calculation of damages to the United States:

600 PATIENTS X $200/DAY X 365 DAYS/YEAR

X 8 YEARS = $350,400,000.00.

202. This does not include the patients that Defendants Kumar and White obtained using the same kickback techniques for Defendants BE Gentle HomeHealth, Inc., also d/b/a Phoenix Hospice, Phoenix Hospice Care, Defendant Goodwin Hospice, and their other hospice and home health entities.

## XV. CAUSES OF ACTION

**Count 1:** **False Claims Act, 31 U.S.C. § 3729(a)(1)(A) SHAM LOAN, EQUITY, AND RENT SCHEME: False or Fraudulent Claims**

**Defendants: BRYAN K. WHITE, M.D.; BE GENTLE HOME, HEALTH, INC. ALSO D/B/A PHOENIX HOME HEALTHCARE; SURESH G. KUMAR, R.N.; HOSPICE PLUS, L.P.; SABARI KUMAR; REMANI B. KUMAR, A/K/A REMANI AMMA; NORTH TEXAS BEST HOME HEALTH; VINAYAKA ASSOCIATES, LLC, D/B/A A&S HOME HEALTH CARE; GOODWIN HOME HEALTHCARE SERVICES, INC.; D. YALE SAGE; KIRK SHORT; SHEILA HALCROW A/K/A SHEILA WATLEY/SHEILA TAYLOR/SHEILA O'BRIEN**

203. Relators restate and re-allege and hereby incorporate by reference each and every allegation contained in preceding paragraphs numbered 1- through 202 of this complaint.

204. Based on the acts described above, including but not limited to

    a) Defendants' violations of the Anti-Kickback Statute 42 U.S.C. § 1320a-7a, by giving or accepting kickbacks, including but not

limited to sham loans, free interests in businesses, and free rent in exchange for patient referrals and re-referrals,

b)      Defendants' violations of the Stark Act by giving or accepting self-interested referrals,

these Defendants:

knowingly presented, or caused to be presented a false or fraudulent claim for payment or approval;

205.    The United States Government unaware of the falsity of the claims Defendants presented or caused to be presented, and in reliance on the accuracy thereof, paid said Defendants for the fraudulent claims.

206.    The United States has suffered damages as a result of Defendants' false and fraudulent claims and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial. In addition, the United States is entitled to a civil penalty of $5,500 to $11,000 for each violation, without regard to or necessity of showing reliance or actual damages.

**Count 2:      False Claims Act, 31 U.S.C. § 3729(a)(1)(A)
PAYOLA SCHEME: False or Fraudulent Claims**

**Defendants: HOSPICE PLUS, LP; INTERNATIONAL TUTORING SERVICES, LLC, F/K/A INTERNATIONAL TUTORING SERVICES, INC., AND D/B/A HOSPICE PLUS; CURO HEALTH SERVICES, LLC F/K/A CURO HEALTH SERVICES, INC.; SURESH KUMAR, R.N.; AND BRYAN K. WHITE, M.D.**

207.    Relators restate and re-allege and hereby incorporate by reference each and every allegation contained in preceding paragraphs numbered 1- through 206 of this complaint.

208.    Based on the acts described above, including but not limited to

a)      Defendants' violations of the Anti-Kickback Statute by giving or accepting kickbacks,

b) Defendants' violations of the Stark Act by giving or accepting self-interested referrals,

these Defendants:

knowingly presented, or caused to be presented a false or fraudulent claim for payment or approval;

209. The United States Government unaware of the falsity of the claims Defendants presented or caused to be presented, and in reliance on the accuracy thereof, paid said Defendants for the fraudulent claims.

210. The United States has suffered damages as a result of Defendants' false and fraudulent claims and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial. In addition, the United States is entitled to a civil penalty of $5,500 to $11,000 for each violation, without regard to or necessity of showing reliance or actual damages.

**Count 3:** **False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**
**SHAM LOANS, EQUITY, AND RENT SCHEME: False**
**Record or Statement**

**Defendants: BRYAN K. WHITE, M.D.; BE GENTLE HOME HEALTH, INC. ALSO D/B/A PHOENIX HOME HEALTHCARE; SURESH G. KUMAR, R.N.; HOSPICE PLUS, L.P.; SABARI KUMAR; REMANI B. KUMAR, A/K/A REMANI AMMA; NORTH TEXAS BEST HOME HEALTH; VINAYAKA ASSOCIATES, LLC, D/B/A A&S HOME HEALTH CARE; GOODWIN HOME HEALTHCARE SERVICES, INC.; D. YALE SAGE; KIRK SHORT; SHEILA HALCROW A/K/A SHEILA WATLEY/SHEILA TAYLOR/SHEILA O'BRIEN**

211. Relators restate and re-allege and hereby incorporate by reference each and every allegation contained in preceding paragraphs numbered 1- through 210 of this complaint.

212. Based on the acts described above, including but not limited to

a) Falsely stating or certifying or causing a false statement or certification that a patient was qualified for hospice services;

b) Fraudulently inducing the United States or its agent to accept a person or an entity's application to participate in Medicare or Medicaid by knowingly and falsely promising with the intent of not performing or causing such a false promise, in a form 855A, 855B or similar document, to comply with all relevant laws, regulations, guidance, or rules;

c) Falsely stating or certifying or causing a false statement or certification in monthly batch reports or similar documents that all services were provided in compliance with all relevant laws, regulations, guidance, or rules;

d) Impliedly falsely certifying compliance or causing an implied certification of compliance with all relevant laws, regulations, guidance or rules, which are express conditions of payment, by presenting or causing to be presented claims for payment,

the Defendants:

knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

213. The United States Government unaware of the falsity of the records or statements Defendants made or used or caused to be made or used, and in reliance on the accuracy thereof, paid said Defendants for the false or fraudulent claims.

214. The United States has suffered damages as a result of Defendants' false and fraudulent claims and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial. In addition, the United States is entitled to a civil penalty of $5,500 to $11,000 for each violation, without regard to or necessity of showing reliance or actual damages.

**Count 4:**   **False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**
**PAYOLA SCHEME: False Record or Statement**

**Defendants: HOSPICE PLUS, LP; INTERNATIONAL TUTORING SERVICES, LLC, F/K/A INTERNATIONAL TUTORING SERVICES, INC., AND D/B/A HOSPICE PLUS; CURO HEALTH SERVICES, LLC F/K/A CURO HEALTH SERVICES, INC.; SURESH KUMAR, R.N.; AND BRYAN K. WHITE, M.D.**

215.   Relators restate and re-allege and hereby incorporate by reference each and every allegation contained in preceding paragraphs numbered 1- through 214 of this complaint.

216.   Based on the acts described above, including but not limited to

a)   Fraudulently inducing the United States or its agent to accept a person or an entity's application to participate in Medicare or Medicaid by knowingly and falsely promising with the intent of not performing or causing such a false promise, in a form 855A, 855B or similar document, to comply with all relevant laws, regulations, guidance, or rules;

b)   Falsely stating or certifying or causing a false statement or certification in monthly batch reports or similar documents that all services were provided in compliance with all relevant laws, regulations, guidance, or rules;

c)   Impliedly falsely certifying compliance or causing an implied certification of compliance with all relevant laws, regulations, guidance or rules, which are express conditions of payment, by presenting or causing to be presented claims for payment the Defendants:

knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

217.   The United States Government unaware of the falsity of the records or statements Defendants made or used or caused to be made or used, and in reliance on the accuracy thereof, paid said Defendants for the false or fraudulent claims.

218.   The United States has suffered damages as a result of Defendants' false and fraudulent claims and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial. In addition, the United States is entitled to a civil

penalty of $5,500 to $11,000 for each violation, without regard to or necessity of showing reliance or actual damages.

**Count 5:**      **False Claims Act, 31 U.S.C. § 3729(a)(1)(C)**
                 **SHAM LOAN, EQUITY, AND RENT SCHEME: Conspiracy**

                 **Defendants: BRYAN K. WHITE, M.D.; BE GENTLE HOME HEALTH, INC. ALSO D/B/A PHOENIX HOME HEALTHCARE; SURESH G. KUMAR, R.N.; HOSPICE PLUS, L.P.; SABARI KUMAR; REMANI B. KUMAR, A/K/A REMANI AMMA; NORTH TEXAS BEST HOME HEALTH; VINAYAKA ASSOCIATES, LLC, D/B/A A&S HOME HEALTH CARE; GOODWIN HOME HEALTHCARE SERVICES, INC.; D. YALE SAGE; KIRK SHORT; SHEILA HALCROW A/K/A SHEILA WATLEY/SHEILA TAYLOR/SHEILA O'BRIEN**

219. Relators restate and re-allege and hereby incorporate by reference each and every allegation contained in preceding paragraphs numbered 1- through 218 of this complaint.

220. Based on the acts described above, including but not limited to

a) Entering an agreement to engage in one or more unlawful schemes, including but not limited to

b) Falsely stating or certifying or causing a false statement or certification that a patient was qualified for hospice services;

c) Fraudulently inducing the United States or its agent to accept a person or an entity's application to participate in Medicare or Medicaid by knowingly and falsely promising with the intent of not performing or causing such a false promise, in a form 855A, 855B or similar document, to comply with all relevant laws, regulations, guidance, or rules;

d) Falsely stating or certifying or causing a false statement or certification in monthly batch reports or similar documents that all services were provided in compliance with all relevant laws, regulations, guidance, or rules;

e) Impliedly falsely certifying compliance or causing an implied certification of compliance with all relevant laws, regulations, guidance or rules, which are express conditions of payment, by presenting or causing to be presented claims for payment the Defendants:

conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(A) (knowingly present or cause to be presented a false or fraudulent claim for payment or approval) or § 3729(a)(1)(B) (knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim)

221. The United States Government unaware of the Defendants' conspiracy and unaware of the falsity of the claims Defendants presented or caused to be presented and unaware of the falsity of the records or statements Defendants made or used or caused to be made or used, and in reliance on the accuracy thereof, paid said Defendants for the false or fraudulent claims.

222. The United States has suffered damages as a result of Defendants' false and fraudulent claims and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial. In addition, the United States is entitled to a civil penalty of $5,500 to $11,000 for each violation, without regard to or necessity of showing reliance or actual damages.

**Count 6:** **False Claims Act, 31 U.S.C. § 3729(a)(1)(C)**
**PAYOLA SCHEME: Conspiracy**

**Defendants: HOSPICE PLUS, LP; INTERNATIONAL TUTORING SERVICES, LLC, F/K/A INTERNATIONAL TUTORING SERVICES, INC., AND D/B/A HOSPICE PLUS; CURO HEALTH SERVICES, LLC F/K/A CURO HEALTH SERVICES, INC.; SURESH KUMAR, R.N.; AND BRYAN K. WHITE, M.D.**

223. Relators restate and re-allege and hereby incorporate by reference each and every allegation contained in preceding paragraphs numbered 1- through 222 of this complaint.

224. Based on the acts described above, including but not limited to

a) Entering an agreement to engage in one or more unlawful schemes, and one or more overt acts were committed in furtherance of the agreement;

b)    Fraudulently inducing the United States or its agent to accept a person or an entity's application to participate in Medicare or Medicaid by knowingly and falsely promising with the intent of not performing or causing such a false promise, in a form 855A, 855B or similar document, to comply with all relevant laws, regulations, guidance, or rules;

c)    Falsely stating or certifying or causing a false statement or certification in monthly batch reports or similar documents that all services were provided in compliance with all relevant laws, regulations, guidance, or rules;

d)    Impliedly falsely certifying compliance or causing an implied certification of compliance with all relevant laws, regulations, guidance or rules, which are express conditions of payment, by presenting or causing to be presented claims for payment

the Defendants:

conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(A) (knowingly present or cause to be presented a false or fraudulent claim for payment or approval) or § 3729(a)(1)(B) (knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim)

225.    The United States Government unaware of the Defendants' conspiracy and unaware of the falsity of the claims Defendants presented or caused to be presented and unaware of the falsity of the records or statements Defendants made or used or caused to be made or used, and in reliance on the accuracy thereof, paid said Defendants for the false or fraudulent claims.

226.    The United States has suffered damages as a result of Defendants' false and fraudulent claims and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial. In addition, the United States is entitled to a civil penalty of $5,500 to $11,000 for each violation, without regard to or necessity of showing reliance or actual damages.

**Count 7:**     **Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.001 et seq.**
              **SHAM LOAN, EQUITY, AND RENT SCHEME: False Claims**

              **Defendants: BRYAN K. WHITE, M.D.; BE GENTLE HOME HEALTH, INC. ALSO D/B/A PHOENIX HOME HEALTHCARE; SURESH G. KUMAR, R.N.; HOSPICE PLUS, L.P.; SABARI KUMAR; REMANI B. KUMAR, A/K/A REMANI AMMA; NORTH TEXAS BEST HOME HEALTH; VINAYAKA ASSOCIATES, LLC, D/B/A A&S HOME HEALTH CARE; GOODWIN HOME HEALTHCARE SERVICES, INC.; D. YALE SAGE; KIRK SHORT; SHEILA HALCROW A/K/A SHEILA WATLEY/SHEILA TAYLOR/SHEILA O'BRIEN**

227. Relators restate and re-allege and hereby incorporate by reference each and every allegation contained in preceding paragraphs numbered 1- through 226.

228. Based on the acts described above, Defendants violated Tex. Hum. Res. Code § 36.002, including but not limited to

    (1) knowingly making or causing to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

    (2) knowingly concealing or failing to disclose information that permitted a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

    (3) knowingly making, causing to be made, inducing, or seeking to induce the making of a false statement or misrepresentation of material fact concerning:

        information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

    (4) except as authorized under the Medicaid program, knowingly paying, charging, soliciting, accepting, or receiving, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product

if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

(5) conspiring to commit a violation of Tex. Hum. Res. Code § 36.002 Subdivision (1), (2), (4), (5), or (13);

(6) knowingly engaging in conduct that constitutes a violation under Tex. Hum. Res. Code Section 32.039(b), including but not limited to

   (a) presenting or causing to be presented to the department [Human Services] a claim that contains a statement or representation the person knows or should know to be false;

   (b) soliciting or receiving, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind for referring an individual to a person for the furnishing of, or for arranging the furnishing of, any item or service for which payment may be made, in whole or in part, under the medical assistance program, provided that this subdivision does not prohibit the referral of a patient to another practitioner within a multispecialty group or university medical services research and development plan (practice plan) for medically necessary services;

   (c) soliciting or receiving, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind for purchasing, leasing, or ordering, or arranging for or recommending the purchasing, leasing, or ordering of, any good, facility, service, or item for which payment may be made, in whole or in part, under the medical assistance program;

   (d) offering or paying, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind to induce a person to refer an individual to another person for the furnishing of, or for arranging the furnishing of, any item or service for which payment may be made, in whole or in part, under the medical assistance program [Tex. Hum Resources Code Sec. 32.001. (Texas Medicaid)], provided that this subdivision does not prohibit the referral of a patient to another practitioner within a multispecialty group or university medical services research and development plan (practice plan) for medically necessary services;

(e) offering or paying, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind to induce a person to purchase, lease, or order, or arrange for or recommend the purchase, lease, or order of, any good, facility, service, or item for which payment may be made, in whole or in part, under the medical assistance program;

(f) providing, offering, or receiving an inducement in a manner or for a purpose not otherwise prohibited by this section or Section 102.001, Occupations Code, to or from a person, including a recipient, provider, employee or agent of a provider, third-party vendor, or public servant, for the purpose of influencing or being influenced in a decision regarding:

(A) selection of a provider or receipt of a good or service under the medical assistance program;

(B) the use of goods or services provided under the medical assistance program; or

(C) the inclusion or exclusion of goods or services available under the medical assistance program; or
. . .

(g) engaging in conduct that violates Section 102.001, Occupations Code including but not limited to

(A) knowingly offering to pay or agreeing to accept, directly or indirectly, overtly or covertly any remuneration in cash or in kind to or from another for securing or soliciting a patient or patronage for or from a person licensed, certified, or registered by a state health care regulatory agency.

229. The State of Texas, by and through the Texas Medicaid program and other State healthcare programs, and unaware of the Defendants' fraudulent and illegal practices, paid the claims presented or caused to be presented by Defendant health care providers.

230. Compliance with applicable Federal and State laws cited herein was a condition of payment of claims presented to the State of Texas.

231. As a result of the Defendants' violations of Tex. Hum. Res. Code § 36.002, the State of Texas has been damaged to the extent of millions of dollars, exclusive of interest.

232. Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Tex. Hum. Res. Code § 36.101 on behalf of themselves and the State of Texas.

> **Count 8:** **Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.001 et seq.**
> **PAYOLA SCHEME: False Claims**
>
> **Defendants: HOSPICE PLUS, LP; INTERNATIONAL TUTORING SERVICES, LLC, F/K/A INTERNATIONAL TUTORING SERVICES, INC., AND D/B/A HOSPICE PLUS; CURO HEALTH SERVICES, LLC F/K/A CURO HEALTH SERVICES, INC.; SURESH KUMAR, R.N.; AND BRYAN K. WHITE, M.D.**

233. Relators restate and re-allege and hereby incorporate by reference each and every allegation contained in preceding paragraphs numbered 1- through 232.

234. Based on the acts described above, Defendants violated Tex. Hum. Res. Code § 36.002, including but not limited to

(1) knowingly making or causing to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(2) knowingly concealing or failing to disclose information that permitted a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(3) knowingly making, causing to be made, inducing, or seeking to induce the making of a false statement or misrepresentation of material fact concerning:

information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

(4)   except as authorized under the Medicaid program, knowingly paying, charging, soliciting, accepting, or receiving, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

(5)   conspiring to commit a violation of Tex. Hum. Res. Code § 36.002 Subdivision (1), (2), (4), (5), or (13);

(6)   knowingly engaging in conduct that constitutes a violation under Tex. Hum. Res. Code Section 32.039(b), including but not limited to

(a)   presenting or causing to be presented to the department [Human Services] a claim that contains a statement or representation the person knows or should know to be false;

(b)   soliciting or receiving, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind for referring an individual to a person for the furnishing of, or for arranging the furnishing of, any item or service for which payment may be made, in whole or in part, under the medical assistance program, provided that this subdivision does not prohibit the referral of a patient to another practitioner within a multispecialty group or university medical services research and development plan (practice plan) for medically necessary services;

(c)   soliciting or receiving, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind for purchasing, leasing, or ordering, or arranging for or recommending the purchasing, leasing, or ordering of, any good, facility, service, or item for which payment may be made, in whole or in part, under the medical assistance program;

(d)   offering or paying, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind to induce a person to refer an individual to another person for the furnishing of, or for arranging the furnishing of, any item or service for which payment may be

made, in whole or in part, under <u>the medical assistance program [Tex. Hum Resources Code Sec. 32.001. (Texas Medicaid)]</u>, provided that this subdivision does not prohibit the referral of a patient to another practitioner within a multispecialty group or university medical services research and development plan (practice plan) for medically necessary services;

(e)    offering or paying, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind to induce a person to purchase, lease, or order, or arrange for or recommend the purchase, lease, or order of, any good, facility, service, or item for which payment may be made, in whole or in part, under the medical assistance program;

(f)    providing, offering, or receiving an inducement in a manner or for a purpose not otherwise prohibited by this section or Section 102.001, Occupations Code, to or from a person, including a recipient, provider, employee or agent of a provider, third-party vendor, or public servant, for the purpose of influencing or being influenced in a decision regarding:

    (A)    selection of a provider or receipt of a good or service under the medical assistance program;

    (B)    the use of goods or services provided under the medical assistance program; or

    (C)    the inclusion or exclusion of goods or services available under the medical assistance program; or
. . .

(g)    engaging in conduct that violates Section 102.001, Occupations Code including but not limited to

    (A)    knowingly offering to pay or agreeing to accept, directly or indirectly, overtly or covertly any remuneration in cash or in kind to or from another for securing or soliciting a patient or patronage for or from a person licensed, certified, or registered by a state health care regulatory agency.

235.    The State of Texas, by and through the Texas Medicaid program and other State healthcare programs, and unaware of the Defendants' fraudulent and illegal

practices, paid the claims presented or caused to be presented by Defendant health care providers.

236. Compliance with applicable Federal and State laws cited herein was a condition of payment of claims presented to the State of Texas.

237. As a result of the Defendants' violations of Tex. Hum. Res. Code § 36.002, the State of Texas has been damaged to the extent of millions of dollars, exclusive of interest.

238. Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Tex. Hum. Res. Code § 36.101 on behalf of themselves and the State of Texas.

## XVI. PRAYER - STATE LAW VIOLATIONS

239. WHEREFORE Relators respectfully request that this Court accept supplemental jurisdiction of the related State causes of action herein as they are predicated upon the same facts as the federal causes of action and merely assert separate damages to the State of Texas in the operation of its Medicaid program.

240. Relators further request this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF TEXAS:

(1) Two times the amount of actual damages which the State of Texas has sustained as a result of each Defendant's fraudulent and illegal practices;

(2) A civil penalty as described in Tex. Hum. Res. Code § 36.025(a)(3) for each false claim which the Defendants caused to be presented to the state of Texas;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATORS:

(1)    A fair and reasonable amount allowed pursuant to Tex. Hum. Res. Code § 36.110, and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## XVII. PRAYER - FEDERAL LAW VIOLATIONS

241.    On behalf of the United States Government, Relators seek to recover monetary damages equal to three (3) times the damages suffered by the United States Government. In addition, Relators seek to recover all available civil penalties on behalf of the United States Government in accordance with the False Claims Act.

242.    Relators seek, for their contribution to the government's investigation and recovery, to be awarded a fair and reasonable whistleblower award as provided by 31 U.S.C. § 3730(d) of the False Claims Act;

243.    Relators seek to be awarded all costs and expenses for this action, including statutory attorneys' fees and expenses, as well as court costs from the Defendants.

244.    Pre-judgment interest at the highest rate allowed by law and post-judgment interest as applicable.

WHEREFORE, Relators pray that Defendants be cited to appear and answer herein, and that upon final determination of these causes of action, this District Court enter judgment on behalf of the United States and Relators and against all Defendants for the following:

a.      Damages in the amount of three (3) times the actual damages suffered by the United States Government as a result of the Defendants' conduct;

b.      Civil penalties against the Defendants, respectively, equal to $11,000 for each violation of 31 U.S.C. 3729;

c.      Relators be awarded the fair and reasonable Relator's Share to which they are entitled under 31 U.S.C. § 3730(d);

d.      Relators be awarded all costs and expenses of this litigation, including statutory attorneys' fees and expenses, as well as costs of court;

e.      Pre-judgment and post-judgment, as appropriate, interest at the highest rate allowed by law; and

g.      All other relief on behalf of Relators or the United States Government to which they may be justly entitled, under law or in equity, which the District Court deems just and proper.

### Request for Jury Trial

Relators respectfully request a trial by jury as they are accorded under Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment of the U. S. Constitution.

Dated: May 8, 2014.

UNITED STATES OF AMERICA, ex rel. Sean Capshaw,
Kevin Bryan, and Franklin Brock Wendt

Respectfully submitted,

TED B. LYON & ASSOCIATES, P.C.

By: _____
**TED B. LYON**
State Bar No. 12741500
tblyon@tedlyon.com
**MARQUETTE WOLF**
State Bar No. 00797685
mwolf@tedlyon.com
RICHARD MANN
State Bar No. 24079640
rmann@tedlyon.com
18601 LBJ Freeway, Suite 525
Mesquite, Texas 75150
Phone (972) 279-6571
Fax    (972) 279-3021

CAPSHAW & ASSOCIATES

By: _____
RICHARD A. CAPSHAW
State Bar No. 03783800
3031 Allen Street , Suite 201
Dallas, Texas 75204
(214) 761-6610
(214) 761-6611 Facsimile
richard@capslaw.com

*ATTORNEYS FOR RELATOR*
*CHRISTOPHER SEAN CAPSHAW*

BOYD & ASSOCIATES

By: _____ w permission
Samuel L. Boyd, P.C.                             cq
SBOT # 02777500
Catherine C. Jobe
SBOT # 10668280
6440 North Central Expressway
Suite 600
Dallas, Texas 75206-4101
Telephone (214) 696-2300
Facsimile (214) 363-6856
sboyd@boydfirm.com

MARCHAND & ROSSI, L.L.P.

By: _____
David V. Marchand
State Bar No. 00791173
Victoria M. Rossi
State Bar No. 24053697
10440 North Central Expressway, Suite 1425
Dallas, Texas 75231
TEL: (214) 378-1043
FAX: (214) 378-6399
dave@mrlaw.com
victoria@mrlaw.com

*ATTORNEYS FOR RELATORS KEVIN*
*BRYAN AND FRANKLIN BROCK WENDT*

UNITED STATES OF AMERICA, ex rel. Sean Capshaw, Kevin Bryan, and Franklin Brock Wendt

Respectfully submitted,

**TED B. LYON & ASSOCIATES, P.C.**

By:_____
**TED B. LYON**
State Bar No. 12741500
tblyon@tedlyon.com
**MARQUETTE WOLF**
State Bar No. 00797685
mwolf@tedlyon.com
RICHARD MANN'
State Bar No. 24079640
rmann@tedlyon.com
18601 LBJ Freeway, Suite 525
Mesquite, Texas 75150
Phone (972) 279-6571
Fax    (972) 279-3021

**CAPSHAW & ASSOCIATES**

By:_____
**RICHARD A. CAPSHAW**
State Bar No. 03783800
3031 Allen Street , Suite 201
Dallas, Texas 75204
(214) 761-6610
(214) 761-6611 Facsimile
richard@capslaw.com

*ATTORNEYS FOR RELATOR*
*CHRISTOPHER SEAN CAPSHAW*

**BOYD & ASSOCIATES**

By: _____
Samuel L. Boyd, P.C.
SBOT # 02777500
Catherine C. Jobe
SBOT # 10668280
6440 North Central Expressway
Suite 600
Dallas, Texas 75206-4101
Telephone (214) 696-2300
Facsimile (214) 363-6856
sboyd@boydfirm.com

**MARCHAND & ROSSI, L.L.P.**

By:_____
David V. Marchand
State Bar No. 00791173
Victoria M. Rossi
State Bar No. 24053697
10440 North Central Expressway, Suite 1425
Dallas, Texas 75231
TEL: (214) 378-1043
FAX: (214) 378-6399
dave@mrlaw.com
victoria@mrlaw.com

*ATTORNEYS FOR RELATORS KEVIN*
*BRYAN AND FRANKLIN BROCK WENDT*

# CERTIFICATE OF SERVICE

On May 8, 2014 a copy of Relators' proposed Joint Amended Complaint was served upon US Attorney Sarah Saldana, Assistant U.S. Attorney Lynette S. Wilson for the United States District Court for the Northern District of Texas, Dallas Division.

On May 8, 2014 a copy of Relator's Joint Amended Complaint, filed under seal, was served as follows in accordance with the Federal Rules of Civil Procedure:

Sarah R. Saldana
United States Attorney
Northern District of Texas
1100 Commerce St., Third Floor
Dallas, TX 75242
sarah.saldana@usdoj.gov

Lynette S. Wilson
Assistant United States Attorney's Office
1100 Commerce St., Third Floor
Dallas, TX 75242-1699
214.659.8611
Lynette.Wilson@usdoj.gov

Gwen Byers, Investigator
US Attorney's Office
1100 Commerce St., Third Floor
Dallas, TX 75242
Gwen.g.byers@usdoj.gov

Greg Abbott
Attorney General of Texas
Office of the Attorney General
PO Box 12548
Austin, TX 78711

W. Rick Copeland, Director
Medicaid/Medicare Fraud Control Unit
Office of the Attorney General
PO Box 12307
Austin, TX 78711

Dallas office for Medicaid Fraud
James Hughes, Investigative Manager
Richard Hill, Investigative Manager
1230 River Bend Drive, Suite 200
Dallas, TX 75247

Mark Coffee
Assistant Attorney General
P.O. Box 12458
Austin, TX 78711-2458
300 W. 15th Street, 9th Floor
Austin, TX 78701

On May 8, 2014, a copy of Relators' Joint Amended Complaint filed under seal was formally served pursuant to FRCP 4(i)(1)(b), via Certified Mail, Return Receipt Requested, upon:

Eric Holder
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

Samuel Boyd