IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *ex rel.* CHRISTOPHER CAPSHAW, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:12-CV-4457-N |
| | § | |
| BRYAN L. WHITE, M.D. and | § | |
| SURESH G. KUMAR, R.N., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION ORDER

This Order addresses Defendant Suresh Kumar's motion to dismiss the Government's complaint in partial intervention [344]. For the reasons stated below, the Court denies the motion.

## I. ORIGINS OF THE DISPUTE

The substance of this case can be boiled down to a straightforward question: did Defendants Bryan L. White and Suresh G. Kumar make payments to a health care organization in exchange for referrals of Medicare patients?

The two men owned a family of hospice companies operating in North Texas. Before joining forces, Kumar was a registered nurse in hospice care; White, a doctor. The Government alleges that shortly after the two formed their hospice businesses in 2007, they got in contact with a home care company called American Physician Housecalls ("APH"). APH was allegedly in great financial distress at the time and needed support. So, the Government claims that Kumar, White, and APH struck a deal: Kumar and White would

ORDER – PAGE 1

transfer money and equity to APH in exchange for referral of APH's Medicare patients. This arrangement allegedly resulted in almost $3 million going to APH, and over 70% of APH's Medicare patients going to Kumar and White's businesses. Things came to a halt when APH filed for bankruptcy in 2012 and stopped functioning as a referring entity.

The Government argues that this scheme constitutes fraud under the federal Anti-Kickback Statute ("AKS"). 42 U.S.C. § 1320a-7b. The Government further states that because these referrals were illegal, a large number of Medicare claims that White and Kumar presented to the Government for payment should be considered fraudulent under the False Claims Act ("FCA"). 31 U.S.C. § 3729(a)(1).

For the past six years this case has meandered through a complicated web of court procedures. Christopher Capshaw filed the first complaint in this matter in 2012. Separate relators filed a complaint in 2013. Capshaw consolidated the complaints in 2014, and filed an amended complaint in 2015. Up until 2016, the Government declined to intervene on the Capshaw's behalf. In October 2016, however, the Government moved to intervene against only Defendants White and Kumar.

On January 23, 2017, the Court issued an order that: (1) dismissed three individuals as relators; (2) dismissed the claims against White and Kumar in their individual capacities; (3) dismissed the conspiracy claims against all other Defendants; (4) gave Capshaw thirty (30) days to cure the deficiencies noted in his complaint; and (5) denied the Government's motion to intervene as moot. On reconsideration in April 2017, however, the Court permitted the Government to partially intervene as to Kumar and White. The Government

subsequently filed a complaint against Kumar and White.  Kumar now moves to dismiss the

Government's complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).

## II. LEGAL STANDARDS

### A. The AKS Standard

The AKS is a far-reaching statute.  It prohibits any individual or entity from soliciting

or receiving any kind of remuneration — be it cash or in-kind, direct or indirect, covert or

overt — in exchange for the referring, arranging, purchasing, or ordering of any good,

service, facility or item "for which payment may be made in whole or in part under a Federal

health care program." 42 U.S.C. § 1320(b)(1)(A)-(B).  As long as *any* part of the transaction

was intended to induce referrals, the transaction violates the law.  *United States v. Davis*, 132

F.3d 1092, 1094 (5th Cir. 1998).

### B. The FCA Standard

AKS and FCA violations frequently go hand-in-hand.  The FCA allows for the award

of treble damages against a person who:

> (A)  knowingly presents, or causes to be presented, to the United States Government a false or fraudulent claim for payment or approval;
>
> (B)  knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; or
>
> (C)  conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

31 U.S.C. § 3729(a)(1)(A)–(C). To act "knowingly" under the FCA means that the defendant either submitted the claim with actual knowledge that the information was false, or acted in deliberate ignorance or reckless disregard of the truth. 31 U.S.C. § 3729(b)(1)(A).

"Because compliance with the AKS . . . is a condition of payment for Medicare and Medicaid, claims submitted for services rendered in violation of these statutes may be 'false or fraudulent' for the purposes of the FCA." *United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F.Supp. 2d 654, 663 (S.D. Tex. 2013); *see also United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899 (5th Cir. 1997) (holding that an AKS violation may support a claim under the FCA under a false certification theory).

Whether an alleged AKS violation actually does form the basis of a FCA claim, however, depends on a court's determination of whether or not the violation is "material;" that is, whether the violation has the "natural tendency to influence, or be capable of influencing, the payment or receipt of money or property" from the Government. *Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016). Importantly, under *Escobar,* "whether a provision is labeled as a condition of payment . . . is not dispositive of the materiality inquiry." *Id.* at 2001. Not every violation of law is necessarily material. The critical question is whether the Government's decision to issue payment would change had it known of the transgression. *Id.* at 2003-04.

### C. *Legal Standard on a Motion to Dismiss*

When considering a Rule 12(b)(6) motion to dismiss, a court must determine whether the plaintiff has asserted a legally sufficient claim for relief. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995). A viable complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To meet this "facial plausibility" standard, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court generally accepts well-pleaded facts as true and construes the complaint in the light most favorable to the plaintiff. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir. 2012). But a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. (internal citations omitted).

Because the Government's claims here sound in fraud, Rule 9(b)'s heightened pleading requirements apply. The Government thus must "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). "At a minimum, the 'who, what, when, where, and how' of the fraud must be laid out." *In re Parkcentral Glob. Litig.*, 884 F. Supp. 2d 464, 470 (N.D. Tex. 2012) (quoting *Williams v. WMX Techs., Inc.*,

112 F.3d 175, 178 (5th Cir. 1997)).  This standard must be met for *each* defendant.  "It is impermissible to make general allegations that lump all defendants together; rather, the complaint must segregate the alleged wrongdoing of one from another."  *Id.*

To avoid dismissal, the Government's complaint therefore must sufficiently plead: (a) that Kumar violated the AKS; (b) that those violations formed the basis of claims that Kumar presented to the Government for payment; (c) that Kumar "knowingly" presented those claims under the FCA; and (d) that those violations were material under *Escobar*.

### III.  THE COURT DENIES KUMAR'S MOTION TO DISMISS

#### A.  *The Government Sufficiently Alleges that Kumar Violated the AKS*

The Government alleges that Kumar violated the AKS by issuing loans and equity to APH that amounted to nearly $3 million, in exchange for referrals of APH's Medicare patients.  United States' Compl. in Partial Intervention, ¶ 249 [311] ("Compl.").  The Government's complaint painstakingly tracks the flow of loans to and referrals out of APH from September 2007 to May 2012.  *Id.* at ¶¶ 134 –249.  In doing so, they cite thirty (30) different short term loans that Kumar and White's businesses granted APH, and allege that the duo received over 70% of APH's Medicare hospice patients through referrals.

Taking these allegations at face value, the Government has certainly done more than merely provide a "formulaic recitation of the elements." *Twombly*, 550 U.S. at 555 (internal citations omitted).  If true, its allegations plausibly place Kumar in the middle of a scheme at odds with the AKS.

### B. The Government Sufficiently Alleges that
### Kumar Presented False Claims to the Government

The complaint further alleges that Kumar violated the FCA by submitting Medicare claims that were tainted by the illegal referrals. Compl. ¶¶ 2–3. In support, the Government points to at least twenty-four (24) specific examples of patient referrals that resulted in the submission of at least 180 Medicare claims. *Id.* at ¶¶ 150–55, 163–65, 200–02, 206–10, 212–17, 219–23, 225–34. In sum, the Government alleges that over $18 million was paid out in Medicare claims based on illegally referred patients. *Id.* at ¶ 3. These are specific, fact-supported allegations leaps above the sort of conclusory finger-pointing that *Twombly, Iqbal,* and Rule 9(b) prohibit. Thus, the Court holds that the Government's complaint sufficiently alleges that Kumar presented false claims to the Government for payment in violation of the FCA.

### C. The Government Sufficiently Alleges that Kumar
### Knowingly Presented False Claims to the Government

The Government's complaint also clears the next elemental hurdle: plausibly showing that Kumar knowingly presented the Medicare claims. As discussed above, scienter under the FCA includes actual knowledge, but is not restricted to it. 31 U.S.C. § 3729(b)(1)(A). Knowledge may also be established by showing that the defendant acted in either deliberate ignorance or reckless disregard of the truth. *Id.* The Government repeatedly suggests that Kumar signed several documents that certified his business was complying with the AKS, despite his involvement in gaining referrals from APH. Compl. ¶¶ 60–64, 73–78. The

Government also outlines Kumar's experience and familiarity with the hospice care business. *Id.* at ¶¶ 120–24. Taking these allegations as true, one can plausibly infer that — at the very least — Kumar acted in either deliberate ignorance or reckless disregard that his certifications of lawfulness were false. Thus, the Court holds that the Government's complaint sufficiently alleges that Kumar knowingly presented false claims to the Government for payment.

### D. *The Government Sufficiently Alleges that the AKS Violations Were Material*

The Supreme Court's decision in *Escobar* presents this Court with a somewhat novel question: are AKS violations inherently "material"? While the Fifth Circuit and this district have yet to tackle this issue, the Southern District of New York has. It held that AKS violations are material under *Escobar* for three key reasons:

> First, violation of the AKS is a far cry from an "insubstantial" regulatory violation like, say, requiring "that [government] contractors buy American–made staplers" rather than foreign staplers. Indeed, Congress has made it a felony offense punishable by up to five years in prison, and, as noted, the law now provides explicitly that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim. Second, Medicare Part D Provider Agreements and the majority of state Medicaid Provider Applications expressly designate AKS compliance as a condition of payment. And third, neither Allergan nor PhRMA points to evidence that the Government pays Medicaid or Medicare claims in full despite actual knowledge of AKS violations. In fact, the Government has actively pursued FCA actions and criminal proceedings to deter and punish AKS violations and recoup funds.

*United States ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 818 (S.D.N.Y. 2017), *rev'd on other grounds*, 889 F.3d 163, (2d Cir. 2018) (citations omitted).[1]

The Court finds all three of these reasons to be on point and persuasive. AKS violations are the not "garden-variety breaches of contract or regulatory violations" that the Supreme Court sought to shield from the wrath of the FCA. *Escobar*, 136 S.Ct. at 2003. They are serious, consequential, felony transgressions of law that the Government actively enforces. Every indication is that this is precisely the kind of violation the FCA is supposed to reach. The Court declines to expand *Escobar's* protection to AKS violations, and holds that the Government sufficiently alleges materiality.

### E. The Government did not Violate Rule 9(b) Group Pleading Requirements

The Fifth Circuit and this district have clearly spelled out Rule 9(b)'s group pleading requirements. Parties cannot merely "lump all defendants together." *In re Parkcentral Glob. Litig.*, 884 F.Supp. 2d at 470. There has to be some work that "segregate[s] the alleged wrongdoing of one from another." *Id.* at 471; *see also United States ex rel. Hebert v. Dizney*, 295 Fed. Appx. 717, 722 (5th Cir. 2008) (holding that parties must identify "specific

---

[1] While the Southern District later pointed out in *United States ex rel. Forcier v. Computer Sciences Corporation* that most courts in the Second Circuit have strayed from *Wood's* mention that "[a]fter *Escobar*, liability under the implied certification theory does not . . . require a showing that the submitted claims amount to misleading half–truths," it did not take issue with *Wood's* application of *Escobar* to AKS violations. 2017 WL 3616665 at *12 (S.D.N.Y. Aug. 10, 2017) (quoting *Wood*, 246 F. Supp. 3d at 815–816). In fact, *Wood's* materiality analysis has been relied on by courts facing the same question. *See United States v. Berkeley Heartlab, Inc.*, 2017 WL 6015574 at *2 (D.S.C. Dec. 4, 2017) (holding "AKS compliance is material to payment decisions in all cases.").

action[s] of specific individuals at specific times that would constitute fraud against the government").

The Government's complaint does just that. The complaint describes White's background as a physician. Compl. ¶ 120. It describes Kumar's background as a registered nurse. *Id.* at ¶ 121. It describes how the two joined forces and formed several hospice businesses. *Id.* at ¶¶ 122–25. And, in great length, it describes how this business relationship fed into the alleged law breaking scheme, making sure to single out how both White and Kumar played a role along the way.[2] *Id.* at ¶¶ 135–248. Indeed, this is not a case where the complaint defined one defendant as including both without doing any work. Thus, the Court holds that the Government's complaint does not run afoul of Rule 9(b)'s group pleading requirements.

## CONCLUSION

Because the Government's complaint makes a plausible claim for liability under the FCA, the Court denies Kumar's motion to dismiss.

Signed November 20, 2018.

_____
David C. Godbey
United States District Judge

---

[2] For example, the Government points to instances where Kumar delivered checks to APH personnel, *see e.g. Id.* at ¶ 192, and signed Medicare documents certifying compliance with the law. *See e.g. Id.* at ¶¶ 69,70,71,76.